IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ROBBIE EMERY BURKE, as Special Administratrix of the Estate of BILLY WOODS, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.: 18-CV-108-RAW |
| (1) MUSKOGEE COUNTY COUNCIL OF YOUTH SERVICES ("MCCOYS"), a Domestic Not-for-Profit Corporation, *et al.,* | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT JERROD LANG'S
MOTION FOR SUMMARY JUDGMENT (DKT. 152)**

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA # 19943
danielsmolen@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
SMOLEN & ROYTMAN, PLLC
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone: (918) 585-2667
Facsimile: (918) 585-2669
*Attorneys for Plaintiff*

April 4, 2019

# TABLE OF CONTENTS

Page

Table of Authorities...............…..……………….………….....................................ii

Introductory Statement...……..…………………………....……………............1

LCvR 56.1(c) Statement…………………………………….....................................4

ARGUMENT...…………………………………..………………….………....14

    LANG IS NOT ENTITLED TO SUMMARY JUDGMENT ON
    PLAINTIFF'S CONSTITUTIONAL CLAIMS (BROUGHT
    PURSUANT TO 42 U.S.C. § 1983.....................................................................14

    A. As the Employee of a Private Entity, Lang Cannot Assert a Qualified
        Immunity Defense..............................................................................14

    B. There is Ample Evidence of Lang's Deliberate Indifference to Billy's
        Health and Safety..............................................................................15

        1. There is Significant Evidence of Deliberate Indifference Applying
            A Purely Objective Standard................................................................15

        2. Even if This Court Should Apply a Traditional Deliberate
            Indifference Standard, there is Still Abundant Evidence of
            Deliberate Indifference........................................................................18

    C. Because Lang Cannot Assert a Qualified Immunity Defense as a Matter
        Of Law, "Clearly Established" Right Analysis Does Not Apply.....................23

    D. Even if the Court Decides that Lang May Properly Raise Qualified
        Immunity, Plaintiff Has Shown the Violation of a Clearly
        Established Right..............................................................................23

# **TABLE OF AUTHORITIES**

### *CASES*                                                                *Page*

*Anderson v. Creighton,* 483 U.S. 635 (1987).................................................................24

*Ashcroft v. al-Kidd,* 563 U.S. 731 (2011)......................................................................24

*Barrie v. Grand County, Utah,* 119 F.3d 862 (10th Cir. 1997)............................16, 23

*Bell v. Wolfish,* 441 U.S. 520 (1979)........................................................................15, 16

*Bruno v. City of Schenectady,* 727 Fed.Appx. 717 (2d Cir. 2018) (unpublished)...............16, 17

*Cox v. Glanz,* 800 F.3d 1231 (10th Cir. 2015)........................................................16, 23, 24

*Currie v. Chhabra,* 728 F.3d 626 (7th Cir. 2013)...................................................18

*Darnell v. Pineiro,* 849 F.3d 17 (2nd Cir. 2017).........................................16, 17, 18

*DeSpain v. Uphoff,* 264 F.3d 965 (10th Cir. 2001)..................................................19

*Duff v. Potter,* 665 F. App'x 242 (4th Cir. 2016)....................................................17

*English v. D.C.,* 651 F.3d 1, 7–8 (D.C. Cir. 2011)....................................................5

*Estate of Hocker v. Walsh,* 22 F.3d 995 (10th Cir. 1994).......................................23

*Estelle v. Gamble,* 429 U.S. 97 (1976)...............................................................15, 24

*Farmer v. Brennan,* 511 U.S. 825 (1994)..............................................................19

*Gaston v. Ploeger,* 229 Fed.Appx. 702 (10th Cir. 2007)....................................19, 23

*Goka v. Bobbitt,* 862 F.2d 646 (7th Cir.1988)........................................................22

*Gordon v. Cnty. of Orange,* 888 F.3d 1118 (9th Cir. 2018)....................16, 17, 18, 19

*Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985), *cert. denied,*
480 U.S. 916 (1987)........................................................................................23

*Henry v. County of Shasta,* 132 F.3d 512 (9th Cir. 1997), *amended on denial of rehearing,*
137 F.3d 1372 (9th Cir. 1998)..........................................................................23

*Hope v. Pelzer,* 536 U.S. 730 (2002)....................................................................24

*Kingsley v. Hendrickson,* —— U.S. ——, 135 S.Ct. 2466 (2015)................................16, 17, 18

*Kisela v. Hughes,* 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018)...........................................24

*LaMarca v. Turner,* 995 F.2d 1526 (11th Cir.1993).......................................................22

*Lemire v. California Dept. of Corrections and Rehabilitation,* 726 F.3d 1062 (9th Cir. 2013)...........23

*Lopez v. LeMaster,* 172 F.3d 756 (10th Cir.1999)........................................................15

*Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402 (10th Cir. 1990)..................16

*Manuel v. City of Joliet,* —— U.S. ——, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017).................18

*Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005)..............................................19, 23, 24

*Miranda v. Cty. of Lake,* 900 F.3d 335 (7th Cir. 2018)...............................................16, 17, 18

*Olsen v. Layton Hills Mall,* 312 F.3d 1304 (10th Cir. 2002)............................................19

*Perry v. Durborow,* 892 F.3d 1116 (10th Cir. 2018)....................................................17

*Richardson v. McKnight,* 521 U.S. 399, (1997)........................................................15, 24

*Richmond v. Huq,* 885 F.3d 928 (6th Cir. 2018)......................................................16, 17

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637 (10th Cir. 2017)...................................19

*Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.,* 413 F.3d 1163 (10th Cir. 2005)..15, 24

*Safford Uni-fied Sch. Dist. #1 v. Redding,* 557 U.S. 364 (2009)...............................................23

*Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000)..................................16, 19, 25

*Self v. Crum,* 439 F.3d 1227 (10th Cir. 2006).........................................................19

*Tafoya v. Salazar,* 516 F.3d 912 (10th Cir. 2008).....................................19, 22, 23

*United States v. Lanier,* 520 U.S. 259 (1997)...........................................................24

*White v. Pauly,* 137 S. Ct. 548 (2017)...............................................................23

*Wilson v. Layne,* 526 U.S. 603 (1999)................................................................24

**Rules**

F.R.E. 801(d)(2)(D)..................................................................................................5

F.R.E. 803(8)(A)(iii)..............................................................................................5, 7

**Statutes**

42 U.S.C. § 1983................................................................................................15, 19

## Introductory Statement

Billy Woods needlessly died on December 15, 2016.  He was just 16-years-old.  Billy died alone in his room at the Muskogee County Regional Juvenile Detention Center (hereinafter, "JDC" or "the Facility") after hanging himself with a bed sheet.  This tragedy was eminently preventable. Billy's death was the proximate result of reckless neglect and deliberate indifference to his serious medical and mental health needs.  The lack of supervision, competent care and compassion Billy encountered at JDC is shocking and heartbreaking.  During his short stay at JDC, Billy came into contact with numerous detention workers, including, most prominently, Defendant Shift Supervisor Jerrod Lang ("Lang").  Lang had numerous opportunities and a duty to help Billy.  Lang could have -- easily -- saved Billy's life had he followed simple policies and procedures or shown him even a modicum of human decency.  In fact, Joe Washington, the JDC Superintendent, *admits*, that had these policies been followed, ***Billy would still be alive***. Washington Depo. (Ex. 1) at 235:8-12; 235:25 – 236:3. Yet, Lang could not be bothered to take the most minimal steps to address Billy's conspicuous and serious medical and mental health needs.

Indeed, Lang enhanced the risks to this vulnerable boy by humiliating and belittling him, only to later refuse to check on him for hours.  And in a horrendous display of inhumanity, after Billy was found unresponsive in his room with the make-shift noose tied around his neck, Lang left Billy to go take an extended cigarette break.  As valuable time was wasting, no one at the Facility attempted CPR, no one removed the noose from Billy's neck and no one called 911 (for 20 minutes).  Rather, while an unconscious sixteen-year-old (16) boy laid under a sink, Lang was puffing on a cigarette.  A half an hour later, Billy was pronounced dead.  This is gross negligence, inhumane mistreatment and deliberate indifference.

There is no credible dispute as to the relevant facts in this case.  Most of the evidence in this matter was uncovered as part of the Oklahoma Department of Human Services ("DHS") Office of Client Advocacy's ("OCA") investigation into Billy's death.  The investigation focused on whether personnel at JDC, including Defendants Lang, Brandon Miller, Angela Miller and Winkle, violated the Oklahoma Children's Code's proscription of child "Neglect" and/or child "Abuse". Through the investigation, OCA determined that the allegations of neglect against Lang, Miller, Angela Miller and Marietta Winkle were substantiated and the allegations of abuse against Lang were substantiated. Following are some of "Areas of Concern" identified by OCA as part of its final investigative Report:

- "The Daily Notes sheet for resident Billy Woods was pre-emptively filled out for the entire 3:00 pm to 11:00 pm shift on 12-15-16. Woods's body was discovered in his cell

1

at 8:34 pm after *Woods had not been checked for approximately two hours and two minutes.*"

- "A review of video showed none of these checks were completed by any staff. Miller, Lang, and Winkle were all in the area outside of Woods's room at multiple and various times during the times in question, but checks were not completed."

- "Lang said when he reported to work at 3:00 pm on 12-14-16, he had to complete Woods's intake. ... Lang placed Woods in a room until approximately 7:00 pm. Woods was in a room for approximately four hours without having a suicide assessment completed."

- "In Woods's suicide assessment, he reportedly said he had attempted multiple times to commit suicide and had a family member who had successfully committed suicide. Woods also reportedly said he had *attempted to hang himself approximately one month prior* to being placed at the facility. When asked if he relayed any of that information to a supervisor, Lang said he was going to tell Superintendent Joe Washington about it, but he forgot. Woods was not placed on suicide precautions...."

- "Woods did not sign his suicide assessment...."

- "Lang said he does not have a background in psychology or psychiatry. ...Shift supervisors [at MJDC] are tasked with conducting suicide assessments, apparently with *no formal training on recognizing signs and symptoms of suicidal ideations or behaviors.*"

- "The *facility does not have a qualified mental health professional* administer suicide assessments."

- "[T]here is no indication on a resident's Daily Notes or near his/her room if he/she should be monitored for suicidal behavior. Extra steps are not taken to ensure that heightened monitoring is completed."

- "The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Suicide Prevention and Control section (page 19) states (in part): "When the juvenile is in his/her room they are monitored by intercom and visually observed every five (5) minutes." Lang, Miller, and Winkle all indicated checks for residents on suicide precautions were to be conducted every 15 minutes. *None of them indicated any knowledge of 5-minute check requirements for suicide precautions.* None of them appeared to know residents were to be monitored with the intercom, too."

- "Woods was discovered at approximately 8:36 pm. 911 was not called until 8:56 pm. Lang, Miller, Winkle, and Detention Worker Angela Miller could not account for the 20-minute delay in seeking emergency medical attention for Woods."

2

- "B. Miller said after Woods was discovered, B. Miller and Lang went to Woods's room because B. Miller was going to do CPR. However, B. Miller said when they got to Woods's room, *Lang told him not to do CPR.*"

- "B. Miller said he *did not receive training* on the Policies and Procedures..."

- "Lang said he *had not received any formal training* to work at the facility."

- "Lang said he did *not receive any formal training* to be a Shift Supervisor."

- "When asked how he knew Woods was deceased upon entering Woods's room, Lang said it was 'obvious' because Woods was 'purple' and 'pale-ish.'"

- "Lang admitted he *did not attempt to remove the sheet from Woods's neck, and he did not attempt to perform CPR.*"

- "A Miller said when they were dealing with the emergency situation *no one knew what to do.* No staff mentioned accessing the manual to determine what to do."

- "Lang said he and B. Miller went to Woods's room together, and Lang nudged Woods's body with his foot. Lang said Woods did not respond. *Neither Lang nor B. Miller attempted to loosen the sheet* or to. perform CPR at that time. Lang said after they left the room, he went outside and *"smoked a bunch of cigarettes."* Lang said staff came outside a few times to check on him, but *he could not deal with the situation.*"

- "Winkle went into Woods's room after his body was discovered. Winkle *admitted she did not attempt to loosen the sheet around his neck, check for a pulse, check for respiration, or perform CPR.*"

- "A. Miller admittedly *did not know any of the protocols for a medical emergency* at the facility."

- "It was reported by some residents who were placed at the facility during the time Woods was there that *Lang made fun of the way Woods talked.* Woods also reportedly wanted to be addressed by his middle name, Duane, and *Lang reportedly made fun of that name and would say it in a way that was perceived as being belittling or ridiculing. ... Lang's actions contributed to Woods not wanting to be out of his room and with the rest of the residents.*"

OCA Areas of Concern (Ex. 2) (emphasis added).

OCA's "Areas of Concern" have been confirmed and expanded on through extensive discovery. The evidence in this case is overwhelming. Lang's conduct is shocking and constitutes

deliberate indifference under any formulation of the standard.   Lang's Motion for Summary Judgment (Dkt. #152) should be denied.

## LCvR 56.1(c) Statement

**1-2.**   Lang's employer, MCCOYS, is a private non-profit "corporation." *See* Perkins Depo. (Ex. 3) at 179:4-15; Dkt. #157-7 at ¶ 1.   While Jerrod Lang was a shift supervisor at the Muskogee County Regional Juvenile Detention Center ("JDC" or "Facility"), he was admittedly *not qualified* to serve in that role. *See, e.g.,* Lang Depo. (Ex. 4) at 45:19 – 46:5; Lang Appeal (Ex. 5) at Plaintiff_289.   Despite his lack of qualifications, and that he had been "there only a couple months," Lang, "in essence, became the juvenile detention center superintendent" on the evening shift, from 3:00 p.m – 11:00 p.m., when the Facility Superintendent (Joe Washington) and the Program Coordinator (Patty Reece), both of whom generally worked from 7:00 a.m. – 3:00 p.m., were not at the Facility. Washington Depo. (Ex. 1) at 130:20 – 131:21; *See also* Perkins Depo. (Ex. 3) at 69:25 – 70:16; Shift Supervisor Job Description (Ex. 6) at MCCOYS 677.

**3-5.**   Anthony Cornwell was a shift supervisor at JDC; Cornwell worked for MCCOYS from 1997 until MCCOYS was "shut down" in December of 2016. Cornwell Depo. (Ex. 7) at 12:7-17; 94:11-16.   On December 14, 2016, Cornwell's shift at the Facility ended at 3:00 p.m.; Billy entered the JDC at around 2:27 p.m. *Id.* at 52:24 – 53:17; Daily Note (12/14/16) (Ex. 8) at MCCOYS 879. After Billy arrived at the Facility, Cornwell initiated the "intake" process. Cornwell Depo (Ex. 7) at 52:19-23.   Cornwell did not complete the intake paperwork because Billy arrived late in his shift. *Id.* at 57:13-21.   After Billy changed into JDC garb, Cornwell escorted him to his room and placed him behind a locked door. *Id.* at 56:2 – 57:10.   After interacting with Billy, Cornwell recorded his observations in a "Daily Note". *See* Daily Note (12/14/16) (Ex. 8) at MCCOYS 879; Cornwell Depo. (Ex. 7) at 58:8-24.   In the Daily Note, signed by Cornwell, it is documented that Billy had been "on [the] run" for 2 years and "appear[ed] to have *mental health issues....*" Daily Note (12/14/16) (Ex. 8) at MCCOYS 879[i] (emphasis added).   Cornwell believed Billy had "mental health issues" because he was agitated, "rocking back and forth" and seemed disoriented. Cornwell Depo. (Ex. 7) at 69:6 – 71:6. Cornwell reported Billy's apparent "mental health issues" to Patty Reece, the Facility's Program Coordinator, with the expectation that Billy would be placed on "suicide watch."

---

[i]   Although Cornwell signed the December 14 Daily Note, he did not write it.  Cornwell Depo. (Ex. 7) at 61:24 – 67:24.  The Note was written by another MCCOYS employee, Patty Reece, based on information provided by Cornwell. *Id.*  Cornwell claims that Patty Reece wrote the Daily Note because they were in a "rush" to get Billy admitted into the Facility. *Id.*

*Id.* Daily Notes were required by JDC policy to be completed for each resident in the Facility and were intended to be reviewed and discussed during shift change. *See* Cornwell Depo. (Ex. 7) at 61:4-23; Washington Depo. (Ex. 1) at 44:14-22. Superintendent Washington agrees that failing to review the Daily Note information from the previous shift can adversely affect the residents. Washington Depo. (Ex. 1) at 45:2-7. Nevertheless, the observation that Billy appeared to have "mental health issues" was not discussed during shift change on December 14. Lang testified that it was his custom to never read the previous shift's Daily Notes. Lang Depo. (Ex. 4) at 283:7 - 284:8.

6-8.    When Lang, the "shift supervisor", arrived for his shift on December 14 (at 3:00 p.m.), he did not immediately complete Billy's intake process. Rather, Lang placed Billy "in a room until approximately 7:00 p.m." OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000020; OCA "Areas of Concern" (Ex. 2) at Plaintiff_000211;[2] Lang Depo. (Ex. 4) at 357:13 - 358:16. MCCOYS' written Policies V(E) and (L) require that juveniles confined to their room must be visually observed by staff every 15 minutes. *See* P&P Manual (Ex. 10) at MCCOYS 314, 318. Contrary to this Policy, there is no indication that Lang, or anyone else at the Facility, checked on Billy at any time from 3:00 p.m. to 7:00 p.m. on December 14. Lang Depo. (Ex. 4) at 286:9 - 288:4; 289:12 - 290:6. Making matters worse, Lang falsely represented, on the Daily Note form, that Billy was "in the program" from 3:00 p.m. to 7:00 p.m. when, in fact, Billy was confined to a room. *Id.* Lang admits that he ***regularly falsified the Daily Notes*** in this manner, in what he describes as a "bad habit". *Id.* Furthermore, Lang did not bother to review Cornwell's Daily Note from the previous shift which indicated that Billy appeared to have mental health issues. *Id.* at 283:7 - 285:23. After leaving Billy alone and unmonitored in a room for approximately four (4) hours, Lang resumed the intake process at around 7:00 p.m. *See, e.g.,* OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000008.

9.    Lang filled out a "Suicide Risk Assessment" form, purportedly as part of Billy's intake. Suicide Assessment (Ex. 12) at MCCOYS 24. However, it is impossible to verify whether Lang accurately recorded Billy's responses to the "Suicide Risk Assessment." For one, Billy "did not

---

[2]    The OCA "Report to District Attorney" and "Areas of Concern" are admissible under the Public Records exception to the hearsay rule. *See* F.R.E. 803(8)(A)(iii). That is, these were investigative reports generated by the Oklahoma Department of Human Services ("DHS") Office of Client Advocacy ("OCA"), setting out "factual findings from a legally authorized investigation". *Id. See also English v. D.C.,* 651 F.3d 1, 7–8 (D.C. Cir. 2011) and Iwanski Depo. (Ex. 11) at 18:2 – 20:20; 39:14 – 46:9; 61:14 – 63:13; 158:23 – 159:21; 165:17 – 166:15 (additional foundation for admission). In addition, the statements of MCCOYS employees summarized in the OCA investigative documents are independently admissible under Rule 801(d)(2)(D).

sign his suicide assessment, although he signed all other documents in his intake paperwork." OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000020; OCA "Areas of Concern" (Ex. 2) at Plaintiff_000212.   In addition, there is significant evidence of Lang's untruthfulness through his admitted and repeated falsification of sight check information in the Daily Notes.   *See, e.g.,* Lang Depo. (Ex. 4) at 148:2 – 149:24; 152:11-23.   The unsigned Suicide Risk Assessment form was purportedly completed at 7:46 p.m. on December 14. Suicide Assessment (Ex. 12) at MCCOYS 24. The Suicide Risk Assessment indicates that: **(A)** Billy had *previously attempted suicide "7 or 8" times*; **(B)** each previous suicide attempt was by *"hanging"*; **(C)** his most recent *suicide attempt* occurred just *"a month ago"*; **(D)** Billy had never received any treatment services after his suicide attempts; and **(E)** his "Uncle Ricky" had committed or attempted suicide "4 years ago". *Id.* (emphasis added).   The Suicide Risk Assessment also contains contradictory information concerning Billy's state of mind on the evening of December 14.  Specifically, in part D of the form, it asks "how likely" Billy was to "hurt" himself at the time of the assessment.  *Id.* And while Lang checked "definitely would not"[3] as Billy's alleged response to the question, the Assessment form also shows that Billy had formulated a *specific suicide plan to hurt himself "quick and easy...." Id.* (emphasis added). Though shift supervisors at JDC, including Lang and Marietta "Jackie" Winkle, were "tasked with conducting suicide assessments," they were "apparently [provided] with no formal training on recognizing signs and symptoms of suicidal ideations or behaviors." OCA "Areas of Concern" (Ex. 2) at Plaintiff_000212 (emphasis added); *see also* Lang Depo. (Ex. 4) at 91:8-12 ("Q: Did anybody ever tell you why it was important to do a suicide assessment? A: No, they just told me everything needs to be filled out.") *and* at 91:23 – 92:23 (re: the suicide assessment form – "Q: Right. But what would it actually be used for? A: I have no idea. It would be filled out and left in the book.").

**10-11.**   Based on the information in the Suicide Risk Assessment, as well as Billy's demeanor, it should have been obvious, even to a layperson, that Billy was at substantial risk of self-harm. In this regard, according to Cindy Perkins, MCCOYS' Executive Director, Billy *should have been placed on suicide watch* precautions based on the Assessment. Perkins Depo. (Ex. 3) at 84:2 – 85:2 (emphasis added).  Washington agrees that the Suicide Assessment *should have "triggered"*

---

[3]      This portion of the Assessment should not be given credit -- for the purposes of summary judgment -- as the form is unsigned and because of the overwhelming and uncontested evidence of Lang's propensity to falsify similar forms and paperwork. *See, e.g.,* LCvR 56.1(c) Statement(6-8).  In any event, even if the Court were to credit this portion of the Suicide Assessment form, read as a whole, the information provided evinces Billy's obvious and substantial suicide risk.

*suicide watch* for Billy. Washington Depo. (Ex. 1) at 206:18 – 207:24 (emphasis added). Cornwell and Winkle also testified that they would have placed Billy on suicide watch. *See* Cornwell Depo. (Ex. 7) at 163:12-24; Winkle Depo. (Ex. 13) at 103:2 – 105:24. As further evidence of the "obviousness", OCA found, as part of its official investigation, that one of the juvenile residents "told Lang he should probably check on Woods because *'he could be in there killing himself.'*" Notification of Findings (Ex. 14) at Plaintiff_000239 (emphasis added).[4]

Under MCCOYS' "Suicide Prevention and Control" Policy, when a resident is placed on suicide watch, staff are to monitor the resident in his room by intercom and by visual observation *"every five (5) minutes."* P&P Manual (Ex. 10) at MCCOYS 322. Further, under the suicide watch protocol, "[t]he juveniles [sic] bed linens are removed from their room and clothing can be removed if they attempt to use them to cause bodily harm" and only "[w]hen the juvenile demonstrates to staff that the threat of suicide is no longer real, his/her caseworker and/or medical authority considers the threat of suicide no longer real, his bed linens and clothing will be returned to him/her." *Id.* Nonetheless, MCCOYS had apparently never trained Lang on the five (5) minute visual observation requirement. Lang Depo. (Ex. 4) at 259:2-16. Indeed, "Lang, Miller, and Winkle *all [denied] any knowledge of 5-minute check requirements for suicide precautions"* and "[n]one of them appeared to know residents were to be monitored with the intercom, too." OCA "Areas of Concern" (Ex. 2) at Plaintiff_000212. *See also* Winkle Depo. (Ex. 13) at 56:16-25; B. Miller Depo. (Ex. 15) at 34:11-15; 169:2-17.

Because the staff and supervisors responsible for Billy's well-being had not been trained concerning the five-minute sight check requirement, it is axiomatic that Billy was not checked on every five minutes as required by policy. Indeed, as will be discussed in more detail *infra*, Lang and the staff at the Facility conducted *no sight checks* of Billy for *over two (2) hours* prior to his being found unresponsive in his room. *See, e.g.,* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000211; Lang Depo. (Ex. 4) at 157:13-24.

Further, it is obvious that the "bed linens" were not removed from Billy's room as required by the "Suicide Prevention and Control" Policy. *See, e.g.,* Lang Depo. (Ex. 4) at 173:3-9. Adding to the danger, Billy "was placed in room one, which had a handicap accessible bar across the front of

---

[4]     The "Notification of Findings" document is part of OCA's "factual findings from a legally authorized investigation" and is therefore admission under F.R.E. 803(8)(A)(iii). *See, e.g.,* f.n. 1, *supra.*

the combination toilet and sink installed in the room." OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000013; *see also* Washington Depo. (Ex. 1) at 209:18 – 210:16.

Tellingly, MCCOYS admits, as part of its Motion for Summary Judgment, that "[a]fter filling out the Suicide Risk Form on the 14, Lang wanted to talk to Joe Washington or Patty Reece about Billy's demeanor and his responses to the form" but "'he *forgot to do so.'*" Dkt. #154 at 5 (quoting Dkt. #154-12 at 102-103) (emphasis added). Closer review of Lang's deposition testimony proves that at least one of the reasons Lang intended to contact Superintendent Washington was because Billy "showed *increased risk of suicide[al] ideation....*" Lang Depo. (Ex. 4) at 103:3-15 (emphasis added). Furthermore, Lang testified that he attempted to call Washington about Billy on the morning of December 15, but that Washington did not answer the call. *Id.* at 108:17 – 109:23.

**12-13.** Executive Director Perkins agrees that juveniles on room confinement should be observed for frequent mental status assessments. Perkins Depo. (Ex. 3) at 144:9-16. Washington also understood that there was a risk of suicide for juveniles confined to their rooms, and that if the sight check policies were not followed, that risk of suicide was heightened. Washington Depo. (Ex. 1) at 439:21 – 440:5.

According to Anthony Cornwell, morning shift supervisor, Billy was confined to his room from 7:00 a.m. to at least 2:45 p.m. on December 15, 2016. *See, e.g.,* Cornwell Depo. (Ex. 7) at 100:10-22; Daily Note (12/15/16) (Ex. 16) at MCCOYS 50. Cornwell noted that Billy "wasn't feeling well...." *Id.* at MCCOYS 50. MCCOYS policy dictates that room confinement must be re-authorized by a supervisor every three hours. *See* P&P Manual (Ex. 10) at MCCOYS 314 (Policy V(E)). Cornwell claims he did not re-assess room confinement for Billy on December 15 because Billy was sleeping in his room the "entire day". Cornwell Depo. (Ex. 7) at 174:22 – 175:16. Cornwell, who had previously observed that Billy appeared to have "mental health issues" (Daily Note (12/14/16) (Ex. 8) at MCCOYS 879), was "concerned" that Billy was wanting to sleep all day. Cornwell Depo. (Ex. 7) at 175:17-20. Cornwell briefly spoke with Billy at around noon on December 15, when Billy refused lunch. *Id.* at 176:2-98.

The Daily Note for December 15 indicates that Billy was checked on in his room at 3:00 p.m., 3:15 p.m., 3:30 p.m. and 3:45 p.m. Daily Note (12/15/16) (Ex. 16) at MCCOYS 50. However, Billy was not in his room at 3:00 p.m., 3:15 p.m., 3:30 p.m. and 3:45 p.m., but was in court. *See, e.g.,* Cornwell Depo. (Ex. 7) at 104:25 – 106:6. Thus, these sight checks -- as documented by Cornwell, Lang and B. Miller -- were *falsified. Id.*

Billy returned to the Facility from the courthouse at 3:55 p.m. on December 15. *See* Admission Sheet (Ex. 17) at MCCOYS 20.  By this time, shift change had occurred and Lang was on duty as the shift supervisor. Lang Depo. (Ex. 4) at 80:1-21. After Billy came back from court, he was locked in his room. *Id.* at 143:13 – 144:23.  **No one at the Facility checked on Billy in his room for Lang's entire shift on December 15.** *Id.* at 144:13-17.

**14-15.**  Billy emerged from his room briefly at dinnertime and to take a shower. Ms. Winkle, based on her observations during this time, "viewed [Billy] as being depressed." Winkle Depo. (Ex. 13) at 81:3-5. *See also Id.* at 75:17-25. Moreover, Winkle testified that, based on her observations of Billy alone, it was "***obvious" that Billy was depressed***, such that "even a layperson like one of the other children there at the facility could recognize it." *Id.* at 81:3-21 (emphasis added). Based on Billy's anti-social and withdrawn demeanor, had she been the supervisor on December 15, Winkle would have "had a staff member, ... sit in the room with [Billy] or ... sit outside his door and check every five minutes...." *Id.* at 72:19 – 73:6.

As an example of the utter lack of communication and supervision at the Facility, Brandon Miller was not even aware that Billy was back in his room until he took Billy to the shower on the evening of December 15. *See* B. Miller Depo. (Ex. 15) at 55:3 – 58:8. After Billy requested to return to his room at around 6:30 p.m., Miller understood that sight checks needed to occur (at a minimum of every 15 minutes). *Id.* But Miller did not bother to check on Billy once, even when standing right outside of Billy's room. *See, e.g.,* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000211; B. Miller Depo. (Ex. 15) at 160:1 – 161:8.

After conducting a thorough investigation, the Oklahoma Department of Human Services ("DHS") Office of Client Advocacy ("OCA") found that allegations of neglect and ***abuse-mental injury*** against Lang were *substantiated. See, e.g.,* Letter to Washington (Ex. 18) at Plaintiff_000237; Notification of Findings (Ex. 14) at Plaintiff_000238-40; OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000003.  More specifically, OCA found and stated:

> It was ... discovered during the course of the investigation that Lang made fun of Woods's name and the way he walked. Reportedly, that contributed to Woods not wanting to be out of his room. Three residents confirmed Lang made fun of Woods. One resident also reported he told Lang he should probably check on Woods because ***"he could be in there killing himself."*** This resident stated staff did not go check Woods. The allegation of ABUSE MENTAL INJURY by LANG is SUBSTANTIATED.

Notification of Findings (Ex. 14) at Plaintiff_000239 (emphasis added).

9

16.    It was against written policy for a Facility staff member to: (A) fail to conduct 15-minute sight checks; (B) falsify the sight checks in the forms; and (C) sign another staff member's initials to the sight check paperwork. *See* Washington Depo. (Ex. 1) at 255:13-25. *See* P&P Manual (Ex. 10) at MCCOYS 314, 318.  Nonetheless, MCCOYS admits, as part of its Motion for Summary Judgment, that Lang "filled out the [15 minute] sight check boxes" on the December 15 Daily Notes "in advance". *See* Dkt. #154 at 6 (Fact #15).  MCCOYS further acknowledges that Lang did this "quite a bit." *Id.* This practice, of falsifying the sight check data, aside from being a violation of written policy, had real world consequences.   As the OCA found, "[t]he Daily Notes sheet for resident Billy Woods was pre-emptively filled out for the entire 3:00 p.m. to 11:00 p.m. shift on 12-15-16" and Billy's "body was discovered in his cell at 8:34 p.m. after Woods ***had not been checked for approximately two hours and two minutes.***" *See, e.g.,* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000211.  More specifically, while the Daily Notes sheet for Billy "had initials for Miller and Lang at 6:45 pm, 7:00 pm, 7:15 pm, 7:30 pm, 7:45 pm, 8:00 pm, 8:15 pm, and 8:30 pm... review of video showed ***none*** of these checks were completed by any staff." *Id.*  The video review revealed that "Miller, Lang, and Winkle were all in the area outside of Woods's room at multiple and various times during the times in question, but ***checks were not completed.***" *Id.*[5] As two of the more glaring examples, "[a]t approximately 7:32 pm, Miller placed his hand on the door to Woods's room, but he did not check on Woods" and "[a]t approximately 7:37 pm, Miller was standing beside Woods's door, but did not check on Woods." *Id.* These findings from the OCA are admitted to by Defendants. *See, e.g.,* Lang Depo. (Ex. 4) at 157:13 – 158:16; B. Miller (Ex. 15) at 158:6 – 160:18; Perkins Depo. (Ex. 3) at 78:19 – 83:2.[6]

17.    Surveillance video shows that Lang partially entered Billy's room at around 8:36 p.m., briefly looked at Billy, immediately left the room and walked back down the hall. Video 2 (Ex. 19)[7]; Also seen in Video 1 (Ex. 20)[8] at (8:36 pm – 8:37 pm). When Lang looked into the room, Billy

---

[5]    Again, because Billy should have been on suicide watch precautions, the sight checks actually should have occurred at 5-minute intervals. *See* LCvR 56.1(c) Statement(10-11), *supra.*

[6]    In pre-emptively filling out the Daily Notes form, Lang gave Billy a score of "1" and reported that Billy participated "below average" in the program without even giving him the opportunity to participate. Lang Depo. (Ex. 4) at 144:20 – 146:18. Perkins believes that Lang should have been terminated for preemptively completing Daily Notes in this manner. Perkins Depo. (Ex. 3) at 78:19 – 80:24.

[7] Video 2 is also available at https://vimeo.com/328544759/69e83c0084.

[8] Video 1 is also available at https://vimeo.com/328543607/5667835e2c.

was under the sink with a sheet around his neck. OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000009. Yet, as Lang freely admits, he did not loosen or untie the sheet, take Billy's pulse or try to get Billy down. *See, e.g.,* Lang Depo. (Ex. 4) at 163:9 – 165:18; OCA "Areas of Concern" (Ex. 2) at Plaintiff_000213. In sum, Lang "rendered ***zero aid***" for Billy. Lang Depo. (Ex. 4) at 163:24-25. And while some part of Lang knew that he needed to "help save" Billy, Lang claims that he "panicked" and "couldn't" help him. *Id.* at 165:13-18. Contrary to this testimony, Lang does not appear "panicked" in the surveillance video. Video 2 (Ex. 19); Also seen in Video 1 (Ex. 20) at (8:36 p.m. – 8:37 p.m.). There is no sense of urgency as Lang can be seen strolling away from Billy's room and leaving this 16-year-old boy alone hanging from a sheet underneath the sink. *Id.* Although Lang claims that Billy was already "dead" when he first discovered him (Dkt. #152 at 9 (Fact #17), Lang admits that he was not qualified to determine whether Billy was already deceased. Lang Depo. (Ex. 4) at 194:3 – 196:5.

18.     Lang did not immediately "lock down" the other residents. After finding Billy hanging in his room, Lang's first action was to tell Angela Miller to "go get Brandon [Miller]..." from the control room. A. Miller Depo. (Ex. 21) at 114:7 – 115:21. Lang did not immediately tell Angela what had happened to Billy Woods. *Id.* Similarly, Brandon did not initially know why he was being called down from the control room. *See* B. Miller (Ex. 15) at 62:16 – 67:9. After Brandon finally heard that Billy had hanged himself, he suggested to Lang that they should go check on him. *Id.* MCCOYS' "Emergency Procedures" Policy states (in part): "If a juvenile is seriously injured or has a medical emergency, the following procedures should be followed: 1) One staff member is to administer first aid if necessary. One staff member is to secure the remaining population. 2) The Administrator is to be called immediately. ***If it is a life or death situation the shift supervisor is to call 911*** before notifying the Administrator." P&P Manual (Ex. 10) at MCCOYS 319. However, Lang did not call 911 or order any subordinate to call 911. Instead, Superintendent Washington was called first. *See, e.g.,* A. Miller Depo. (Ex. 21) at 79:18-19; 85:20 – 87:24; B. Miller Depo. (Ex. 15) at 70:25 – 71:19. Ms. Miller testified that Superintendent Washington had previously instructed her and other staff ***not*** to call 911 before talking to him. *See* A. Miller Depo. (Ex. 21) at 85:20 – 87:24. This likely explains why there was a ***20-minute delay*** of 911 being called after Billy was found hanging in his room. *Id.* at 88:3 – 89:20; *see also* OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000003.

19-21.     After approximately four (4) minutes had passed since he initially discovered Billy hanging under the sink, Lang returned to Billy's room, this time with Brandon Miller in tow. Video

3 (Ex. 22)[9]; Also seen in Video 1 (Ex. 20) at (8:40:43 p.m.).  Lang and Brandon entered Billy's room. *Id.*  Lang did nothing to assist Billy. B. Miller Depo. (Ex. 15) at 69:3-7. Lang nudged Billy with his foot to see how "stiff" he was. Lang Depo. (Ex. 4) at 208:20 – 211:13. B. Miller observed that Billy was still hanging from a sheet under the sink and had a blue or purplish color in his face. *See* B. Miller Depo. (Ex. 15) at 75:9-17; OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000010. Brandon asked Lang, "do we get him down from here? Do we do the CPR?" B. Miller Depo. (Ex. 15) at 69:8-20.  Lang replied, "he's gone". *Id.* Neither Lang nor Brandon attempted to loosen or remove the sheet that was wrapped around Billy's neck. *See, e.g.,* OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000021; B. Miller Depo. (Ex. 15) at 134:12 – 135:16. Neither Lang nor Brandon performed CPR on Billy. OCA "Report to District Attorney" (Ex. 9) at Plaintiff_000021. In fact, **Lang ordered Brandon *not to perform* CPR** on Billy. *See* B. Miller Depo. (Ex. 15) at 84:2 – 85:9. Lang told Brandon not to touch Billy because the room was "like a crime scene." *Id.* at 71:24 – 72:1. Although Lang decided not to initiate CPR, Lang admits that he was not qualified to determine whether Billy was already deceased. Lang Depo. (Ex. 4) at 194:3 – 196:5.

Lang told staff that he "can't do CPR"; Lang "didn't know what to do", "couldn't remember nothing [sic]", "couldn't think of nothing [sic]" and "couldn't do nothing [sic] right." *Id.* at 176:25 – 178:13. After doing nothing to help Billy, Lang and Brandon simply left the room. B. Miller Depo. (Ex. 15) at 69:24 – 70:1. After Lang and Brandon left Billy's room, Lang went outside and *"smoked a bunch of cigarettes."* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000213 (emphasis added). While Lang was outside smoking cigarettes, *Billy was still in his room hanging with a sheet around his neck.* Lang Depo. (Ex. 4) at 173:3-9.  When the police arrived, Lang was still outside of the Facility smoking cigarettes. Video 4 (Ex. 23)[10].

More likely than not, Billy's suicidal episode lasted "well more than seven and a half minutes." Ash Depo. (Ex. 24) at 65:22 – 69:22. Thus, if 5-minute checks had been done as required under the Suicide Prevention policy, it is "[e]xceedingly unlikely" that Billy would have died. *Id.* at 80:19 – 81:9.  Moreover, even if 15-minute sight checks had been done, it is more likely than not that Billy would have survived. *See* Ash (Verified) Report (Ex. 25) at page 5.

**22-23.**  The (unsigned) Suicide Assessment form, taken as a whole, is evidence that Billy was threatening to commit suicide. *See, e.g.,* LCvR 56.1(c) Statement(9), *supra.*  And it would have been

---

[9] Video 3 is also available at https://vimeo.com/328544898/efcd67a1f1.
[10] Video 4 is also available at https://vimeo.com/328544930/459e32b351.

obvious, even to an unqualified layperson like Lang, that Billy posed a substantial suicide risk. *Id.* at (9-11; 14-15), *supra.*

**24-25.** There is significant evidence that Lang was provided with no training regarding suicide precautions, or regarding much of anything else for that matter. Lang has stated to investigators and confirmed during his deposition that *"he did not receive <u>any</u> formal training* to be a shift supervisor" and *"was mostly left on his own to figure things out."* Lang Depo. (Ex. 4) at 35:11-16. Further, the shift supervisors, including Lang, were "apparently [provided] with *no formal training on recognizing signs and symptoms of suicidal ideations or behaviors."* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000212 (emphasis added); *see also* Lang Depo. (Ex. 4) at 111:7-10. Lang also had no knowledge of the "5-minute check requirements for suicide precautions" and or that "residents were to be monitored with the intercom, too." OCA "Areas of Concern" (Ex. 2) at Plaintiff_000212.  Lang had no training in assessing the mental health of the juvenile residents. Lang Depo. (Ex. 4) at 182:21 – 183:12. Following are telling excerpts of Lang's testimony concerning suicide assessments:

> Q: Did anybody ever tell you why it was important to do a suicide assessment?
>
> A: No, they just told me everything needs to be filled out."
>
> * * *
>
> Q: Right. But what would [Suicide Assessment form]actually be used for?
>
> A: I have no idea. It would be filled out and left in the book."

Lang Depo. (Ex. 4) at 91:9-14; 92:1-6.

"Lang ... was required [by MCCOYS] to sign a form stating he had received and read the policies and procedures for the Muskogee County Regional Juvenile Detention Center before he had had a chance to actually read the manual." Lang Depo. (Ex. 4) at 26:23 – 27:18.  He was forced to start working at the Facility after less than one hour of policy review. *Id.*  Lang was unable to "sufficiently read the policies and procedures and the training documentations" before he began working at the Facility.  *Id.* at 29:2-14.

The MCCOYS "Orientation Outline" provides that each new employee was required to "complete a minimum of 40 hours training at the facility before" being "assigned a regular schedule." Orientation Outline (Ex. 26) at LANG.002. The Orientation Outline further provides that after the 40 hours of training, the new hires were to be "placed with an experienced staff member for another 40 hours."  *Id. See also* Washington Depo. (Ex. 1) at 373:3-22.   However, Superintendent

Washington admits that *"all of the staff* working at MCCOYS prior to Billy Woods' death *lacked the required training* needed prior to being scheduled to work shifts that involved juveniles that were being housed in the facility...." *Id.* at 379:6-14; *id.* at 380:20 – 381:1; Lang Depo. (Ex. 4) at 299:25 – 300:16. Washington blames the lack of training on staffing and turnover problems. Washington Depo. (Ex. 1) at 379:15-19. At least two of the topics that were to be covered in the first 40 hours of orientation training are the employee handbook and the policy and procedure manual; however, this *never* happened. *Id.* at 381:2 – 382:7.  Adding insult to injury, Superintendent Washington admits that MCCOYS submitted falsified orientation training paperwork to OJA *untruthfully* reporting that Winkle, Miller and Lang had completed the training. *Id.* at 398:3 – 402:3.

On May 31, 2017, Lang submitted a written appeal of OCA's findings of neglect and abuse against him. *See* Lang Appeal (Ex. 5) at Plaintiff_000288-89; Lang Depo. (Ex. 4) at 36:7-23, 38:3-18. Lang maintains that the jury may properly rely on the statements made in his written appeal. *See* Lang Depo. (Ex. 4) at 34:23 – 35:7.  As part of his written appeal, Lang made the following representations and statements: **(A)** "When [he] first took the job at MCCOYS J.D.C., [he] came in without the credentials to take any higher position;" **(B)** he was offered the shift supervisor position three times, and "turned it down twice"; **(C)** he took the shift supervisor position on the "third offer because [the Facility was] *so short staffed* due to numerous of [*sic*] people quitting"; **(D)** MCCOYS supervisors *"never really did" train Lang*; **(E)** Lang "was rushed and told to sign and date training papers due to short staff with the promise to go over policy and procedure later", but that *"never happened"*; **(F)** while Lang knew he *"wasn't qualified"* for the shift supervisor position, he took it anyway; **(G)**  he was having to call the program coordinator on every shift and asking for advice and guidance on numerous situations; **(H)** Lang *"did not know what to do..."* during the Billy Woods incident; and **(I)** he made "uneducated" decisions and "panicked". *See* Lang Appeal (Ex. 5) at Plaintiff_000288-89 (emphasis added).

## ARGUMENT

**PROPOSITION:**     LANG   IS  NOT  ENTITLED  TO  SUMMARY  JUDGMENT  ON PLAINTIFF'S    CONSTITUTIONAL    CLAIMS    (BROUGHT PURSUANT TO 42 U.S.C. § 1983)

**A.**     **As the Employee of a Private Entity, Lang Cannot Assert a Qualified Immunity Defense**

As part of his Motion for Summary Judgment, Lang claims an entitlement to qualified immunity. *See* Dkt. #152 at 12-25.  However, at all pertinent time periods, Lang was an employee

14

of MCCOYS, a private corporation. *See* LCvR 56.1(c) Statement(1), *supra.* It is well established that a "private individual is only entitled to qualified immunity if a claim of immunity is supported by historical practice or based on public policy considerations." *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.,* 413 F.3d 1163, 1166 (10th Cir. 2005) (citing *Richardson v. McKnight,* 521 U.S. 399, 403–04 (1997)).  Lang has asserted no such historical practice or public policy considerations.  Plainly, Lang, as an employee of a private corporation, cannot invoke qualified immunity.

## B.    There is Ample Evidence of Lang's Deliberate Indifference to Billy's Health and Safety

Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners, [t]hey are ... responsible for taking reasonable measures to [e]nsure the safety of inmates." *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999) (internal citation omitted). Under the Eighth Amendment, prisoners possess a constitutional right to medical care, and that right is violated when doctors or officials are deliberately indifferent to a prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Pretrial detainees, like Billy, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment with the standard for deliberate indifference at least as protective as the standard for convicted prisoners under the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406 (10th Cir. 1990).  Claims arising from a failure to prevent inmate suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand County, Utah,* 119 F.3d 862, 866 (10th Cir. 1997). Thus, a plaintiff bringing such a claim must prove that a jailer was "deliberately indifferent to a substantial risk of suicide." *Barrie,* 119 F.3d at 869 (internal quotation marks omitted).  *See also Cox v. Glanz,* 800 F.3d 1231, 1247-48 (10th Cir. 2015).

### 1.    There is Significant Evidence of Deliberate Indifference Applying a Purely Objective Standard

Under the traditional analysis, "[d]eliberate indifference involves both an objective and subjective component." *Olsen,* 312 F.3d at 1315 (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted).  However, more recent caselaw indicates that the Fourteenth Amendment rights of pretrial detainees, like Billy Woods, should be analyzed under a ***purely*** ***objective*** standard.  *See, e.g., Kingsley v. Hendrickson,* --- U.S. ----, 135 S.Ct. 2466, 2473

15

(2015) (held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component by showing that "the force purposely or knowingly used against him was objectively unreasonable."). And several federal circuit courts have applied *Kingsley*'s **objective standard in medical-care claims** brought by pretrial detainees under the Fourteenth Amendment. *See, e.g., Gordon v. Cnty. of Orange,* 888 F.3d 1118, 1125 (9th Cir. 2018) (extending *Kingsley* to medical care claims brought by pretrial detainees under the Fourteenth Amendment); *Miranda v. Cty. of Lake,* 900 F.3d 335, 352 (7th Cir. 2018) ("We ... conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*."); *Darnell v. Pineiro,* 849 F.3d 17, 34–35 (2nd Cir. 2017) (applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim); *Bruno v. City of Schenectady,* 727 Fed.Appx. 717, 720 (2d Cir. 2018) (unpublished) (in a medical care case, asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). *See also Richmond v. Huq,* 885 F.3d 928, 938 (6th Cir. 2018) (relying on *Kingsley* for the observation that "this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them.").

Though the Tenth Circuit has yet to squarely address the issue, the Circuit has strongly suggested, in *dicta*, that it would apply *Kingsley* in contexts outside of an excessive force claim. *See Perry v. Durborow,* 892 F.3d 1116, 1122, n. 1 (10th Cir. 2018). As noted above, the Ninth, Seventh and Second Circuits have all explicitly extended the objective *Kingsley* standard to "medical-need" claims brought by pretrial detainees under the Fourteenth Amendment. *See Gordon,* 888 F.3d at 1125; *Miranda,* 900 F.3d at 352; *Darnell,* 849 F.3d at 34–35. And the Sixth Circuit has signaled a willingness to do the same. *See Richmond,* 885 F.3d at 938. As the Seventh Circuit held and persuasively reasoned in *Miranda*:

> Though *Kingsley*'s direct holding spoke only of excessive-force claims, two of our sister circuits have held that its logic is not so constrained. The Ninth Circuit first extended *Kingsley*'s objective inquiry to detainees' Fourteenth-Amendment failure-to-protect claims. *Castro v. Cnty. of L.A.,* 833 F.3d 1060, 1070–71 (9th Cir. 2016) (en banc), *cert. denied,* --- U.S. ----, 137 S.Ct. 831, 197 L.Ed.2d 69 (2017). Since then, that court has applied the *Kingsley* holding more broadly to a medical-need claim brought by a pretrial detainee. *Gordon v. Cnty. of Orange,* 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018). The Second Circuit followed suit, applying the

objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim. *Darnell v. Pineiro,* 849 F.3d 17, 34–35 (2d Cir. 2017) (overruling *Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir. 2009) ).... Later, the Second Circuit expressly applied an objective standard to a claim of deliberate indifference to a serious medical condition. *Bruno v. City of Schenectady,* 727 Fed.Appx. 717, 720 (2d Cir. 2018) (unpublished) (asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). Other courts of appeals have contemplated the same reading of *Kingsley. Richmond v. Huq,* 885 F.3d 928, 938 n.3 (6th Cir. 2018)....

The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts— that is, to Fourteenth-Amendment claims based on excessive-force allegations in a pretrial setting [citations omitted].

\* \* \*

Some circuits have continued to analyze inadequate medical treatment claims under the deliberate indifference standard without grappling with the potential implications of *Kingsley.* E.g., *Duff v. Potter,* 665 F. App'x 242, 244–45 (4th Cir. 2016) (applying the objective reasonableness standard to a detainee's excessive-force claim but not his medical-need claim, which it affirmed on forfeiture grounds).

We have not yet expressly weighed in on the debate. ... Because the answer may make a difference in the retrial of Gomes's claims, we think it appropriate to address the proper standard at this time. We begin with the fact that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. In this respect, *Kingsley* does not stand alone. *See, e.g., Manuel v. City of Joliet,* --- U.S. ----, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017) (allowing Fourth Amendment challenges to pretrial detention even beyond the start of legal process). The Court has cautioned that the Eighth Amendment and Due Process analyses are not coextensive. *See Kingsley,* 135 S.Ct. at 2475 ("The language of the two Clauses differs, and the nature of the claims often differs."); *Currie v. Chhabra,* 728 F.3d 626, 630 (7th Cir. 2013) ("[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody."). We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause. To the contrary, the Court said that ***"[t]he language of the [Eighth and Fourteenth Amendments] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"*** 135 S.Ct. at 2475 (citations omitted). ***We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in Kingsley.***

*Miranda*, 900 F.3d at 351–52 (emphasis added).

Under proper Fourteenth Amendment analysis, a pretrial detainee under the Fourteenth Amendment, unlike a convicted prisoner under the Eighth Amendment, should not be required to prove the subjective state of mind of a civil rights defendant. *See, e.g., Kingsley,* 135 S.Ct. at 2473; *Gordon,* 888 F.3d at 1124-25; *Miranda,* 900 F.3d at 351–52; *Darnell*, 849 F.3d at 34–35. The concept of "punishment", central to the Eighth Amendment, simply does not apply to pretrial detainees, particularly juvenile pretrial detainees, like Billy Woods. *See Miranda*, 900 F.3d at 351–52 (citing 135 S.Ct. at 2475). Thus, conditions of confinement actions, including right to adequate medical care claims, brought by pretrial detainees, "***must*** be evaluated under an objective deliberate indifference standard." *Gordon,* 888 F.3d at 1125 (emphasis added).

Applying a purely objective standard of liability, the evidentiary record in this case [as summarized in Plaintiff's LCvR 56.1(c) Statement above and in the following subsection (B)(2)] establishes that Lang "did not take reasonable available measures to abate [the] risk [of substantial harm to Billy Woods], even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious...." *Gordon,* 888 F.3d at 1125. As such, Lang is not entitled to judgment as a matter of law on Plaintiff's claims brought pursuant to § 1983.

### 2.   Even if This Court Should Apply a Traditional Deliberate Indifference Standard, there is Still Abundant Evidence of Deliberate Indifference

To be clear, it is Plaintiff's position that the subjective component of the traditional deliberate indifference standard no longer applies to cases brought by pretrial detainees under the Fourteenth Amendment. However, even if this Court should apply the traditional analysis, Lang is still not entitled to summary judgment on the Constitutional claims brought against him.

Under the traditional analysis, "[d]eliberate indifference involves both an objective and subjective component." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002) (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted). To satisfy the objective component under the traditional deliberate indifference standard, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006). As Lang concedes, "courts have held that suicide satisfies this requirement." Dkt. #152 at 13 (citing *Gaston v. Ploeger,* 229 Fed.Appx. 702, 710 (10th Cir. 2007)).

The subjective component of the traditional test requires evidence that the official "knows of and disregards an excessive risk to inmate health or safety." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A civil rights defendant is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). In the suicide context, a civil rights plaintiff must present evidence that the defendant has knowledge of a "substantial risk of suicide." *Cox*, 800 F.3d at 1250.

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001). For instance, "the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him *or because all prisoners in his situation face such a risk." Farmer*, 511 U.S. at 843 (emphasis added).

Here, Billy's substantial risk of suicide would be patently **obvious**, even to a layperson, even someone like Lang who was admittedly unqualified for his job as a shift supervisor. As summarized above, the (unsigned) December 14 Suicide Risk Assessment form indicates that: **(A)** Billy had *previously attempted suicide "7 or 8" times*; **(B)** each previous suicide attempt was by *"hanging"*; **(C)** his most recent *suicide attempt* occurred just *"a month ago"*; **(D)** Billy had never received any treatment services after his suicide attempts; and **(E)** his "Uncle Ricky" had committed or attempted suicide "4 years ago". Suicide Assessment (Ex. 12) at MCCOYS 24. The Suicide Risk Assessment also contains contradictory information concerning Billy's state of mind on the evening of December 14. Specifically, in part D of the form, it asks "how likely" Billy was to "hurt" himself at the time of the assessment. *Id.* And while Lang checked "definitely would not" as Billy's alleged response to the question,[11] the Assessment form also shows that Billy had formulated a *specific suicide plan to hurt himself "quick and easy...." Id.* (emphasis added).

---

[11]      This portion of the Assessment should not be given credit -- for the purposes of summary judgment -- as the form is unsigned and because of the overwhelming and uncontested evidence of Lang's propensity to falsify similar forms and paperwork. *See, e.g.,* LCvR 56.1(c) Statement(6-8), *supra*. In any event, even if the Court were to credit this portion of the Suicide Assessment form, read as a whole, the information provided evinces Billy's obvious and substantial suicide risk.

Lang cannot credibly argue that Billy was not at obvious risk of suicide as MCCOYS' own Executive Director and Superintendent testified to the contrary. According to Ms. Perkins, MCCOYS' Executive Director, based on his purported answers during the Suicide Assessment administered by Lang, Billy *should have been placed on suicide watch* precautions. Perkins Depo. (Ex. 3) at 84:2 – 85:2. Joe Washington, the Facility Superintendent, similarly testified that the Suicide Assessment *should have "triggered" suicide watch* for Billy. Washington Depo. (Ex. 1) at 206:18 – 207:24 (emphasis added).   Ms. Winkle, a shift supervisor at the Facility, took it a step further. Winkle testified that, had she known of Billy's answers during the Suicide Assessment, she would have "put on the front page, *suicide risk*" and "would have *highlighted with red* ... that he's thought about it ... tried to hurt his self before eight or nine times..."  Winkle Depo. (Ex. 13) at 103:2 – 105:24 (emphasis added).  Winkle would have done this to alert the other staff of Billy's serious risk of suicide.  *Id.*  Winkle further testified that she would have had someone watching Billy "closely" and "almost continuously."  *Id.*  Tellingly, MCCOYS relies on Winkle's testimony as part of its Motion for Summary Judgment.  *See* Dkt. #154 at 14 (Fact #54).  This is a *tacit admission* that Billy was at heightened risk of suicide.  Indeed, Lang himself conceded during his deposition that he intended to contact Superintendent Washington concerning Billy in part because Billy "showed increased risk of suicide[al] ideation...." Lang Depo. (Ex. 4) at 103:3-15. Also, on December 14, Mr. Cornwell documented in the daily note that Billy "appear[ed] to have mental health issues....", with the expectation that Billy would be placed on suicide watch.  *See* LCvR 56.1(c) Statement(3-5), *supra*. And one of the other juvenile residents warned Lang that "he should probably check on Woods because '*he could be in there killing himself.*'" *Id.* at Statement(10-11).  At the very least, there are genuine issues of fact as to whether Lang knew that Billy was at substantial risk of suicide.

Lang argues that he did not believe Billy to be at substantial risk of suicide because Billy "affirmatively stated" that he was not suicidal. Dkt. #152 at 17. Lang's only evidence of this is the (unsigned) Suicide Assessment form that he filled out.  Leaving aside the serious questions about Lang's credibility, which should be decided by a jury, the balance of the Assessment form, and the other evidence summarized in the preceding paragraph, establishes that Billy was obviously at substantial risk of suicide such that any reasonable layperson would have recognized it. Plaintiff is not required to force a "confession" from Lang as to his own state of mind. Again, "[b]ecause it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had

knowledge may be inferred from circumstantial evidence." *DeSpain,* 264 F.3d at 975. Here, there is ample evidence that Billy's suicide risk was both serious and patently "obvious".

In addition, the evidence establishes that Lang utterly disregarded obvious and substantial risks to Billy's health and safety. In fact, there is evidence that Lang inflamed an already dangerous situation by mentally abusing Billy through taunting and teasing. *See, e.g.,* LCvR 56.1(c) Statement(14-15), *supra.* In addition to mentally abusing Billy, Lang did not place Billy on suicide watch. As MCCOYS' own administrators testified, Billy should have placed been on suicide watch precautions. Under MCCOYS "Suicide Prevention and Control" Policy, when a resident was placed on suicide watch, staff were to monitor the resident in his room by intercom and by visual observation "every five (5) minutes." *See, e.g.,* LCvR 56.1(c) Statement(10-11), *supra.* Further, under the suicide watch protocol, "[t]he juveniles [sic] bed linens are removed from their room and clothing can be removed if they attempt to use them to cause bodily harm" and only "[w]hen the juvenile demonstrates to staff that the threat of suicide is no longer real, his/her caseworker and/or medical authority considers the threat of suicide no longer real, his bed linens and clothing will be returned to him/her." *Id.* The evidence is clear that these suicide precautions were not provided for Billy.

At a minimum, according to MCCOYS policy,[12] Billy, while confined to a room, should have been checked on by staff every 15 minutes. *See, e.g.,* LCvR 56.1(c) Statement(6-8), *supra.* However, on December 14, Lang and the other staff at the Facility left Billy alone in a room and unmonitored for approximately four (4) hours. *Id.* Then, on December 15, Billy's "body was discovered in his cell at 8:34 p.m. after Woods *had not been checked for approximately two hours and two minutes."* *See, e.g.,* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000211 (emphasis added). In his Motion, Lang freely admits that he "failed to check on Woods every 15 minutes (despite documenting that the checks were done)...." Dkt. #152 at 20. Compounding the recklessness of Lang's failure to check on this vulnerable boy for over two hours, Lang falsely documented that Billy was checked on at "6:45 pm, 7:00 pm, 7:15 pm, 7:30 pm, 7:45 pm, 8:00 pm, 8:15 pm, and 8:30 pm" when "review of video showed *none* of these checks were completed...." *Id.* The video review revealed that "Miller, Lang, and Winkle were all in the area outside of Woods's room at multiple and various times" but couldn't be bothered to look in on Billy. *Id.* When Lang finally got around to checking on Billy, he

---

[12]    In *Tafoya v. Salazar,* 516 F.3d 912 (10th Cir.2008), the Tenth Circuit expressly held that "the knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." (citing *LaMarca v. Turner,* 995 F.2d 1526, 1536 (11th Cir.1993), and *Goka v. Bobbitt,* 862 F.2d 646, 652 (7th Cir.1988).

found him with a sheet around his neck hanging from a handicap bar under the sink. *See, e.g.,* LCvR 56.1(c) Statement(16, 17), *supra.* And even then, Lang rendered "zero aid" for Billy. *Id.* On the contrary, he left Billy alone and hanging in the room for approximately four (4) minutes while he summoned Brandon Miller. Lang did not administer CPR, did not loosen the noose, did not call 911 and did not attempt to get Billy down. When Lang returned to the room, this time with Miller in tow, neither Lang nor Brandon attempted to loosen or remove the sheet that was wrapped around Billy's neck nor perform CPR. *Id.* at (22). In fact, Lang ordered Brandon <u>not</u> to perform CPR on Billy. *Id.* While Lang claims that he did not assist Billy because he believed Billy to be dead, Lang was plainly not competent to make that determination.

After Lang and Brandon left Billy's room, Lang went outside and *"smoked a bunch of cigarettes."* OCA "Areas of Concern" (Ex. 2) at Plaintiff_000213 (emphasis added). While Lang was outside smoking cigarettes, *Billy was still in his room hanging with a sheet around his neck. See* Lang Depo. (Ex. 4) at 173:3-9. This is callous and shockingly reckless conduct which offends contemporary standards of decency.[13]

Taken together, Lang's conduct constitutes deliberate indifference under any formulation of the standard. That is, Lang disregarded known or obvious and substantial risks to Billy's health and safety, namely the substantial risk of suicide. *See, e.g., Mata,* 427 F.3d at 751; *Tafoya,* 516 F.3d at 916.

For his part, Lang notes that "[c]ase law in this jurisdiction has established that the 'deliberate indifference' standard in the suicide context is extremely rigorous." Dkt. #152 at 14. While the standard is certainly "rigorous", as shown above, Plaintiff has met the standard. And all of the cases relied upon by Lang are readily distinguishable. For instance, as Lang notes, in *Estate of Hocker v. Walsh,* 22 F.3d 995 (10th Cir. 1994), the decedent was "incoherent", and there was no evidence that she communicated or presented with the clear signs of suicide risk that Billy did. In *Barrie v. Grand County,* 119 F.3d 862 (10th Cir. 1997), as Lang concedes, "[w]hen asked if he had tried to hurt himself in the past, attempt suicide, or was contemplating suicide, he shook his head and answered

---

[13]   Though it is true that Plaintiff does not have any scientific evidence that the failure to loosen the noose, perform CPR or cut Billy down contributed to his death, the post-event evidence of the staff's conduct, and particularly that of shift supervisor Lang, evinces the lack of training as well as a culture of indifference toward the residents. *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985), *cert. denied,* 480 U.S. 916 (1987); *Henry v. County of Shasta,* 132 F.3d 512, 518-20 (9th Cir. 1997), *amended on denial of rehearing,* 137 F.3d 1372 (9th Cir. 1998); *Lemire v. California Dept. of Corrections and Rehabilitation,* 726 F.3d 1062 (9th Cir. 2013).

'no.'" Dkt. #152 at 15.  In *Cox v. Glanz*, as Lang tells it, the "decedent had never contemplated suicide, and was not currently suicidal...." *Id.* These cases are in stark contrast to Billy's reported serious, long-standing and recent history of suicide attempts, as well as his expression of a specific suicide plan.  In *Gaston v. Ploeger*, 229 Fed.Appx. 702, 711 (10th Cir 2007), the defendants were aware "of the strange behavior described by Mr. Belden's cellmates."  Here, by contrast, in addition to the information conveyed during the suicide assessment, there is evidence that one of the other juvenile residents warned Lang that "he should probably check on Woods because '*he could be in there killing himself.*'" *Id.* at Statement(10-11).  Further, unlike the case-at-bar, none of the cases cited by Lang involved a juvenile or evidence that the defendant verbally abused the decedent prior to his suicide.

In sum, Plaintiff has put forth significant evidence of Lang's deliberate indifference, such that he is not entitled to summary judgment.

### C.   Because Lang Cannot Assert a Qualified Immunity Defense as a Matter of Law, "Clearly Established" Right Analysis Does Not Apply

As discussed above, as the employee of a private entity, Lang cannot assert a qualified immunity defense. *See Rosewood Servs., Inc., Inc.,* 413 F.3d at 1166; *Richardson,* 521 U.S. at 403–04.  As such, the "clearly established" right requirement, which is part of the qualified immunity analysis does not apply. And Lang's arguments concerning the "clearly established" right prong are moot.

### D.   Even if the Court Decides That Lang May Properly Raise Qualified Immunity, Plaintiff Has Shown the Violation of a Clearly Established Right

Assuming *arguendo* that the Court determines that Lang may properly raise a qualified immunity defense, Plaintiff satisfies the clearly established right prong.  The United States Supreme Court has instructed lower courts "not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011), and held that "clearly established law must be 'particularized' to the facts of the case." *White v. Pauly,* 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). However, the Court has also maintained that its case law *"does not require a case directly on point for a right to be clearly established,"* *Kisela v. Hughes,* 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (quoting White, 137 S. Ct. at 551), and that *"'general statements of the law are not inherently incapable of giving fair and clear warning.'"* *White,* 137 S. Ct. at 552 (quoting *United States v. Lanier,* 520 U.S. 259, 271 (1997)).  "[T]here is no need that 'the very action in question [have] previously been held unlawful.'" *Safford Uni-fied*

*Sch. Dist. #1 v. Redding,* 557 U.S. 364, 377 (2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615 (1999)). The law is also clearly established if the conduct is so obviously improper that any reasonable officer would know it was illegal. *See Hope v. Pelzer,* 536 U.S. 730, 739–42 (2002). Overall, qualified immunity protects "all but the ***plainly incompetent*** or those who knowingly violate the law." White, 137 S. Ct. at 551 (emphasis added).

An inmate's right to adequate medical care and to be free from deliberate indifference have been clearly established for decades. *See, e.g., Estelle,* 429 U.S. at 103-04. "[T]here is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right." *Mata,* 427 F.3d at 749. It is also clearly established that officials may not disregard a substantial risk of suicide. *See, e.g. Cox.* It is similarly established that corrections personnel cannot "prevent" a detainee like Billy "from receiving treatment [and] deny[ ] him access to medical personnel capable of evaluating the need for treatment." *Sealock,* 218 F.3d at 1211.

In this case, Lang's conduct was "plainly incompetent" and existing caselaw provided him with "fair warning" that his conduct was unlawful. In particular, it would be clear to anyone that leaving a vulnerable child, at obvious and substantial risk of suicide, alone in his room for hours, without any supervision, was unlawful. It was also plain that falsifying the records to document sight checks that never occurred was, at best, callous conduct. Further, Lang knew that verbally abusing a child with obvious and serious mental health issues was dangerous and would subject him to liability.

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court deny Defendant Lang's Motion for Summary Judgment (Dkt. #152).

Respectfully,

/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax:     (918) 585-2669

*Attorneys for Plaintiff*

24

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of April 2019, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore