IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

ROBBIE EMERY BURKE,
     Plaintiff,

Vs.                  Case 18-CV-108-RAW

MUSKOGEE COUNTY COUNCIL
OF YOUTH SERVICES
("MCCOYS"), et al,
     Defendants.


VIDEO DEPOSITION OF
JOE WASHINGTON
VOLUME I


DATE:  FEBRUARY 15, 2019

REPORTER:  MARISA SPALDING, CSR, RPR


Spalding Reporting Service, Inc.
1611 South Utica Avenue, Box 153
Tulsa, Oklahoma 74104
(918) 284-2017



PLAINTIFF'S EXHIBIT
1

```
1   are important?

2      A    Yes.

3      Q    Okay.

4           MR. WOOD:   Joe, let me emphasize

5   that if any time you feel like he has cut off

6   your response before you're done answering, be

7   sure and let him know.

8           THE WITNESS:   All right.

9      Q    (By Mr. Smolen)   Were you done with

10  that?

11     A    Yes.

12     Q    Okay.   Let's look at No. 3.   Joe

13  aggressively voices frustration over policy and

14  procedures.   He voiced, quote, I am tired of

15  policy and procedures not being followed.   I am

16  tired of getting blamed for policy and

17  procedures not being followed.

18     Supervisors, you are responsible for seeing

19  your staff are following policy and procedures.

20  I am tired of hearing that things will go back

21  in two weeks.   It is your responsibility to see

22  that it doesn't.   Did I read that correctly?

23     A    Yes, sir.

24     Q    Okay.   Do you recall this meeting?

25     A    Yes, sir.
```

1    Q    Could you tell me how a staff member

2  showing up late to the facility would impact

3  their inability to receive information through

4  the shift change?

5    A    Repeat that.

6    Q    Sure.  Can you just -- I just want to

7  know from someone who's ran the facility for as

8  long as you have okay --

9    A    Uh-huh.

10    Q    -- how a staff member showing up late to

11  a shift would negatively impact their ability to

12  participate in the shift change process?

13    A    Okay, repeat that again.

14    Q    Let's try it this way.  What is the

15  purpose of shift change?

16    A    Okay.  The -- the purpose is to exchange

17  information about what happened on the previous

18  shift and to pass on pertinent information.

19    Q    And is that so that we can have a

20  continuity of care or alertness for the staff

21  and for the residents?

22    A    Yes.

23    Q    Okay.  And is it fair to say that if a

24  staff member is showing up late for the shift,

25  they're missing the shift change information?

1    A    Yes.

2    Q    Okay.  And would you agree with me that

3  if their shift starts and that shift has not

4  received pertinent information from the previous

5  shift, that that has the ability to adversely

6  affect both the residents and the staff?

7    A    Yes.

8    Q    No. 2.  It says:  Scheduling enough

9  staff to operate this facility.  No

10 communication.  Staff not attending the staff

11 meetings to hear issues that are being

12 addressed.  All staff should be attending the

13 staff meetings, especially full-time staff.

14 They should be setting the examples for the new

15 staff.  The new staff is looking at the seasoned

16 staff for their cues.  Did I read that

17 correctly?

18   A    Yes.

19   Q    Again, we see that the issue of staff

20 not attending the mandatory meetings was being

21 discussed on October 10th of 2015, correct?

22   A    Yes.

23   Q    Did you and Ms. Perkins discuss the fact

24 that July of 2015, we have a note that staff are

25 not showing up for the mandatory meetings, and

1   A    From the time that I observed them, they

2   always did them.

3   Q    Okay.  So there was never any need to

4   remind them of it?

5   A    No, sir.

6   Q    Okay.  Do you ever recall being in a

7   position or in a meeting where staff were being

8   reminded that they needed to do 15-minute

9   checks?

10   A    No, because during the staff meetings,

11   they did 15-minute checks while we were doing

12   the staff meeting.

13   Q    So there was no need to remind them if

14   they were doing it?  That's your testimony?

15   A    Yes.

16   Q    Okay.  If they weren't doing 15-minute

17   checks, do you think it would be important to

18   remind them that they needed to do that?

19   A    Yes.

20   Q    Okay.  But it's your testimony that that

21   never happened, correct?

22   A    Not that I recall.

23   Q    Okay.  Well, let's look at 459.  No. 22.

24   When kids are in lockdown, staff has plenty of

25   time to complete shift tasks.  It appears that

```
 1  staff is too busy visiting.  Reminder -- and
 2  this is in bold.  A visual check must be
 3  couldn't every 15 minutes when a resident is in
 4  their room for any reason.  If your staff were
 5  already aware of that, why are you having to
 6  remind them during the staff meetings?
 7      A    Like I said, I -- I didn't do this so I
 8  don't know why that's in bold.
 9      Q    That wasn't my question, though.  Why --
10  if your staff were doing 15-minute checks and
11  they knew that they were doing it, and you just
12  testified you never had to remind them, why does
13  this note indicate that they were being
14  reminded?
15      A    Well, I never had to remind them.
16      Q    I asked you if you ever recall them
17  being reminded in meetings and you said no.  You
18  said that they never had to be reminded because
19  they always did it and they knew to do it?
20      A    Yes, sir.
21      Q    This note reflects something different
22  than that, correct?
23      A    Well, that note is written in there, I
24  -- I don't -- Patty had written this so I don't
25  know why she had written that in there.
```

1    Q    Do you think she's lying?

2    A    No, I don't think she's lying.

3    Q    Okay.  You don't have a specific memory

4  of the meeting, do you?

5    A    No, sir.

6    Q    Okay.  So you'd agree with me that it's

7  more accurate to rely on the notes, correct?

8    A    Yes.

9    Q    No. 24 on that same page.  It is vital

10  that all paperwork is completed and pertinent

11  information is being passed on to other shifts.

12  Don't get mad if you have a note waiting on you

13  when you fail to complete a job task.  Again,

14  staff failing to complete the paperwork for

15  shift change, correct?

16            MR. ARTUS:  Object to the form.

17            MS. FOUTCH:  Object to the form.

18            MR. ARTUS:  What page are you on?

19            MR. SMOLEN:  459.

20    Q    (By Mr. Smolen)  Yes?

21    A    Repeat your question.

22    Q    No. 24.  It is vital that all paperwork

23  is completed and pertinent information is being

24  passed on to other shifts.  Don't not get mad if

25  you have a note waiting on you when you fail to

1      Q     But this is talking about at all times,

2   which would include the evening shift as well,

3   correct?

4      A     Right.

5      Q     So who was that person that had been

6   designated in 2015 or 2016 on the evening shift?

7      A     The shift supervisor.

8      Q     Okay.  And this particular shift which

9   Billy Woods died, it would have been Jerrod

10   Lang?

11      A     Yes.

12      Q     And that was the case despite him of

13   having only four months experience at the

14   facility, correct?

15      A     Four months?  I think he was there

16   longer than that.

17      Q     I think he began in February of 2016 and

18   he became a supervisor in April of 2016.  Does

19   that seem to be accurate with your memory?

20      A     Okay, in April and Billy died in

21   December.

22      Q     Right.  And from the time in which Mr.

23   Lang became a shift supervisor, he had been

24   there just two months, correct?

25      A     You said February?

```
 1        Q    February and March --

 2        A    Yes.

 3        Q    -- and then in April, okay?  And so he

 4    had only been there a couple of months.  But

 5    despite him being there only a couple months,

 6    he, in essence, became the juvenile detention

 7    center superintendent when you were not present

 8    and Ms. Reece wasn't present, correct?

 9        A    Yes.

10        Q    Okay.  And both you and Ms. Reece would

11    generally work an administrative schedule from

12    8:00 to 5:00 daily, correct?

13        A    7:00 to 3:00, yes.

14        Q    7:00 00 to 3:00, okay.  And so evening

15    shift started at 3:00, correct?

16        A    Yes.

17        Q    Okay.  And on that evening shift, the

18    shift supervisor for the evening shift would

19    serve in that capacity, correct?  That's

20    correct?

21        A    Yes.

22                  (Plaintiff's Exhibit No. 33

23                   marked for identification)

24        Q    I'm going to hand what we've marked as

25    Exhibit 33.  Take a look at what's been Bates
```

1  was aware that Mr. Lang was promoted to a

2  supervisory position within just a few short

3  months after being employed at MCCOYS?

4       A    Yes.

5       Q    And that she went ahead and authorized

6  that despite it being a policy violation?

7       A    Yes.

8       Q    Did she ever raise any concerns to you

9  when she approved that promotion of Jerrod Lang

10  into the supervisory position despite it being

11  in direct violation of MCCOYS' policy?

12       A    No, sir.

13       Q    I want to talk to you about performance

14  evaluations, okay?  How are performance

15  evaluations conducted at MCCOYS in 2015 and

16  2016?

17       A    Normally, we would get 30, 60, and 90

18  days.  30, 90, and six months, and annually.

19       Q    30, 90, six month, and then an annual?

20       A    Yes.

21       Q    So four per year?

22       A    First year, yes.

23       Q    For the first year?

24       A    Yes.

25       Q    And then once a year after that?

1      A      Yes.

2      Q      Okay.   And how were those evaluations

3   completed?

4      A      The supervisors were supposed to

5   complete those.

6      Q      And that was completed on a form?

7      A      Yes.

8      Q      And what was the purpose of completing a

9   30, 90, six month, and one-year evaluation?

10      A      The purpose to see how they were doing.

11      Q      Okay.   In part, to determine their

12   proficiencies, correct?

13      A      Yes.

14      Q      Okay.   It indicates that the evaluation

15   was intended as a means of measuring and

16   enhancing employee performance, fostering and

17   professional development and career growth,

18   determining merit increasing, and meeting the

19   internal and external demands for documentation

20   of individual performance, correct?

21      A      Yes.

22      Q      It goes on to state that the program

23   supervisor shall evaluate the employee by an --

24   by anniversary or original date of hire.   The

25   performance management evaluation will be based

1   correct?

2       A   Yes.

3       Q   Is it your testimony to the jury that

4   this practice was happening at MCCOYS in 2015

5   and 2016?

6       A   No, sir.

7       Q   Okay.  Why was it not happening,

8   Mr. Washington?

9       A   Well, one reason is normally we would

10  get something from human resources letting us

11  know whenever an evaluation date was coming up

12  and then that stopped happening.

13      Q   Okay.  But -- but we still had a written

14  policy on it, right?

15      A   Yes.

16      Q   You were still aware that it was

17  supposed to happen at 30, 60, 90, and an annual

18  -- annual evaluation as well?

19      A   Yes.

20      Q   But that wasn't happening, correct?

21      A   No, sir.

22      Q   Other than the fact that HR was

23  supposedly giving you guys some dates on when

24  these would be conducted, do you have any other

25  explanation for why these evaluations were not

1   taking place?

2       A    No, sir.

3       Q    Okay.  Do you believe that if the

4   evaluations were happening, that MCCOYS and you,

5   in particular, would have had a better

6   understanding as to your employee's

7   proficiencies with respect to the policies,

8   procedures, and the training materials?

9       A    Yes.

10      Q    Mr. Lang should have also received an

11  evaluation at the time that he was promoted into

12  a supervisor's position, correct?

13      A    Yes.

14      Q    Did that happen?

15      A    No, sir.

16      Q    Okay.  Whose decision was it not no

17  conduct that performance evaluation?

18      A    That was mine.

19      Q    Anything prevent you from conducting the

20  performance evaluation?

21      A    Well, the only excuse I have is that,

22  you know, we were in a new building and there

23  were things that were going on with the new

24  building that needed to be corrected and those

25  weren't happening with the people that I

```
1    contacted to help me with those things and --
2         Q    Let's talk about that, Joe.
3                   MR. WOOD:  Hold on.
4                   MR. SMOLEN:  Oh, I thought he was
5    finished.  Randall, I'm sorry.
6                   MR. WOOD:  Were you done with your
7    answer?
8                   THE WITNESS:  Yeah.
9         Q    (By Mr. Smolen)  Joe, let's talk about
10   the problems you were having with the new
11   building.  Can you tell me what those were?
12        A    Leaking windows, leaking walls, problems
13   with the stove, problems with the -- the sewers
14   in the restrooms.
15        Q    Can you recall any others?
16        A    Let's see.  Oh, and when they did the
17   keying to the locks, they were supposed to call
18   me and have me let them know how I wanted the
19   locks keyed and they didn't do that, so we had
20   to get somebody to come out and rekey all the
21   locks, changed some of the locks on some of the
22   doors, get intercoms installed where they
23   weren't installed, tried to get them to do some
24   work in the classroom as far as providing
25   petitions to separate the residents.  I think
```

1    A    No, sir.

2    Q    What intercoms were not installed?

3    A    There was no intercoms on the wings.

4  There was no intercoms in the multipurpose room.

5  There was no intercom in the classroom.

6    Q    Okay.

7    A    So we had no communication with, you

8  know, anybody in the classroom.  We couldn't

9  hear what was being -- or any conversations on

10  the wings, and then we didn't have any way to

11  communicate with staff who were out in the

12  multi-purpose room.

13    Q    Okay.  And it was these issues that it's

14  your testimony prevented you from doing the

15  employee evaluations at 30, 60, 90, and one

16  year?

17    A    Yes.

18    Q    Okay.  Did you think these issues were

19  more important than the employee evaluations?

20    A    No.

21    Q    Why did you choose then to not do the an

22  annual -- or the performance evaluations?

23    A    Well, one reason is that, you know,

24  staff were always wanting to leave or talking

25  about leaving.  I thought maybe they might leave

1   the form.

2        Q    Or his signature, correct?

3        A    Or signature.

4        Q    And what's the importance of having his

5   signature on this form?

6        A    To indicate that he understands what

7   he's completed here.

8        Q    And that these are his accurate answers,

9   correct?

10       A    Yes.

11       Q    Did you ever ask any staff at MCCOYS why

12   the suicide risk assessment was not properly

13   completed?

14       A    No.

15       Q    Is that something that you could have

16   asked?

17       A    Yes.

18       Q    Several of your staff have indicated

19   that a suicide risk assessment sheet that was

20   completed like this, irrespective of whether or

21   not there was a signature on the form, should

22   have triggered a suicide watch.  Do you agree or

23   disagree --

24             MR. LEBLANC:  Object to the form.

25       Q    (By Mr. Smolen) -- with that?

```
1                    MR. LEBLANC:  Object to the form.
2                    THE WITNESS:  I agree.
3        Q    (By Mr. Smolen)  You agree?
4        A    Yes.
5        Q    Did you ever talk to your staff after
6    the fact why we had a suicide risk assessment
7    that should have triggered a watch but that was
8    not completed?
9                    MR. LEBLANC:  Object to the form.
10                   THE WITNESS:  No, I didn't.
11       Q    (By Mr. Smolen)  Is that something that
12   you could have inquired about?
13       A    Yes, sir.
14       Q    Did Ms. Perkins ever inquire about that?
15       A    No, sir.
16       Q    Did Ms. Perkins and you ever discuss
17   that you felt like Billy Woods' suicide risk
18   assessment should have triggered a suicide
19   watch?
20       A    Yes.
21       Q    What did Ms. Perkins -- what did she
22   say?
23       A    She felt like it should have been -- he
24   should have placed on suicide watch.
25       Q    Based on what was identified in the
```

1   you?

2      A   Because it -- just what happened with

3   this young man.

4      Q   Because he could be in there devising a

5   plan to hurt himself, correct?

6      A   Yes.

7            MR. LEBLANC:  Object to the form.

8      Q   (By Mr. Smolen)  Would you agree with me

9   that children who withdraw from the program want

10  to seek out isolation are individuals that

11  should be identified as a moderate risk for

12  suicidal ideation?

13           MS. ZAMARRIPA:  Object to the form.

14           MR. LEBLANC:  Object to the form.

15           MR. ARTUS:  Object to the form.

16           MR. WOOD:  Object to the form.

17           THE WITNESS:  Yes.

18     Q   (By Mr. Smolen)  Would agree with me or

19  are you aware that the majority of suicides that

20  occur in the juvenile detention facility occur

21  with children who are in room confinement or

22  placed in a locked room?

23     A   Yes.

24           MR. LEBLANC:  Same objection.

25     Q   (By Mr. Smolen)  Mr. Woods wasn't just

1   housed in a room with a locked door, but he was

2   housed in a room with an ADA compliant toilet

3   bar, correct?

4        A    Yes.

5        Q    Did it concern you that you had a child

6   who had presented and during the suicide risk

7   assessment provided information that you felt

8   like should have triggered a suicide watch, but

9   yet he was housed in a room that had a bar that

10  was capable of being used to hang himself?

11              MR. LEBLANC:  Object to the form.

12              THE WITNESS:  If I had known this

13  before he was placed in that room, then yes.

14       Q    (By Mr. Smolen)  He wouldn't have been

15  placed in that room?

16       A    No, sir.

17       Q    Would you agree with me that by placing

18  him in that room created a heightened risk?

19              MR. LEBLANC:  Object to the form.

20              THE WITNESS:  Yes.

21       Q    (By Mr. Smolen)  Did you ever talk with

22  Ms. Perkins about your concern that placing

23  Billy Woods, who had expressed suicidal

24  ideation, that placing him in this room was a

25  concern for you after the fact?

```
 1   allowed me to do that, but Patty is the one that
 2   actually entered JOLTS, the resident's
 3   information, or looking up any -- any
 4   information that we didn't have.
 5       Q    Okay.  So Patty was the one who
 6   primarily worked on JOLTS?
 7       A    Yes.
 8       Q    You'd agree with me that we've
 9   identified a number of policy violations that
10   occurred with respect to the care of Billy Woods
11   while he was at MCCOYS, correct?
12       A    Yes.
13       Q    Do you take any responsibility for those
14   policy violations?
15       A    Regarding his care?
16       Q    Yes, sir.
17       A    No, sir.
18       Q    Who do you believe is responsible for
19   those policy violations?
20       A    The staff that was on duty that evening.
21       Q    Okay.  And do you believe MCCOYS should
22   be held accountable for the staff's failures?
23               MR. WOOD:  Object to the form.
24               THE WITNESS:  No, sir.
25       Q    (By Mr. Smolen)  Do you believe if
```

1  policies had been followed, that Billy Woods

2  would still be alive?

3      A   Yes.

4              MR. LEBLANC:  Object to the form.

5      Q   (By Mr. Smolen)  Do you recall having

6  meetings with your staff prior to them sitting

7  for interviews with OSBI?

8      A   Meetings with them?

9      Q   Yes, sir.

10     A   Only that they were scheduled for

11 interviews.

12     Q   Okay.  And that was the extent of the

13 conversations that you had with them?

14     A   Yes.

15     Q   Take a look at Exhibit 2, and I'm going

16 to go to Page 82 of that exhibit.

17             MR. ARTUS:  What exhibit?  I'm

18 sorry.

19             MR. SMOLEN:  It's Exhibit 2 and the

20 Bates stamp is 82.

21     Q   (By Mr. Smolen)  Mr. Washington, you've

22 had an opportunity since Billy Woods' death to

23 review the actions and inactions of the staff

24 that were employed at MCCOYS, correct?

25     A   Yes.

255

1   their rooms?

2      A   Any doubt?

3      Q   Yeah, do you have any doubt that they

4   were trained to do that?

5           MR. SMOLEN:  Object to the form.

6           THE WITNESS:  Yes, they were

7   trained.

8      Q   (By Mr. Artus)  Okay.  So is it -- would

9   it be against MCCOYS policies not to do

10  15-minute checks of the juveniles if they're in

11  their room?  Would that be against policy?

12     A   Repeat that.

13     Q   Is it against policy to fail to do or

14  not do 15-minute checks?

15     A   Yes, sir.

16     Q   So you agree with that?

17     A   Yes, sir.

18     Q   Is it against policy to falsify

19  15-minute checks on the logs?

20     A   Yes, sir.

21     Q   Is it against policy to sign someone

22  else's initials to the 15-minute check

23  paperwork, especially if you didn't see them do

24  the 15-minute check?

25     A   Yes, sir.

373

1    Q    And you were familiar with this
2  orientation policy, correct?
3    A    Yes, sir.
4    Q    On the first page, it states:  You will
5  be expected to complete a minimum of 40 hours
6  training at the facility before you are assigned
7  a regular schedule, correct?
8    A    Yes, sir.
9    Q    You were aware of that policy prior to
10 Billy Woods' death, correct?
11   A    Yes, sir.
12   Q    It says:  Then you will be placed with
13 an experienced staff member for another 40
14 hours, correct?
15   A    Yes, sir.
16   Q    And you were aware of that policy prior
17 to Billy's death, correct?
18   A    Yes, sir.
19   Q    It says you -- if you are comfortable
20 with the program at this time, you will be
21 placed on the permanent schedule, correct?
22   A    Yes, sir.
23   Q    And you were -- you understood that that
24 was the policy at MCCOYS prior to Billy's death,
25 correct?

```
 1   through so...
 2               MR. SMOLEN:  Okay.
 3               MR. LEBLANC:  I'm just making a
 4   record.
 5               MR. SMOLEN:  Okay.
 6       Q   (By Mr. Smolen)  Sir, I don't recall
 7   covering this specifically with you, but
 8   Mr. LeBlanc must have a better memory or a
 9   different memory than me.  But if you would,
10   look at 538, please.
11       A   Yes.
12       Q   How many hours of orientation training
13   did Brandon Miller have?
14       A   Well, like I stated, I -- I didn't keep
15   track of this.
16       Q   Well, according to the form, how many
17   hours of orientation training did --
18       A   Oh, 16.
19       Q   -- Mr. Miller have?  16 hours?
20               MR. SMITH:  You can finish your
21   answer if you haven't.
22       Q   (By Mr. Smolen)  16 hours, correct?
23       A   Yes.
24       Q   And let's look at Exhibit 38.  That's
25   the personnel file of Jackie Winkle, correct?
```

377

```
1        A    Yes, sir.
2        Q    Look at 577, if you would, please.  Are
3   you there?
4        A    Yes, sir.
5        Q    Can you tell the jury how many hours of
6   orientation training Jackie Winkle had?
7        A    16 hours.
8        Q    Now let's look at Mr. Lang's personnel
9   file, which is Exhibit 38.  Are you there?  I'm
10  sorry, 39.  Do you have that in front of you?
11       A    Yes.
12       Q    How many hours of orientation training
13  did Jerrod Lang have?
14       A    16.
15       Q    You were also asked about Angela
16  Miller's personnel file, which is Exhibit 36.
17  Take a minute to look at that.  How many hours
18  does Angela Miller's file show that she had with
19  respect to orientation training?  If -- if I
20  told you that she didn't have any documentation
21  in her personnel file to establish that she had
22  had any orientation training, would you take my
23  word for it?
24            MR. SMITH:  Object to the form.
25            THE WITNESS:  Yes.
```

379

```
 1   even be put on shift, that an additional 40
 2   hours was required for observation immediately
 3   following the first 40 hours, correct?
 4        A    Yes, sir.
 5              MR. SMITH:  Object to the form.
 6        Q    (By Mr. Smolen)  Okay.  You were aware
 7   that all of the staff working at MCCOYS prior to
 8   Billy Woods' death lacked the required training
 9   needed prior to being scheduled to work shifts
10   that involved juveniles that were being housed
11   in the facility, correct?
12              MR. ARTUS:  Object to the form.
13              MR. SMITH:  Object to the form.
14              THE WITNESS:  Yes, sir.
15        Q    (By Mr. Smolen)  Okay.  Can you tell the
16   jury why you allowed your detention staff to be
17   assigned shifts prior to receiving the requisite
18   40 hours training -- orientation training?
19        A    Well, we had staff that was leaving.
20   And as policy states, we need so many staff per
21   residents to care for the residents.
22        Q    Okay.  But the policy also said that --
23   that it was an absolute requirement that they
24   have 40 hours of orientation training prior to
25   being scheduled to work, correct?
```

1             MR. SMITH:  Object to the form,

2    vague.

3        Q   (By Mr. Smolen)  If you need to refresh

4    your memory, it's back at Defendant's Exhibit 2,

5    the one Mr. Artus asked you about.  See the

6    first -- the bottom paragraph on Page 1, MCCOYS

7    371?

8        A   Yes.

9        Q   It says:  You will be expected to

10   complete a minimum of 40 hours training at the

11   facility before you are assigned a regular

12   schedule, correct?

13       A   Yes.

14       Q   I asked you about that.  You

15   acknowledged that you knew that was the policy

16   at the time prior to Billy Woods' death,

17   correct?

18             MR. SMITH:  Object to the form.

19             THE WITNESS:  Yes.

20       Q   (By Mr. Smolen)  But that policy was

21   violated with respect to every single detention

22   worker on staff that night that Billy died,

23   correct?

24             MR. ARTUS:  Object to the form.

25             MR. SMITH:  Same.

381

1          THE WITNESS:  Yes.

2      Q    (By Mr. Smolen)   Okay.  We also know

3  from MCCOYS orientation training information

4  that the -- two -- at least two of the topics

5  that would be covered in that first 40 hours of

6  orientation training -- training included

7  training over the employee handbook and training

8  over the policy and procedure manual, correct?

9      A    Yes.

10     Q    Nothing in the orientation training

11 manual indicates that staff would be required to

12 take home the employee handbook or the policy

13 and procedure manual and read it at home, does

14 it?

15          MR. SMITH:  Object to the form.

16          THE WITNESS:  Repeat that question.

17     Q    (By Mr. Smolen)   Nothing in the

18 orientation material states that staff would be

19 required to take home the employee handbook and

20 the policy and procedure manual and read them at

21 home, does it?

22          MR. SMITH:  Same.

23          THE WITNESS:  No, it doesn't state

24 that.

25     Q    (By Mr. Smolen)   It specifically states

382

1   that it would be trained upon during the first

2   40 hours of orientation training at the

3   facility, correct?

4        A    Yes.

5        Q    But that never happened, did it?

6             MR. SMITH:  Object to the form.

7             THE WITNESS:  No, sir.

8        Q    (By Mr. Smolen)  No. 3:  First Aid & CPR

9   Training.  It says:  If you have not been

10  previously trained -- I'm at 372, sir.  Are you

11  there?

12       A    Yes.

13       Q    If you have not been previously trained

14  in first aid and CPR, a time will be scheduled

15  for you to complete this training, correct?

16       A    Yes.

17       Q    It also indicates that aggressive

18  behavior management training was part of that

19  first 40 hours, correct?  I'm at 372, No. 4.

20       A    Yes.

21       Q    Okay.  Now let's look at Mr. Lang's

22  employment file.  It's Exhibit 39.  Are you

23  there?

24       A    Yes.

25       Q    Despite Mr. Lang being hired in February

398

1    orientation checklist, that's where they get

2    that.

3        Q    (By Mr. Smolen)  Right.  Where -- where

4    the form is marked that the orientation process

5    happened and there's a check box that says it

6    has, correct?

7        A    Yes.

8        Q    And we see those -- we see those check

9    boxes on Detention Worker Miller -- Angie

10   Miller.  We see those check boxes on Detention

11   -- excuse me -- not on Angie Miller.  But we see

12   those check boxes on Brandon Miller, correct?

13       A    Yes, sir.

14       Q    We see it on Jerrod Lang, correct?

15       A    Yes.

16       Q    And we see it on Ms. Winkle, correct?

17       A    Yes.

18       Q    But we know now that that orientation

19   was not happening pursuant to the procedure,

20   correct?

21       A    Yes.

22       Q    But despite that, the personnel files

23   have been put together in a way that leads OJA

24   --

25            MR. ARTUS:  Hold on.

```
 1      Q    (By Mr. Smolen)  -- to believe that they
 2  --
 3           MR. ARTUS:  Object to the form.  I
 4  can even check right now before you can get it
 5  out all.
 6      Q    (By Mr. Smolen)  You would agree with me
 7  that the personnel files have been put together
 8  in a way that leads OJA to believe that the
 9  orientation has actually happened, correct?
10           MR. ARTUS:  Object to the form.
11           MR. SMITH:  Same.
12           THE WITNESS:  Yes.
13      Q    (By Mr. Smolen)  Did you ever tell OJA,
14  Hey, wait a second.  Guys, I know that the
15  personnel files show that the orientation has
16  happened but it, in fact, has not?
17           MR. SMITH:  Object to the form.
18           THE WITNESS:  No, sir.
19           MR. SMITH:  Vague on the orientation
20  process.
21      Q    (By Mr. Smolen)  I'm talking about -- if
22  I'm being vague, I'm talking about the
23  orientation training procedures that were
24  produced by the defendants in this case?
25           MR. SMITH:  Same objection.
```

1    Q    (By Mr. Smolen)   The personnel files
2  showed that the orientation training was
3  happening pursuant to the procedure, yes?
4    A    Yes.
5    Q    But they were not happening in
6  accordance with the procedure.  We've already
7  established that, correct?
8    A    Yes.
9    Q    Did you ever clarify to OJA that the
10 orientation was not actually happening pursuant
11 to the written procedure?
12           MR. ARTUS:  I'm going to make a
13 running objection to this because this document
14 you're showing -- this document 385.  And what's
15 checked is orientation to policy and procedures
16 assigned duties.  It says nothing about
17 orientation policy or orientation this folder.
18 It just says that the orientation policies and
19 procedures, and it says -- checked yes.
20           MR. SMITH:  I'll object, too, that
21 this date on the document is 2/16 of '12.
22    Q    (By Mr. Smolen)   Sir, my question was:
23 Did you ever go in and tell OJA that the staff
24 were not receiving the required 40 hours of
25 orientation training prior to them being

401

1  scheduled to work shifts at the facility?

2             MR. ARTUS:  Required by what?

3     Q   (By Mr. Smolen)  Your orientation

4  training procedure?

5             MR. ARTUS:  Not the Oklahoma

6  Administrative Code?

7             MR. SMOLEN:  I'm talking about the

8  Oklahoma -- I'm talking about MCCOYS orientation

9  procedure, the one that you covered and the one

10 that we've just got done --

11            MR. ARTUS:  We're not talking about

12 the Oklahoma Administrative Code?

13            MR. SMOLEN:  We're talking about the

14 orientation training.

15            MR. ARTUS:  Okay.

16            THE WITNESS:  No.

17    Q   (By Mr. Smolen)  Did you ever tell them

18 that?

19    A   No.

20    Q   Why not?

21    A   Because I didn't know that -- that was

22 what they were asking for on this.  I had never

23 seen this before.

24    Q   Did you ever tell anybody that the

25 orientation training was not happening in

402

1   accordance with the policies and procedures at

2   MCCOYS?

3       A    No, I didn't.

4       Q    Let's look at 374 in the same exhibit.

5   Are you there?

6       A    Yes.

7       Q    You're listed as the facility

8   administrator, correct?

9       A    Yes.

10      Q    Okay.  And under Security and Control,

11  it says:  The administration recognizes the

12  difference between room restriction and

13  confinement, correct?

14              MR. ARTUS:  Where are we?

15              MR. SMOLEN:  374 under Security and

16  Control.

17              THE WITNESS:  Oh, okay.

18              MR. ARTUS:  Again, I'm going to have

19  a running objection to this whole line of

20  questioning because you're test -- you're --

21  you're asking him about an internal document

22  prepared by the juvenile detention center which

23  he's never seen before, and then you're asking

24  him how the OJA interpreted this in finding

25  this, which I think is completely unfair and

```
 1              MR. SMOLEN:  Oh, not in -- no, no, I
 2   was talking about --
 3              MR. COLDIRON:  He's recrossing mine.
 4              MR. SMOLEN:  Yeah.
 5              MR. SMITH:  I gotcha.
 6              MR. SMOLEN:  And the personnel file,
 7   I'm going to get to right after this, which I
 8   expect will be really short, okay?
 9                   (Audio playing)
10      Q   (By Mr. Smolen)  Do you remember telling
11   the police when they asked you who had found
12   Billy Woods' body, that you told them that you
13   didn't know?
14      A   That I just got there, yeah, I saw that.
15      Q   Okay.  But you knew at the time the
16   police asked you who found Billy Woods' body,
17   you knew it was Jerrod Lang, correct?
18      A   Yes.
19      Q   Why did you tell the police you didn't
20   know?
21      A   I don't know.
22      Q   You'd agree with me it's important to be
23   honest with law enforcement when they're
24   investigating the death --
25      A   Yes.
```

426

```
 1      Q    -- of one of the juveniles at the
 2   facility, correct?
 3      A    Yes.
 4      Q    But you weren't honest with them, were
 5   you?
 6              MR. ARTUS:  Object to the form.
 7              MR. SMITH:  Same.
 8              THE WITNESS:  I don't -- I don't
 9   guess I was.
10      Q    (By Mr. Smolen)  If you weren't honest
11   to the police officer conducting an
12   investigation into the death of Billy Woods, why
13   should the jury believe any of your testimony?
14              MR. LEBLANC:  Form.
15              MR. SMITH:  Object to the form,
16   vague.
17              THE WITNESS:  Because I'm telling
18   the truth.
19      Q    (By Mr. Smolen)  Okay.  But you weren't
20   telling the truth to the officer, correct?
21      A    No, I wasn't.
22      Q    So why would the jury -- why -- I want
23   you to tell the jury why they should believe you
24   now?
25              MR. LEBLANC:  Same objection, asked
```

438

1  counseling then.  So -- but back in '13, I don't

2  remember.

3      Q    Maybe they weren't doing the weekly

4  meetings then?

5      A    Well, back in 2013 -- yeah, they were

6  doing it because they had somebody from a -- a

7  counselor from MCCOY'S that would come over and

8  -- and provide that service.

9      Q    I think we identified close to five --

10  it was four or five attempted suicides prior to

11  Billy Woods' suicide.  Do you recall discussing

12  those with me?

13             MR. SMITH:  Object to the form.

14             MR. ARTUS:  Object to the form.

15             THE WITNESS:  With you?

16      Q    (By Mr. Smolen)  Yes, the first time we

17  spoke?

18      A    Uh-huh, yes.

19      Q    And you had indicated that your

20  knowledge of those four or five events, that the

21  suicide attempts happened during room

22  confinement, correct?

23             MR. LEBLANC:  Form.

24             THE WITNESS:  Not necessarily.  Well

25  --

439

```
1        Q    (By Mr. Smolen)  Can you -- let me ask
2   you this.  Can you identify any of those four or
3   five prior suicide attempts that occurred
4   outside of a room confinement situation?
5                MR. LEBLANC:  Form.
6                MR. SMITH:  Object to the form.
7                THE WITNESS:  Well, okay.  Now are
8   you -- like, you know, at lockdown, they would
9   go into their room.  So are you considering that
10  like a room confinement?
11       Q    Yes, anytime that they were --
12       A    Okay, yes.
13       Q    -- confined to their room?  It was my
14  understanding that that's when the previous
15  suicide attempts had happened based on your
16  knowledge of those events?
17               MR. SMITH:  Object to the form.
18       Q    (By Mr. Smolen)  Is that correct?
19       A    Yes.
20               MR. SMITH:  Vague, confusing.
21       Q    (By Mr. Smolen)  You understood that
22  there was a risk of children while they were
23  confined to their rooms attempting to commit
24  suicide, correct?
25               MR. LEBLANC:  Form.
```

```
 1              THE WITNESS:  Yes, sir, that's why
 2  they did 15-minute room checks.
 3     Q   (By Mr. Smolen)  That's why the policy
 4  required them to do it?
 5     A   Yes, sir.
 6              MR. SMITH:  Object to the form,
 7  vague.
 8     Q   (By Mr. Smolen)  And, again, we've
 9  discussed this but if the policies are not being
10  followed, it heightens the risk for children in
11  their rooms to commit suicide if those checks
12  are not being done, correct?
13     A   Yes.
14              MR. LEBLANC:  Form, repetitious.
15  You're right, Andy.  It has been discussed about
16  half a dozen times.
17              MR. SMOLEN:  Because Mr. LeBlanc is
18  so agitated this Friday evening, I'm going to
19  end my line of questioning.
20              MR. ARTUS:  May I ask a few
21  questions?
22              MR. LEBLANC:  I have no questions.
23              MR. ARTUS:  I have a few.
24              MR. LEBLANC:  You can ask as many as
25  you wish.
```