


COMMISSION
FOR HUMAN SERVICES

**State of Oklahoma**
DEPARTMENT OF HUMAN SERVICES
**Office of Client Advocacy**
Angela Burleigh, Programs Administrator
P.O. Box 25352, Oklahoma City, OK 73125
405/522-2720; FAX 405/522-2680

April 20, 2017

Donna Glandon, Advocate General
Office of Juvenile Affairs
P.O. Box 268812
Oklahoma City, OK 73126

Re:     OCA Number:     1806285
       Client name(s):    Woods, Billy
       Facility:           Muskogee County Regional Juvenile Detention

Dear Ms. Glandon:

The Office of Client Advocacy (OCA) investigated the above noted case involving an allegation of abuse and/or neglect. Pursuant to OCA policy, you are being informed of the findings.

| Accused caretaker | Finding |
|---|---|
| Jerrod Lang | NEGLECT SUBSTANTIATED |
| Brandon Miller | NEGLECT SUBSTANTIATED |
| Angela Miller | NEGLECT SUBSTANTIATED |
| Jerrod Lang | ABUSE SUBSTANTIATED |
| Marietta Winkle | NEGLECT SUBSTANTIATED |
| Angela Miller | CARETAKER MISCONDUCT CONFIRMED |
| Jerrod Lang | CARETAKER MISCONDUCT CONFIRMED |
| Marietta Winkle | CARETAKER MISCONDUCT CONFIRMED |
| Brandon Miller | CARETAKER MISCONDUCT CONFIRMED |

Area of concerns noted during the investigation:
Areas of concern were noted.

> A copy of the investigative report is enclosed. Attachments will be provided upon request. This report contains information confidential under Oklahoma and Federal law. Confidential information in this record remains confidential and cannot be disclosed to others without proper authorization. Its use is limited to the purposes for which disclosure has been authorized. Any violation of the confidentiality of information in this record is a misdemeanor.

Please contact this office if there are any questions.

Enclosure
c:    Facility Administrator
     OCA file



PLAINTIFF'S EXHIBIT 2

**AOC's for 1806285-Woods (Muskogee County Regional Juvenile Detention Center)**

1.	The Daily Notes sheet for resident Billy Woods was pre-emptively filled out for the entire 3:00 pm to 11:00 pm shift on 12-15-16. Woods's body was discovered in his cell at 8:34 pm, after Woods had not been checked for approximately two hours and two minutes. Checks were initialed through 10:45 pm as having been completed. Shift Supervisor Jarred Lang admitted he had filled out the sheet ahead of time, but Lang claimed he had never done that before for any resident. Lang also filled in the initials for Detention Worker (DW) Brandon Miller. According to Lang and DW Jackie Winkle, shift supervisors are permitted to write in the initials of other staff who complete checks, even if the shift supervisor does not complete that check.
2.	The Daily Notes sheet for Woods had initials for Miller and Lang at 6:45 pm, 7:00 pm, 7:15 pm, 7:30 pm, 7:45 pm, 8:00 pm, 8:15 pm, and 8:30 pm. A review of video showed none of these checks were completed by any staff. Miller, Lang, and Winkle were all in the area outside of Woods's room at multiple and various times during the times in question, but checks were not completed. At approximately 7:32 pm, Miller placed his hand on the door to Woods's room, but he did not check on Woods. At approximately 7:37 pm, Miller was standing beside Woods's door, but did not check on Woods.
3.	The Daily Notes sheets for the other nine residents in the facility did not have 15-minute checks documented from 8:00 pm to 10:45 pm.
4.	Lang placed residents on lockdown at approximately 8:37 and had finished securing all residents in their rooms on the West Wing—the wing where Woods resided—by approximately 8:38 pm. Video was not provided for the East Wing, so it cannot be determined at what time the residents on that wing were secured in their rooms. Fifteen minute checks were not completed for residents on the West Wing until Miller opened the flap covering the in-door window for room #5 at approximately 9:04 pm. At that point, 26 minutes had passed without any checks. Miller did not check the residents in rooms #2, #3, or #4 at that time.
5.	At approximately 10:21 pm, Winkle appeared to be administering medication to the resident in room #4. At that point, the resident had not been checked for approximately one hour and 43 minutes. Miller and Winkle then conducted checks of rooms #2, #3, and #5. Rooms #2 and #3 had not been checked for approximately one hour and 45 minutes, and room #5 had not been checked for one hour and 19 minutes. None of these checks were documented on the Daily Notes. These four rooms were not checked again until approximately 10:47 pm, which was approximately 26 minutes since the last check. These four rooms were then checked again at approximately 11:25 pm, which was approximately 36 minutes since the last check. These four rooms were not checked again until approximately 12:06 am, which was approximately 41 minutes since the last check.
6.	An unknown male resident was left unsupervised, by Miller, with access to a shaving razor for approximately four minutes. The razor was in his hygiene box, which was sitting on the table in the West Wing. Video showed the resident picking up the razor and rubbing his thumb over the blades.
7.	An unknown male resident was locked in the shower room for approximately 20 minutes without being checked.
8.	Lang said when he reported to work at 3:00 pm on 12-14-16, he had to complete Woods's intake. Lang said Woods was not cooperating with the process, so Lang placed Woods in a room until approximately 7:00 pm. Lang said Woods then cooperated with the process and finished the intake process, which included a suicide assessment. Woods was in a room for approximately four hours without having a suicide assessment completed. It is unknown how often Woods was checked during that time.
9.	In Woods's suicide assessment, he reportedly said he had attempted multiple times to commit suicide and had a family member who had successfully committed suicide. Woods also reportedly said he had attempted to hang himself approximately one month prior to being placed

at the facility. When asked if he relayed any of that information to a supervisor, Lang said he was going to tell Superintendent Joe Washington about it, but he forgot. Woods was not placed on suicide precautions because he reportedly said he did not intend to kill himself at that time.

10. Woods did not sign his suicide assessment, although he signed all other documents in his intake paperwork.

11. Lang said he does not have a background in psychology or psychiatry. It is unclear if other shift supervisors have a background in psychology or psychiatry. Shift supervisors are tasked with conducting suicide assessments, apparently with no formal training on recognizing signs and symptoms of suicidal ideations or behaviors. The facility does not have a qualified mental health professional administer suicide assessments.

12. Detention Workers only know that a resident is on suicide precautions if it is discussed during a shift change. Reportedly, there is no indication on a resident's Daily Notes or near his/her room if he/she should be monitored for suicidal behavior. Extra steps are not taken to ensure that heightened monitoring is completed.

13. Miller said he did not know anything about Woods until he saw Woods during shower time at approximately 6:30 pm on 12-15-16. Miller's shift did not begin until after 3:00 pm that day, so he had no way of knowing that Woods had a history of suicidal behavior or attempts. It is unclear how information is relayed—if at all—to workers who are not able to attend a shift change meeting.

14. The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Suicide Prevention and Control section (page 19) states (in part): "When the juvenile is in his/her room they are monitored by intercom and visually observed every five (5) minutes." Lang, Miller, and Winkle all indicated checks for residents on suicide precautions were to be conducted every 15 minutes. None of them indicated any knowledge of 5-minute check requirements for suicide precautions. None of them appeared to know residents were to be monitored with the intercom, too.

15. Resident J___ P___ was placed at the facility from 12-20-16 to 12-22-16, after Woods's death. P___ said he was placed on suicide precautions during his placement, and he had his bedding and clothes removed. P___ said staff checked on him "a lot" during that time. P___ said his room was cold, and without any way to stay warm, he resorted to sleeping while sitting on the metal toilet. P___ said he had requested a sweatshirt prior to his clothes being removed, but staff did not get him a sweatshirt. P___ reported other residents were given sweatshirts. P___ said staff ignored him when he made requests. The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Suicide Prevention and Control section (page 19) states (in part): "The juveniles [sic] bed linens are removed from their room and clothing can be removed if they attempt to use them to cause bodily harm. When the juvenile demonstrates to staff that the threat of suicide is no longer real, his/her caseworker and/or medical authority considers the threat of suicide no longer real, his bed linens and clothing will be returned to him/her." It is unknown how a determination was made to remove Parsons from suicide precautions.

16. The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Medical section (page 16) states (in part): "If a juvenile is seriously injured or has a medical emergency, the following procedures should be followed: 1) One staff member is to administer first aid if necessary. One staff member is to secure the remaining population. 2) The Administrator is to be called immediately. If it is a life or death situation the shift supervisor is to call 911 before notifying the Administrator." Washington said staff called him prior to calling 911, and he had to tell them to call 911.

17. Woods was discovered at approximately 8:36 pm. 911 was not called until 8:56 pm. Lang, Miller, Winkle, and Detention Worker Angela Miller could not account for the 20-minute delay in seeking emergency medical attention for Woods.

18. B. Miller said after Woods was discovered, B. Miller and Lang went to Woods's room because B. Miller was going to do CPR. However, B. Miller said when they got to Woods's room, Lang told him not to do CPR. When asked any questions about performing CPR on Woods, B. Miller resorted to saying he had been instructed not to do CPR. B. Miller said if a similar situation had occurred at his home with a family member, he would have performed CPR and called 911.

19. B. Miller said he did not receive training on the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center. B. Miller said a supervisor "skims through" the manual with employees. B. Miller signed a form indicating he had read the manual and understood it.

20. Lang said he had worked at the facility for approximately eight months, and he had been a shift supervisor for four or five of those eight months. Lang indicated he did not have any prior experience in a similar field or facility. According to the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Shift Supervisor Job Description, an employee must have "one year experience working with juveniles" in order to qualify for the position.

21. Lang said he had not received any formal training to work at the facility. Lang also said there "disagreements about staff being trained wrong" once they began their on-the-job training. Lang said he had one class on restraint, and he was taught to "swoop and grab from behind." Lang did not know the restraint technique he had training for.

22. Winkle said she had not received any training on how to restrain a resident.

23. Lang said he was required to sign a form stating he had received and read the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center before he had a chance to actually read the manual.

24. Lang said he had read "most" of the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center, but he did not understand all of what he read. Lang said when he asked questions about the manual, "a few" of them were answered.

25. Lang said he did not receive any formal training to be a Shift Supervisor. Lang said there were "a few shifts" where he received on-the-job training, but he was mostly left on his own to figure things out.

26. When asked how he knew Woods was deceased upon entering Woods's room, Lang said it was "obvious" because Woods was "purple" and "pale-ish." Lang said he also called Woods's name, and when Woods did not respond, Lang knew he was dead. Lang admitted he did not attempt to remove the sheet from Woods's neck, and he did not attempt to perform CPR. Lang said he "panicked and got out of there."

27. Lang admitted that he told A. Miller to call Washington before she called 911.

28. Winkle said a copy of the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center was maintained in the control room so that everyone could access it. However, A. Miller said when they were dealing with the emergency situation no one knew what to do. No staff mentioned accessing the manual to determine what to do.

29. Lang said he and B. Miller went to Woods's room together, and Lang nudged Woods's body with his foot. Lang said Woods did not respond. Neither Lang nor B. Miller attempted to loosen the sheet or to perform CPR at that time. Lang said after they left the room, he went outside and "smoked a bunch of cigarettes." Lang said staff came outside a few times to check on him, but he could not deal with the situation.

30. Lang said he had been trained in CPR by the American Red Cross. Lang could not remember what he had been trained to do when if he discovered an unconscious victim.

31. Winkle said calling 911 was an "automatic" thing to do in a medical emergency. However, she could not account for why it had taken staff 20 minutes to call 911 after Woods's body was discovered.

32. Winkle went into Woods's room after his body was discovered. Winkle admitted she did not attempt to loosen the sheet around his neck, check for a pulse, check for respiration, or perform CPR. Winkle said she did not perform CPR because she did not know if the room was a crime scene. Winkle said she thought policy stated facility staff should perform CPR on a victim until paramedics arrived.

33. A. Miller admittedly did not know any of the protocols for a medical emergency at the facility.

34. The facility was not equipped with an Automated External Defibrillator (AED).

35. It was reported by some residents who were placed at the facility during the time Woods was there that Lang made fun of the way Woods talked. Woods also reportedly wanted to be addressed by his middle name, Duane, and Lang reportedly made fun of that name and would say it in a way that was perceived as being belittling or ridiculing. Reportedly, Lang's actions contributed to Woods not wanting to be out of his room and with the rest of the residents.

36. A staff known only as "Mr. Anthony" reportedly made fun of resident R███ G███ and called G███ "retard" or "retarded." This behavior reportedly occurred over multiple times that G███ was placed at the facility, not just during the dates in question during December, 2016.