IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA


ROBBIE EMERY BURKE,                )
                                   )
          Plaintiff,               )
                                   )
vs.                                ) No. 18-CV-108-RAW
                                   )
MUSKOGEE COUNTY COUNCIL OF         )
YOUTH SERVICES ("MCCOYS"),         )
et al.,                            )
                                   )
          Defendants.              )


          VOLUME I AUDIOVIDEO DEPOSITION OF JERROD LANG, a

witness called on behalf of the Plaintiff, on the 28th day

of January, 2019, at One West Third Street, Suite 900,

commencing at 10:44 a.m., in the City of Tulsa, County of

Tulsa, State of Oklahoma, before the undersigned, Marlene

Johnson, a Certified Shorthand Reporter in and for the

State of Oklahoma.


                    _____
                      Marlene Johnson, CSR


                    DAVIDSON REPORTING
                 CERTIFIED SHORTHAND REPORTERS
                   5508 South Lewis Avenue
                      Tulsa, OK 74105
                   Phone: (918) 745-9959
                 DavidsonReporting@cox.net



PLAINTIFF'S
EXHIBIT

4

1   Q    And when you would get confused, who would you report   11:20AM

2   that to?

3   A    Either Patty, Anthony or Joe Washington.

4   Q    And what would their response be?

5   A    They had different answers for me as well sometimes.   11:20AM

6   Q    Okay.  So you were getting different answers from all

7   these different supervisors about the same topic, the same

8   concern you had; is that fair?

9   A    Yes, sir.

10  Q    Okay.  Did that make it frustrating?   11:20AM

11  A    Very much.

12  Q    Okay.  Did you express your frustration?  Did you

13  tell those supervisors that you were confused about what

14  your obligations were?

15  A    Yes, sir.   11:20AM

16  Q    And what were their responses when you would tell

17  them that?

18  A    We'll go over it and Patty would come through and

19  show me policies and procedures.

20  Q    Okay.  They said, "We'll go over that," like, we're   11:20AM

21  going to go over that in the future?

22  A    Yes, sir.

23  Q    Okay.  We're going to get into that a little bit

24  more.  At line 23, you stated, at least according to this

25  report, "Lang said he was required to sign a form stating   11:21AM

1    he had received and read the policies and procedures for    11:21AM

2    the Muskogee County Regional Juvenile Detention Center

3    before he had had a chance to actually read the manual."

4    Do you recall making that statement?

5    A    Yes, sir.    11:21AM

6    Q    Okay.  Is that a true statement?

7    A    Yes, it is.

8    Q    Okay.  Walk me through, Jerrod, that process when

9    they gave you the policies and procedures, but you didn't

10   get a chance to read them?    11:21AM

11   A    I was handed a book and told to follow it.  And

12   Leonard took me into the control room and told me to read

13   as much as you can.  And maybe an hour, less than an hour

14   later, he came and got me and said, "Okay, we'll go over

15   the rest of it later, but, right now, I need you to come    11:22AM

16   help me.  We'll go over this and we'll go over this."

17   Q    Okay.  About an hour of time he gave you?

18   A    Yes, sir.

19   Q    Okay.  Give me one second, okay, Jerrod, because we

20   did this with Brandon and I want to ask you kind of the    11:22AM

21   same.

22          MR. SMOLEN:  Hey, Thomas, is there a -- I

23   thought Marisa would be here with the exhibits, but she's

24   not.  I was having to reprint this one.

25          MR. LeBLANC:  Which one?    11:23AM

```
 1  BY MR. SMOLEN:                                         11:25AM

 2  Q    Okay.  You were there when I had Brandon hold those

 3  up.  That was about the amount of information you were

 4  given on that first day and given an hour to read through,

 5  correct?                                               11:25AM

 6              MR. LeBLANC:  Object to the form.

 7  A    Yes, sir.

 8  BY MR. SMOLEN:

 9  Q    Okay.  I had a difficult time reading through that

10  over several days.  Were you able to sufficiently read the 11:25AM

11  policies and procedures and the training documentations

12  within an hour?

13              MR. LeBLANC:  Object to the form.

14  A    No, I was not able.

15  BY MR. SMOLEN:                                         11:26AM

16  Q    Okay.

17  A    I was advised to read certain parts.

18  Q    Okay.  That first day, you were --

19  A    Rules and regulations, something like that.  I can't

20  exactly remember exactly which one it was, but it was      11:26AM

21  something about rules.  And once I finished reading that,

22  I skimmed through a few more pages, read some few more

23  pages and he came and got me.

24  Q    Okay.  But that was the extent of it, correct?

25  A    Yes, sir.                                         11:26AM
```

34

```
1    A    Yes, sir.                                        11:31AM

2    Q    Okay.  I mean, you're not telling me that you had

3    lied to the investigators, are you?

4    A    No, sir.

5    Q    Okay.  I mean, you've had an opportunity to read all  11:31AM

6    these documents, correct?

7    A    Yes, sir.  Not at all.  I don't know about all.

8    Q    Well, the investigative findings, correct?

9    A    Yes.

10   Q    Did you ever go back and tell someone that, "hey, you  11:31AM

11   took my statement down wrong?"

12   A    I was in a bad state of mind at that time when I was

13   being questioned.

14   Q    Okay.

15   A    I was in the -- traumatized.                     11:31AM

16   Q    Well, were you traumatized when you wrote your

17   response to the findings of neglect and abuse?

18   A    Yes.

19   Q    You were still traumatized?

20   A    Yes.                                             11:31AM

21   Q    Okay.  Are you still traumatized as we sit here?

22   A    Very much so.

23   Q    Okay.  So if you're traumatized then and you were

24   traumatized when you wrote your letter, you're traumatized

25   now, can the jury rely on the answers that you're giving  11:32AM
```

```
 1  today?                                              11:32AM

 2  A    Yes.

 3              MR. LeBLANC:  Object to the form.

 4  BY MR. SMOLEN:

 5  Q    Could they rely on the answers that you gave in your  11:32AM

 6  appeal to your findings of abuse and neglect?

 7  A    Yes.

 8  Q    Can the jury rely on the statement that you made to

 9  the investigators as being true statements?

10  A    Yes.                                           11:32AM

11  Q    Twenty-five, "Lang said he did not receive any formal

12  training to be a shift supervisor.  Lang said there were a

13  few shifts where he received on-the-job training, but he

14  was mostly left on his own to figure things out."  Is that

15  a true statement?                                   11:32AM

16  A    Yes, sir.

17  Q    Okay.  Is that an accurate description of your

18  training?

19  A    "Accurate" as exactly how it went?  There was -- I

20  mean, there was some training.                      11:33AM

21  Q    Right.  "Lang said he did not receive any formal

22  training to be a shift supervisor.  Lang said there were,

23  quote, 'a few shifts, where he received on-the-job

24  training, but he was mostly left on his own to figure

25  things out.'"                                       11:33AM
```

36

```
 1   A      And the phone number to call Joe and Patty.         11:33AM

 2   Q      Okay.  That is an accurate description of the

 3   training you received as a shift supervisor, correct?

 4   A      Yes, sir.

 5                  (Plaintiff's Exhibit No. 2 was marked for    11:33AM

 6   identification.)

 7   Q      Okay.  Let's look at Exhibit 2.  This will be ACA/DHS

 8   Investigative File at Page 31 and 30, Bates page 288,

 9   Plaintiff's 288 and 289.  Go ahead and, if you would, flip

10   there.  Do you recall -- let me ask you this.  Do you       11:34AM

11   recognize the handwriting?

12   A      Yes, sir.

13   Q      And whose handwriting is it?

14   A      Mine.

15   Q      Did you draft this document?                         11:34AM

16   A      Did I draft it?

17   Q      Uh-huh.  Did you prepare it?  Did they -- did you

18   write it out?

19   A      Yes.

20   Q      Anyone tell you what to say?                         11:35AM

21   A      No.

22   Q      Okay.  Did you complete this on your own?

23   A      Yes.

24   Q      Anyone help you?

25   A      My wife helped me proofread it.                      11:35AM
```

```
1   Q    Okay.                                          11:36AM

2   A    And I asked her if it sounded okay.

3   Q    So you had a lot of your own time to draft up the

4   two-page document, correct?

5   A    Yes, sir.                                      11:36AM

6   Q    You had the opportunity to have your wife review it

7   to make sure that you had dotted your I's and crossed your

8   Ts, correct?

9   A    Yes, sir.

10  Q    Okay.  And you did this because you had been found by 11:36AM

11  the Oklahoma Department of Human Services to have

12  perpetrated neglect and abuse on a resident by the name of

13  Billy Woods, correct?

14  A    Yes, sir.

15  Q    Okay.  And the purpose of your letter was to explain 11:37AM

16  your position on that finding, correct?

17                  MR. LeBLANC:  Object to the form.

18  A    Yes, sir.

19  BY MR. SMOLEN:

20  Q    And you start -- you write it on May 31st of 2017,   11:37AM

21  correct?

22  A    Yes, sir.

23  Q    You say, "When I first took the job at MCCOYS J.D.C.,

24  I came in without the credentials to take any higher

25  position," true statement?                              11:37AM
```

1  Q    You go on to say, "If I was to stick around."  That    11:45AM

2  means if you were actually going to stay on at MCCOYS then

3  you would get the training, right?

4                    MR. LeBLANC:  Object to the form.

5  A    Yes.                                                    11:45AM

6  BY MR. SMOLEN:

7  Q    Okay.  You go on to state, "That never happened.  I

8  stayed longer than them," correct?

9  A    Yes.

10  Q    So here we've got a situation where you're writing to  11:45AM

11  the Oklahoma Department of Human Services saying, "Look, I

12  was supposed to be trained by these individuals if I had

13  ultimately stayed on at MCCOYS," correct?

14  A    Yes.

15  Q    But you never got trained by those individuals         11:45AM

16  because you stayed longer with them and they quit before

17  that happened, correct?

18  A    Yes.

19  Q    Okay.  You go on to state, "Knowing I wasn't

20  qualified for the job, I took it."  How did you know you    11:46AM

21  weren't qualified for it?

22  A    That's just how I felt.  I knew I wasn't qualified,

23  me, personally.

24  Q    You knew?

25  A    Knowing me, I wasn't qualified.                        11:46AM

```
 1   Q     And you didn't want it, correct?              11:46AM

 2   A     Exactly.

 3   Q     You hadn't worked in juvenile for over a year,

 4   correct?

 5   A     No, sir.                                       11:46AM

 6   Q     You didn't want the job, but you were told you needed

 7   to take it, correct?

 8                  MR. LeBLANC:  Object to the form.

 9                  MR. WOOD:  Object to form.

10   A     It was policy.  I wasn't told to take it, I was   11:46AM

11   offered it numerous times.

12   BY MR. SMOLEN:

13   Q     You say, "After taking the shift supervisor position,

14   I realized why all the old supervisors quit," correct?

15   A     (No response.)                                 11:46AM

16   Q     Yes?

17   A     Yes, sir.

18   Q     True statement?

19   A     Yes, sir.

20   Q     Tell me what your realization was.            11:47AM

21   A     Stressful.

22   Q     Okay.  "Stressful."  Why was it stressful?

23   A     Paperwork was a major deal for me; attitudes with

24   staff and residents; nobody wanted somebody over them so

25   they would treat you like --                        11:47AM
```

54

| | | |
|---|---|---|
| 1 | A      A lot. | 11:57AM |
| 2 | Q      A lot? | |
| 3 | A      A lot. | |
| 4 | Q      And why did you ask it a lot? | |
| 5 | A      I didn't like being in that position. | 11:57AM |
| 6 | Q      Did you ever tell Cindy Perkins that? | |
| 7 | A      I never could get ahold of Ms. Cindy Perkins. | |
| 8 | Q      Did you try? | |
| 9 | A      Numerous times. | |
| 10 | Q      And the numerous times you tried to get ahold of | 11:57AM |
| 11 | Cindy Perkins, what was the purpose of it? | |
| 12 | A      To figure out what do we do about this letter and | |
| 13 | throughout the job, it was -- when I come out there to do | |
| 14 | my drug test at one point, and then I couldn't get ahold | |
| 15 | of her, she wasn't in the office.  And all the other | 11:58AM |
| 16 | times, it was like some of the employees were telling me | |
| 17 | that's who you talk to about if you have a problem, such | |
| 18 | as Ms. Margaret Taylor.  "If you have got a problem, call | |
| 19 | Ms. Cindy."  I could never get ahold of Ms. Cindy. | |
| 20 | Q      Okay.  Well, tell me about the problems you were | 11:58AM |
| 21 | talking -- trying to get ahold of Cindy about. | |
| 22 | A      Employees being jerks and not doing their jobs. | |
| 23 | Q      Okay.  And would you leave her voicemails? | |
| 24 | A      Yes, I'd leave messages. | |
| 25 | Q      Okay.  And you never would get a call back? | 11:58AM |

```
 1   A    Huh-uh.                                              11:58AM

 2   Q    Did you tell Joe Washington that you'd been trying to

 3   call Cindy?

 4   A    No.

 5   Q    Okay.  Did you tell Patty Reece that you had been    11:58AM

 6   trying to call Cindy?

 7   A    Yes.

 8   Q    Okay.  Did you go to Patty Reece to try to report

 9   these issues that you had with employees, I'm assuming

10   detention workers, not doing their job?                   11:59AM

11   A    Yes.

12   Q    Okay.  What was her response?

13   A    "Tell Joe."

14   Q    Okay.  And when you would tell Joe, all he would do

15   is raise it in the meetings and you never saw any         11:59AM

16   discipline issued, correct?

17              MR. LeBLANC:  Object to the form.

18   BY MR. SMOLEN:

19   Q    Is that correct?

20   A    Correct.                                             11:59AM

21              (Plaintiff's Exhibit No. 35 was marked for

22   identification.)

23   Q    Okay.  I'm going to hand you what we're going to mark

24   as Exhibit 35 to your deposition.  I'm going to just run

25   through these with you real quick, okay?  And we can      12:00PM
```

```
 1   Q    Okay.  So let's look at Exhibit 10.          1:36PM

 2   A    10?

 3   Q    Uh-huh.

 4              MR. LeBLANC:  Dan, what is Number 10?  I

 5   didn't get a Number 10.                           1:36PM

 6              MR. SMOLEN:  It's MCCOYS 20.

 7              MR. LeBLANC:  Okay.

 8              MR. SIMS:  That's our only copy.

 9              MR. SMOLEN:  That's the one -- would you

10   like us to make a copy of it?                     1:36PM

11              MR. LeBLANC:  Well, I'd like to at least

12   see what it is.  I don't have the papers memorized.

13   BY MR. SMOLEN:

14   Q    And what is this form?

15   A    Admission sheet from the second day.          1:36PM

16   Q    Okay.  Is there an admission sheet that's filled out

17   every time a juvenile comes to the facility?

18   A    Every time they leave and return, yes.

19   Q    Okay.  And you filled that out at 3:55, is that

20   correct?                                          1:37PM

21   A    Yes, the bottom half.

22   Q    What do you mean "the bottom half?"  Did you fill the

23   whole thing out or just the bottom half?

24   A    The whole thing, the whole thing.

25   Q    Okay.  And I noticed that in the first form that's    1:37PM
```

```
1   Q     Right.  But what would it actually be used for?        1:55PM

2               MR. WOOD:  Objection, asked and answered.

3               THE REPORTER:  I'm sorry, who said that?

4               MR. WOOD:  I did.

5   A     I have no idea.  It would be filled out and left in    1:55PM

6   the book.

7   BY MR. SMOLEN:

8   Q     And that's all you knew about it?

9   A     That's all I knew about it.

10  Q     Okay.  There was no protocol that you were aware of    1:55PM

11  other than having the form filled out?

12  A     That is it.

13  Q     Okay.  It didn't trigger any kind of response from

14  you?

15  A     That everyone needs to be questioned about it.        1:56PM

16  Q     Okay.  Short of everyone having to fill it out,

17  nothing about that triggered any kind of reaction that you

18  needed to take, it was just important for you to fill it

19  out and put it in the book?

20              MR. WOOD:  Object to the form.                    1:56PM

21  BY MR. SMOLEN:

22  Q     Yes?

23  A     Yes, sir.

24  Q     Okay.  When did you fill out, when do you recall

25  doing that suicide risk assessment with Mr. Wood?          1:56PM
```

103

```
 1  statement?                                             2:10PM

 2  A    Yes.

 3  Q    Okay.  If a juvenile presented to the facility, okay,

 4  and showed increased risk of suicide ideation, would you

 5  go report it to Joe Washington?                        2:10PM

 6                  MR. LeBLANC:  Object to the form of the

 7  question.

 8  A    To any supervision.

 9  BY MR. SMOLEN:

10  Q    Okay.  Including Joe Washington?                  2:10PM

11  A    Yes.

12  Q    And is that why you went to Mr. Washington -- or were

13  going to go to Mr. Washington as it pertained to

14  Mr. Woods?

15  A    Yes.                                              2:10PM

16  Q    Okay.  Because you knew he was at an increased risk

17  for suicide, correct?

18                  MR. LeBLANC:  Object to the form.

19  A    I didn't know that.  I felt like he was answering

20  those questions just being, how would you say,         2:10PM

21  untruthfully, trying to get me to say, oh, yeah, this is

22  what he's saying.  Like I say, he was being sarcasm.

23  BY MR. SMOLEN:

24  Q    Okay.  You felt like he was not being truthful --

25  A    Yes.                                              2:11PM
```

```
1   his whole demeanor was, period.                        2:14PM

2   Q    Right.  You just testified you wanted to see if

3   Mr. Washington could help you because you couldn't tell if

4   Mr. Woods was telling you the truth or not, right?

5                  MR. ARTUS:  Objection, leading.           2:14PM

6                  MR. LeBLANC:  Object to the form.

7   BY MR. SMOLEN:

8   Q    Correct?

9   A    Yes.

10  Q    Okay.  What did you think Mr. Washington would be    2:14PM

11  able to do as far as ascertaining whether or not Mr. Woods

12  was telling you the truth about the information on the

13  form?

14  A    Go over the questions again with him.

15  Q    With him?                                            2:14PM

16  A    Yes.

17  Q    Okay.  And you forgot to do this?

18                  MR. ARTUS:  Objection, leading.

19  BY MR. SMOLEN:

20  Q    Is that correct?                                     2:14PM

21  A    I never got ahold of Joe.

22  Q    Did you try?

23  A    Yes.

24  Q    Okay.  Tell me about the steps you took to try to get

25  ahold of Mr. Washington.                                  2:14PM
```

```
1   A    Phone call.                                              2:14PM

2   Q    Okay.  And where did you try to call him at?

3   A    The next day when I was at home, off my cell phone.

4   Q    Okay.  On the 15th?

5   A    Yes, that morning.                                       2:15PM

6   Q    Okay.  You made a call to Mr. Washington from your

7   cell phone?

8   A    (Nods head.)

9   Q    Is that correct?

10            MR. ARTUS:  Objection, leading.                     2:15PM

11  A    I believe so.

12  BY MR. SMOLEN:

13  Q    Okay.

14  A    I believe that's how it happened.

15  Q    You had done the intake that night, correct?            2:15PM

16            MR. ARTUS:  Objection, leading.

17  A    Yes.

18  BY MR. SMOLEN:

19  Q    Okay.  Why did you wait to call Joe Washington until

20  the next day to ask him about the suicide risk assessment    2:15PM

21  form?

22  A    Trying to keep up with the program and what was at

23  task, what was at hand.

24  Q    Were you concerned about the form?

25  A    That specific form, no.  I was concerned about the      2:15PM
```

```
 1   A    I can't remember all of it.                        2:16PM

 2   Q    Why don't you just give me any of it?

 3   A    I remember training, but I don't -- I can't remember

 4   none of it.  I remember attending the training, but I

 5   don't remember -- I can't repeat none of what happened nor  2:17PM

 6   what was said.

 7   Q    What were you supposed to do if you felt like one of

 8   the kids at the facility might be suicidal?

 9   A    I don't know.  I never had to deal with that

10   situation.                                              2:17PM

11   Q    Well, you've had to deal with it at least once.

12              MR. LeBLANC:  Object to the form.

13   BY MR. SMOLEN:

14   Q    Right?

15              MR. LeBLANC:  Object to the form.            2:17PM

16   Argumentative.  Misstates his testimony.

17   A    I've heard of it.  I've never had to deal with it

18   personally.

19   BY MR. SMOLEN:

20   Q    Okay.  What have you heard of?                     2:17PM

21   A    As long as they're not threatening themselves,

22   there's no need to -- at this precise time, saying I'm not

23   going to hurt myself right now, there's no need for you

24   put them in suicide risk.

25   Q    Okay.                                              2:18PM
```

```
1   BY MR. SMOLEN:                                               2:40PM

2   Q    Let's look back at Exhibit 1, if you would, please.

3   Let's look at 14 of 22.

4                MR. ARTUS:  What exhibit are we on?

5                MR. SMOLEN:  Exhibit 1.                         2:41PM

6                MR. ARTUS:  All right.

7   BY MR. SMOLEN:

8   Q    Do you know who Daniel Sallis is?

9   A    Yes, sir.

10  Q    Okay.  Who is Daniel Sallis?                           2:41PM

11  A    He was a resident.

12  Q    Okay.  Do you have a problem with him?

13  A    Not a personal problem, no.

14  Q    Did you have any problems with him?

15  A    With program -- program rules, yes, sir.              2:41PM

16  Q    Okay.  Did he want to take a long time to fill out

17  the forms; what were the types of problems that he had?

18                MR. LeBLANC:  Object to the form.

19  A    Not following program rules, talking without

20  permission and stuff like that.                           2:42PM

21  BY MR. SMOLEN:

22  Q    You would agree with me it's critical to follow the

23  rules of the program, right?

24                MR. ARTUS:  Objection, leading.

25  A    I didn't expect him to follow the rules.  They're    2:42PM
```

```
 1   A     That's what it says on paper.                        3:17PM

 2   Q     What did you do to check on Mr. Woods when you took

 3   over the shift?

 4   A     Mr. Woods was coming in from court on that day.  He

 5   was not in his room.                                       3:17PM

 6   Q     But what are the purposes of the daily notes?

 7   A     Allowing a line of communication.

 8   Q     To let the oncoming staff know what had been going on

 9   during the previous shift, correct?

10   A     Uh-huh.                                              3:18PM

11   Q     Okay.  Yes?

12   A     Yes.

13   Q     You're told that Resident 1 was not feeling well and

14   wanted to stay in his room, correct?

15   A     Yes.                                                 3:18PM

16   Q     What did you do to follow up on that?

17   A     Well, he returned back from court.

18   Q     Okay.

19   A     I asked him how was his day going and he told me it

20   was going okay.  I asked him what did he want to do, if he  3:18PM

21   wanted to go on the program and he said no, he wanted to

22   go in his room.

23   Q     You write, "Billy cooperated in the program below

24   average.  He stayed in his room the whole shift and

25   refused to come out," correct?                             3:18PM
```

144

```
 1   A    Yes.                                              3:18PM

 2   Q    Was he locked in his room?

 3   A    Yes.

 4   Q    Okay.  If he wanted to come out, how would he have

 5   come out?                                              3:18PM

 6   A    There's an intercom in his room.

 7   Q    Okay.  And what would he have done?

 8   A    Hit the button and talked to the control room and

 9   requested to come out.

10   Q    Okay.  And did you go over that with Mr. Woods how  3:19PM

11   that process worked?

12   A    Yes.

13   Q    And who was checking on Mr. Woods when he was

14   confined in his room during your entire shift?

15               MR. GIBBS:  Now, we're on the 15th?         3:19PM

16               MR. SMOLEN:  We've been on the 15th.

17   A    In my understanding, no one.

18   BY MR. SMOLEN:

19   Q    When did you write this handwritten note that says,

20   "Billy cooperated in the program below average.  He stayed  3:19PM

21   in his room the whole shift and refused to come out."

22   A    I answered that a while ago, between the time I got

23   there and dinner, which is around 5:30.

24   Q    Why did you put that he stayed in there his whole

25   shift?                                                 3:20PM
```

145

```
 1   A    I would write certain parts of my daily notes in      3:20PM

 2   advance.

 3   Q    Right.  And this is one of those things you wrote,

 4   correct?

 5   A    Yeah.                                                  3:20PM

 6   Q    So you wrote in advance that Billy Woods wasn't

 7   cooperating in the program and stayed in his room the

 8   whole shift and refused to come out before that actually

 9   happened?

10   A    Yes.                                                   3:20PM

11   Q    Why?

12   A    Trying to stay ahead of my paperwork.

13   Q    Okay.  But you just scored this kid a one without

14   even giving him an opportunity to participate in the

15   program.  Why would you do that?                           3:20PM

16   A    I can't recall why I gave him a one on that specific

17   time.

18   Q    That's the lowest you could give him before he's even

19   done anything during your shift, correct?

20              MR. ARTUS:  Object to form.                     3:20PM

21   BY MR. SMOLEN:

22   Q    Did you think that was fair?

23              MR. LeBLANC:  Object to the form.

24   A    If you don't participate in the program, the way I

25   was trained, if you refuse to participate in the program,  3:21PM
```

1   you give -- some people give zeroes.  I don't know why   3:21PM

2   they -- they give a zero with a slash through it.

3   Q    Okay.  But you filled this out in advance?

4   A    Yes.

5   Q    You lied and said that he refused to participate in   3:21PM

6   the program during your entire shift when that, in fact,

7   wasn't true because you filled it out --

8   A    Yes.

9   Q    -- before your shift started?

10           MR. ARTUS:  Object to the form.   3:21PM

11  BY MR. SMOLEN:

12   Q    Correct?

13   A    Not before my shift started.

14   Q    Okay.

15   A    Before the shift was completed, yeah.   3:21PM

16   Q    Before the shift was completed is when you filled it

17   out?

18   A    Yeah.

19   Q    Okay.  How long prior to Mr. Woods' suicide did you

20   fill it out?   3:21PM

21           MR. LeBLANC:  Objection, it's been asked

22   and answered.

23   A    I gave you the answer twice.

24  BY MR. SMOLEN:

25   Q    When?   3:21PM

148

```
 1  BY MR. SMOLEN:                                          3:22PM
 2  Q    "Billy cooperated in the program below average.  He
 3  stayed in his room the whole shift and refused to come
 4  out."  You filled that out an hour to an hour and a half
 5  into the shift?                                         3:22PM
 6  A    Yes.
 7  Q    That was a lie, correct?
 8               MR. ARTUS:  Object to the form.
 9               MR. WOOD:  Object to form.
10  A    If that's how he did it, it's your opinion, but I was  3:23PM
11  just trying to fill out my paperwork in advance.
12  BY MR. SMOLEN:
13  Q    Before it even happened?
14  A    And I -- yes.
15  Q    Okay.  And you don't think that's a lie?           3:23PM
16  A    That's what happened when he arrived.  He wanted to
17  go to his room.  He decided to go to his room.  He had
18  below average then.  That's how the point system was
19  explained to me.
20  Q    We know that Billy was going to be his room the     3:23PM
21  entire shift because you filled it out in the advance.
22  A    Yes.
23  Q    Correct?
24  A    That's what he wanted, to go to his room just like
25  yesterday, the 14th.                                    3:23PM
```

1  Q    That's not the only false piece of information you    3:23PM

2  put on this form, is it?

3  A    No, sir.

4  Q    Why don't you tell the jury all the other false

5  information that you filled out on this form?    3:24PM

6               MR. ARTUS:  Object to form.

7  A    The 15-minute checks.

8  BY MR. SMOLEN:

9  Q    Okay.  Those were falsified.  Other than the

10  15-minute checks, what were falsified?    3:24PM

11  A    I believe that's all I done that was falsified.

12  Q    Just the shift supervisor statement and the 15-minute

13  checks?

14  A    Yes, sir.

15  Q    Okay.  Now, why did you try to preemptively fill out    3:24PM

16  your daily note forms?  What was the benefit of doing that

17  for you?

18  A    I did that quite a bit just to stay ahead.  And then

19  you see how there's actually a couple of lines there.  If

20  anything else happened, I would fill that in.  But that's    3:25PM

21  how all my, my, my daily notes started out.

22  Q    They were all falsified and they were all 15-minute

23  checks filled out in advance?

24  A    Yes.

25  Q    Okay.  Were your supervisors aware of that?    3:25PM

1   A     You said all?                                              3:25PM

2   Q     I thought you said that you, that on almost all of

3   your forms you would do that.

4   A     I would do that quite a bit.

5   Q     Quite a bit?                                               3:25PM

6   A     Not this day.

7   Q     Well, this day we know you did it?

8   A     Yes.

9   Q     Right?  You said you would do that, that would be

10  your practice to do most of the time anyway?                    3:25PM

11  A     To try to stay ahead of my paperwork, yes.

12  Q     Okay.  And did your supervisors ever have a problem

13  with you falsifying and filling out in advance your forms?

14  A     They didn't know.

15              MR. LeBLANC:  Object to the form.                    3:25PM

16  A     They never knew.

17  BY MR. SMOLEN:

18  Q     They never new.  Okay.  I mean, the whole facility is

19  monitored by video, correct?

20  A     Yes.                                                       3:26PM

21  Q     I mean, there's someone in the control room watching

22  the video, making -- they can see that you're not doing

23  the checks, correct?

24  A     Yes.

25              MR. LeBLANC:  Object to the form.                    3:26PM

```
1   BY MR. SMOLEN:                                          3:26PM

2   Q    Okay.  Were you ever disciplined for that?

3   A    No.

4   Q    Did you train the other subordinate employees after

5   you became a supervisor to complete their forms in a     3:26PM

6   similar fashion?

7   A    No.

8   Q    Okay.  Is that something only you thought you were

9   allowed to do?

10  A    Nobody -- as far as me, I was the only one that did  3:26PM

11  this.  I never trained no one to do this or fill out daily

12  notes.  They were all trained by someone else.

13  Q    So when you sat through Brandon Miller's deposition

14  and he said that, "I thought," he thought you were going

15  to be the guy to train him, you weren't the guy that was  3:26PM

16  supposed to train him?

17  A    No, I wasn't the guy training him.

18  Q    Okay.  Did you train any staff when you were there as

19  a supervisor?

20  A    No.                                                  3:27PM

21  Q    Okay.

22  A    Not that I remember, no.

23  Q    Okay.  So yesterday's point, looking back at Exhibit

24  24.  Are you there?

25  A    Uh-huh.                                              3:27PM
```

```
 1  Q     Why did you put "not applicable?"              3:27PM

 2  A     The way -- I don't know who drew those lines there

 3  and I don't know if who put not applicable, but I was

 4  explaining.  Okay, first couple days they're there, they

 5  really -- the first day they're there, they don't get   3:27PM

 6  scored because they're getting -- they've got to get

 7  accustomed to the point system.  After you explain the

 8  point system to them, that's when they start getting

 9  points taken.  That's how I was trained.  For the first

10  day, I believe -- I don't believe I took points from him.  3:27PM

11  Q    You and I agree that a lot of the information you put

12  on this form was falsified, correct?

13                  MR. LeBLANC:  Object to the form.

14  A     A lot of it.

15  BY MR. SMOLEN:                                         3:28PM

16  Q     Okay.  How -- I want you to tell the jury why they

17  should believe you, okay, as it pertains to the other

18  forms that you allegedly filled out, that those were done

19  in accordance with policy and procedure.

20  A     Could you ask that again?                       3:28PM

21  Q     Sure.  You and I already are on the same page that

22  you falsified a lot of information on this form, correct?

23  A     Yes.

24  Q     Okay.  I want you to tell the jury --

25  A     False --                                        3:29PM
```

157

1   pin it on me, but I never done this.                    3:43PM

2   Q    No, no, I understand.  But you had an opportunity to

3   appeal these findings, which we've covered earlier in the

4   deposition, right?

5   A    Yes.                                                3:43PM

6   Q    That was the two-page handwritten response that you

7   and your wife prepared, correct?

8                   MR. LeBLANC:  Object to the form.

9   A    That I prepared and she --

10  BY MR. SMOLEN:                                           3:43PM

11  Q    Yeah, and then she double-checked it with you, right?

12  A    Yes.

13  Q    Okay.  Let's go to MCCOYS 64, the second page.

14  Number 1, "The Daily Notes sheet for resident Billy Woods

15  was preemptively filled out for the entire 3:00 p.m. to    3:43PM

16  11:00 p.m. shift on 12-15-16.  Woods' body was discovered

17  in his cell at 8:34 p.m., after Woods had not been checked

18  for approximately two hours and two minutes.  Checks were

19  initialed through 10:45 p.m. as having been completed."

20  That's a correct statement?  I read that correctly, yes?   3:43PM

21  A    You read that correctly.

22  Q    Okay.  And based on your own knowledge of the events,

23  that is also true, correct?

24  A    Yes.

25  Q    Okay.  Number 3, "The Daily Note sheet for Woods had   3:44PM

158

| | | |
|---|---|---|
| 1 | initials for Miller and Lang at 6:45, 7:00 p.m., 7:15 | 3:44PM |
| 2 | p.m., 7:30 p.m., 7:45 p.m., 8:00 p.m., 8:15 p.m. and | |
| 3 | 8:30 p.m.   A review of the video showed none of these | |
| 4 | checks were completed by any staff."  Do you have any | |
| 5 | reason to dispute that finding? | 3:44PM |
| 6 | A    No. | |
| 7 | Q    It's true, is it not, that both you, Mr. Miller and | |
| 8 | Ms. Winkle were all outside of the area of Woods' rooms at | |
| 9 | multiple and various times during the times in question, | |
| 10 | but that the checks were not completed? | 3:45PM |
| 11 | A    Yes, yes. | |
| 12 | Q    Number 3, "The Daily Note sheets for the other nine | |
| 13 | residents in the facility did not have 15-minute checks | |
| 14 | documented from 8:00 p.m. to 10:45 p.m."  Were you aware | |
| 15 | of that? | 3:45PM |
| 16 | A    Yes. | |
| 17 | Q    So not only were the checks not being done on Billy | |
| 18 | Woods, they weren't being done on the other nine | |
| 19 | residents, correct? | |
| 20 | MR. LeBLANC:  Object to the form. | 3:45PM |
| 21 | A    There was no need to check on them, they were -- they | |
| 22 | were in the program. | |
| 23 | BY MR. SMOLEN: | |
| 24 | Q    They weren't on lockdown from 8:00 p.m. to 10:45 | |
| 25 | p.m.? | 3:45PM |

163

| | | |
|---|---|---|
| 1 | Q    There's an outside window? | 3:53PM |
| 2 | A    Yes. | |
| 3 | Q    Okay.  Does it get daylight? | |
| 4 | A    Yes. | |
| 5 | Q    Okay.  This is at night though, right? | 3:53PM |
| 6 | A    Yes, sir. | |
| 7 | Q    Nighttime? | |
| 8 | A    Yes. | |
| 9 | Q    There's no light in this room.  You don't even enter | |
| 10 | the room completely.  Tell me how you knew that the sheet | 3:54PM |
| 11 | around Billy's neck, that the knots you wouldn't be able | |
| 12 | to untie those?  Tell the jury how you knew that. | |
| 13 | MR. LeBLANC:  Object to the form of the | |
| 14 | question. | |
| 15 | A    I didn't know where to start or how to end it so I | 3:54PM |
| 16 | just looked at the knot and the light from behind me was | |
| 17 | shining in, right in on it. | |
| 18 | BY MR. SMOLEN: | |
| 19 | Q    And you didn't even take a chance to go try to undo | |
| 20 | it? | 3:54PM |
| 21 | A    No, sir. | |
| 22 | Q    You didn't check a pulse, correct? | |
| 23 | A    No, sir. | |
| 24 | Q    You rendered zero aid, correct? | |
| 25 | A    At that time, yes. | 3:54PM |

```
 1  Q    Okay.  Do you have children?                      3:54PM

 2  A    Yes, sir.

 3  Q    Okay.  If you walked in on one of your children in

 4  that condition, would you have behaved the same way?

 5            MR. LeBLANC:  Object to the form.            3:55PM

 6            MR. WOOD:  Same objection.

 7  A    I can't say that I would have.  I don't know how I

 8  would act.

 9  BY MR. SMOLEN:

10  Q    You wouldn't even go check on them?               3:55PM

11            MR. LeBLANC:  Object to the form.

12            MR. WOOD:  Same objection.

13  A    I don't know how I would act.

14  BY MR. SMOLEN:

15  Q    You never touched his body the first time you saw him  3:55PM

16  hanging there, correct?

17  A    Correct.

18  Q    Okay.  You never attempted to get him down, correct?

19  A    Correct.

20  Q    Okay.  You never checked for a pulse?             3:55PM

21            MR. LeBLANC:  Objection, asked and

22  answered.

23  BY MR. SMOLEN:

24  Q    Right?

25            MR. LeBLANC:  Same objection, asked and      3:55PM
```

```
 1   answered.                                            3:55PM

 2   A     I told you that.

 3   BY MR. SMOLEN:

 4   Q     Okay.  And you said that his body was purple when you

 5   saw him in the dark room there?                      3:56PM

 6               MR. LeBLANC:  Object to the form.

 7   A     It was not normal.  I know it was palish, purple,

 8   bluish and blank.  It was just -- I can't, I can't

 9   describe exactly how  it was, but it wasn't normal.

10   BY MR. SMOLEN:                                       3:56PM

11   Q     Okay.  Had you ever seen a dead body before?

12   A     I've seen a lot of funerals, yeah.

13   Q     Okay.  Didn't any part of you think I need to jump in

14   there and help save this kid?

15   A     Sure.                                          3:56PM

16   Q     But you didn't?

17   A     I couldn't.  I panicked.  I didn't know what to do at

18   that point.  I had to clear the room.

19               (Plaintiff's Exhibit No. 49 was marked for

20   identification.)                                     1:14PM

21   Q     I'm going to hand you what we have previously marked

22   as Exhibit 49 to your deposition.  It's the EMS records.

23               MR. LeBLANC:  Do you have an extra copy of

24   that one?

25               MR. SMOLEN:  I know we've handed it out  3:57PM
```

1  have been calling?                                          4:08PM

2  A    Just panicking.  I don't remember who I called.

3  Q    And where was Billy when you were smoking cigarettes

4  calling all these people?

5              MR. LeBLANC:  Object to the form.             4:08PM

6  A    Where he was at, in his room.

7  BY MR. SMOLEN:

8  Q    Still hanging there with the sheet around his neck?

9  A    Yes, sir.

10  Q    Let's look at Exhibit 1 page 9 of 22.               4:09PM

11  A    Can I move this?  I think it's under there.  It might

12  be under there.  You say 1?

13  Q    Exhibit 1, page 9 of 22.

14  A    Exhibit 1.  Exhibit 1, 2.

15  Q    Do you need me to find it for you?                  4:09PM

16  A    No, I'm good.

17  Q    I'm on page 9 of 22.

18  A    "9 of 22."

19  Q    And I'm looking now right at the center of the page

20  and it says, "Lang said he went to take a snack to Woods."  4:11PM

21  Are you there on page 9?

22  A    Page 9.  Where is it again?  I can't find it.

23  Q    Let me show you.  Right there.  Are you there?

24  A    Yes.

25  Q    "Lang said he went to take a snack to Woods.  He     4:11PM

1   A     Sounds familiar.                                          4:14PM

2   Q     "When asked why he did not attempt to remove the

3   sheet, Lang said, "I couldn't do it.'"   What did you mean

4   by that?

5              MR. LeBLANC:   Objection, it's been asked          4:14PM

6   and answered.   Go ahead.

7   A     I never had anything to cut him down with or I didn't

8   know how it was tied and I didn't want to put any more

9   pressure on him than was already on him.

10  BY MR. SMOLEN:                                                4:14PM

11  Q     Why were you concerned about putting more pressure on

12  him?

13             MR. LeBLANC:   Object to the form.

14  A     I don't know.   It was just a thought in my head at

15  the time.                                                     4:14PM

16  BY MR. SMOLEN:

17  Q     That if you did something more that could cause more

18  pressure, it might injure him more?

19             MR. LeBLANC:   Object to the form.

20  A     I don't know, tamper with evidence, I can't tell you   4:14PM

21  why I thought that or why I said that.   I assumed it was

22  going to be a crime scene and no need for me to be

23  touching anything.

24  BY MR. SMOLEN:

25  Q     It goes on to say that, "Lang said he told staff 'I     4:15PM

1   can't do CPR' and added 'I couldn't do nothing.'"  Do you     4:15PM

2   recall making those statements?

3   A     I do recall saying some of that.

4   Q     Okay.  Why did you tell people you couldn't do CPR?

5   A     I couldn't even think right at the moment.              4:15PM

6   Q     Well, I mean, you were able to go have a staff

7   meeting; you were able to think to put kids on lockdown,

8   you were able to go have some cigarettes; and you were

9   able to make some phone calls, right?

10  A     Yes, sir.                                               4:15PM

11  Q     I mean, you weren't in some kind of catatonic state,

12  were you?

13  A     I was devastated, devastated.

14  Q     You were devastated?

15  A     I couldn't remember nothing.  I couldn't think of     4:16PM

16  nothing.  I couldn't do nothing right.

17  Q     I mean, you could do things, you did things?

18  A     I couldn't think.

19  Q     Okay.  But the things you thought to do were go have

20  a staff meeting, put the other juveniles on lockdown, tell  4:16PM

21  the staff to call 911, go have some cigarettes, go call a

22  bunch of people, call Mr. Washington, right?  These are

23  all things you thought to do.  So you were thinking,

24  right?

25  A     I believe so, if that's what you're saying.            4:16PM

```
 1   Q     You just didn't think to attempt to --         4:16PM

 2   A     I didn't know what to do in that situation.

 3   Q     -- render aid?

 4   A     In that situation, I didn't know what to do.

 5   Q     Well, didn't your training tell you what to do?  4:16PM

 6   A     My training, it was months before that.  I forgot

 7   half of that stuff.

 8   Q     Do you feel like you needed to be trained in this

 9   situation to know that you needed to at least attempt to

10   help out this person?                                 4:17PM

11               MR. LeBLANC:  Object to the form of the

12   question, calls for speculation.

13   A     I didn't know what to do.

14               MR. ARTUS:  What was the answer?  I

15   couldn't hear it.                                     4:17PM

16   A     I didn't know what to do.

17   BY MR. SMOLEN:

18   Q     "Lang said he had not previously dealt with a

19   resident dying, although he had a situation where a

20   resident had a seizure and was bleeding from his mouth.  4:18PM

21   Lang said he turned the resident on his side and ensured

22   that 911 was called."

23   A     That was a complete different situation.

24   Q     Okay.  But you had enough state of mind to call 911

25   then?                                                 4:18PM
```

```
1   Q     There's rules at the facility, at least written        4:23PM

2   rules, that state the staff aren't to make fun of the

3   residents.  You know that, right?

4   A     I'm pretty sure, yes.

5   Q     Okay.  And do you know why it's important to not make   4:24PM

6   fun of the juvenile residents?

7   A     It's bullying, picking with people, you don't do

8   that.

9   Q     Okay.  And why don't you do it?

10  A     Same reason why my mom told me not to do it, it's not   4:24PM

11  right.  You treat people how you want to be treated.

12  Q     Okay.  And you understand that these children that

13  are in there are also more susceptible because of the fact

14  that they're in it, through any kind of -- they're already

15  sad they're in a juvenile facility, right?                   4:24PM

16                   MR. LeBLANC:  Object to the form of the

17  question, speculation, lack of foundation.

18                   MR. SMOLEN:  Well, right.  That's a good

19  point, Thomas.

20  BY MR. SMOLEN:                                               4:24PM

21  Q     Do you do any kind of assessment to determine --

22  A     No.

23  Q     -- what the state of mind is of the child when they

24  enter the facility?

25  A     I've never been trained on how to read someone's       4:24PM
```

1   mind.                                                    4:25PM

2   Q    Well, I didn't ask about reading someone's mind.  I'm

3   talking about --

4   A    I'm trying to figure out what you're talking about.

5   Q    Yeah, looking for indication that a child might be    4:25PM

6   having mental health issues.

7   A    I'm not a counselor.

8   Q    You've not had any training in it?

9   A    I'm not a counselor.

10  Q    That's not my question.  Have you had any training in  4:25PM

11  it?

12  A    No, not that I know of.

13              (Plaintiff's Exhibit No. 33 was marked for

14  identification.)

15  Q    I'm going to have you jump to Exhibit 33.  Are you    4:25PM

16  there?

17  A    Yes, sir.

18  Q    I'm at Lang 49.  This was from your employment file.

19              MR. ARTUS:  Is this a new exhibit?  We only

20  have one copy.                                           4:26PM

21              MR. WOOD:  What is it?

22              MR. SMOLEN:  It's just that policy and

23  procedure manual -- or it's the training folder.

24              MR. ARTUS:  It's the personnel file?

25              MR. SMOLEN:  Yeah, it's from his personnel    4:26PM

194

```
 1   A    I believed he was already deceased when I laid my      4:56PM

 2   eyes on him.

 3   Q    Again, that was just based on what you observed in

 4   that dark room from the doorway, correct?

 5                  MR. LeBLANC:  Object to the form.            4:56PM

 6                  MR. ARTUS:  Object to form.

 7   A    I believed him to be deceased when I first laid my

 8   eyes on him.

 9   BY MR. SMOLEN:

10   Q    You didn't consider it to be a medical emergency?     4:57PM

11                  MR. ARTUS:  Objection.

12   A    I believed it to be way more critical than that, than

13   a medical emergency.

14   BY MR. SMOLEN:

15   Q    My question is real straightforward.  When you walked  4:57PM

16   down that hall and opened that room, you did not believe

17   it to be a medical emergency.  That's your testimony?

18   A    I believed he was already dead.

19   Q    Tell the jury how long he had been dead for.

20                  MR. LeBLANC:  Object to the form, lack of    4:57PM

21   foundation.

22   A    I can't tell you that.

23   BY MR. SMOLEN:

24   Q    Right.  You have no foundation for that, do you?

25                  MR. ARTUS:  Object to form.                  4:57PM
```

195

```
 1   A    I can't tell you, I'm not a medical examiner.        4:57PM

 2   BY MR. SMOLEN:

 3   Q    Right.  You're not -- you have no medical training at

 4   all, correct?

 5   A    No, sir.                                              4:58PM

 6   Q    Tell the jury what steps you knew that you could do

 7   to ensure that someone was or was not dead.

 8                  MR. LeBLANC:  Object to the form.

 9   A    I can't recall.

10   BY MR. SMOLEN:                                             4:58PM

11   Q    Well, could you have recalled it back in December of

12   2016?

13   A    Not in that state of mind, no, I couldn't think

14   right.

15   Q    Okay.  How about right before Billy was -- you found  4:58PM

16   his body?  Did you know what steps you could take to

17   determine if someone was still alive or not?

18   A    I don't know why since I went over those steps and I

19   don't remember all of them.

20   Q    How about any of them?                                4:58PM

21   A    I don't remember all of them.

22   Q    Can you give me any?

23   A    The ones that I did, clear the scene, tell my staff

24   members to call 911.

25   Q    No, I'm talking about what steps you could have taken  4:58PM
```

```
 1  to determine if somebody was still alive or not.        4:58PM

 2  A    I don't know.  I don't know how to determine that.

 3  Q    Okay.  You wouldn't have even known how to determine

 4  that?

 5  A    No.                                                 4:59PM

 6  Q    Let's look at -- and then I think we'll be finished

 7  up here.  Let's look at Exhibit 2.  I'm at OCA/DHS

 8  Investigative File 31, page 289.  Last paragraph.  "As for

 9  the young man and my interactions, we never had a physical

10  contact.  We did have some words over what the program     5:00PM

11  rules were and what was expected.  He did not like or

12  agree with.  I never wanted to hurt the young man.  I'm

13  truly sorry for the loss for his family.  God have mercy

14  on his soul."  That's what you wrote in your appeal to the

15  DHS findings of abuse and neglect, correct?              5:00PM

16  A    Yes, sir.

17  Q    When you said, "We had some words over what the

18  program rules were and what was expected," what do you

19  mean you had "some words?"

20  A    We had disagreements of what he would comply to and   5:01PM

21  what was expected of him to do.

22  Q    It wasn't an argument?

23  A    No, it was just he said he wasn't going to do that.

24  He replied he wasn't going to do that so I said, "Where do

25  you want to go, wing or your room."                     5:01PM
```

1   Q    Sure.  We know that the room was dark, correct?      5:18PM

2              MR. LeBLANC:  Object to the form.

3   A    I don't recall that.

4   BY MR. SMOLEN:

5   Q    Well, we can see the video.  The room is dark.      5:18PM

6              MR. LeBLANC:  Object to the form.

7   A    Like I said, the light over my shoulder could have

8   easily well lit up that room from my point of view.

9   BY MR. SMOLEN:

10  Q    Okay.  Well, the lights weren't on in the room, would  5:18PM

11  you at least agree on that?

12  A    I guess so.

13  Q    Okay.  And despite the lights not being on in the

14  room, despite the fact that there was a wall there on the

15  left-hand side, and despite the fact that there was a      5:18PM

16  metal sink, you were still able to see what you told

17  investigators you saw when you walked in that room; that's

18  your testimony?

19  A    Yes.

20  Q    Okay.  Can you just, real quick, can you stand up and  5:18PM

21  show me real quick when you say you nudged him with your

22  foot?  Can you show the jury what that looked like?

23  A    Should I stand up and show you?

24  Q    Yeah, because I've got the video, I want to see just

25  so I can kind of have an understanding of how you --      5:19PM

209

1    A    With my foot?                                                5:19PM

2    Q    Yeah, just stand up and show the jury how you nudged

3    Mr. Woods' body.

4    A    (Complies with request).

5    Q    Kind of just kicked him, like tapped him with your          5:19PM

6    foot?

7    A    To feel how stiff he was.

8              THE REPORTER:  I'm sorry.  I didn't hear

9    what you said.

10   A    To feel how stiff he was.                                   5:19PM

11   Q    To feel how stiff he was.

12   A    Yeah, and see if he had any response or moved.  That

13   may have been the second, when I was in there with

14   Brandon.

15   Q    Right.  We know you didn't do it the first time          5:19PM

16   because you didn't go in the room?

17             MR. LeBLANC:  Object to the form.

18   BY MR. SMOLEN:

19   Q    Beyond what the video shows, right?

20   A    Yes.                                                        5:19PM

21   Q    Okay.

22   A    So just -- but I could see what I saw --

23   Q    I understand.

24   A    -- from that angle.

25   Q    Okay.  We're talking about the foot nudge though.          5:20PM

210

```
1    A    I believe that was the second time I was in the room.   5:20PM

2    Q    Okay.  And the reason you nudged him was why?

3               MR. LeBLANC:  Object to the form.

4    A    I don't know.

5               MR. LeBLANC:  Asked and answered.   5:20PM

6    BY MR. SMOLEN:

7    Q    I thought -- go ahead.  I thought it was because you

8    thought you might -- to see if he was still moving?

9    A    To see if he would move or how stiff he was.

10   Q    Why, if you felt like it was important to see if you   5:20PM

11   were going to nudge him with your foot the second time to

12   see if he would still move, why didn't you go in and check

13   on him the first time when it was a lot closer to the time

14   that you found him?

15   A    I perceived him to be deceased the first time I went   5:20PM

16   in.

17   Q    Then why did you kick a dead body?

18   A    I didn't kick him.

19               MR. LeBLANC:  Object to the form of the

20   question.   5:20PM

21   BY MR. SMOLEN:

22   Q    Why did you nudge a deceased body with your foot if

23   you already knew that the person was dead?

24               MR. LeBLANC:  Objection, it's been asked

25   and answered.  You're getting argumentative, Dan.  Move   5:20PM
```

```
 1  on, please.  It's been asked and answered.  Next question.  5:20PM
 2              MR. SMOLEN:  No, it hasn't been answered.
 3              MR. LeBLANC:  It has been answered three
 4  times.
 5  BY MR. SMOLEN:                                          5:21PM
 6  Q    If you thought -- you've testified that you thought
 7  he would -- that maybe he would move if you nudged him
 8  with your foot.  You testified about that, right?
 9              MR. LeBLANC:  Object to the form, it's been
10  asked and answered.                                     5:21PM
11  BY MR. SMOLEN:
12  Q    Yes?
13  A    I nudged him to see how stiff he was.
14  Q    Okay.  So now your testimony is you just nudged him
15  to see how stiff he was?                                5:21PM
16              MR. WOOD:  Objection, form.
17              MR. LeBLANC:  Actually, that was his
18  testimony about four questions ago.
19              MR. SMOLEN:  Well, the good news, Thomas,
20  is we've got a court reporter here that I'm sure did a   5:21PM
21  great job taking it all down and a video.
22              MR. LeBLANC:  I'm not -- I'm so glad.
23              MR. SMOLEN:  Me, too.
24              MR. LeBLANC:  Yeah.  So you're ready to
25  move on now.  That's good.                              5:21PM
```

1   ability, yes, sir.

2       Q   (By Mr. Wood)  Now later on in that

3   paragraph it says:  When the juvenile is in his

4   or her room, they are monitored by intercom and

5   visually observed every five minutes; do you see

6   that?

7               MR. LEBLANC:  Object to the form.  I

8   don't know that it's clear that if there's a

9   suicide watch that's what's required, the reason

10  for my objection.

11              MR. WOOD:  Okay.

12              THE WITNESS:  If he was on suicide

13  watch?  I was -- the only thing I remember is 15

14  minutes.

15      Q   (By Mr. Wood)  Okay.

16      A   Five minutes, I never was told that.

17      Q   Now if you had a juvenile that had --

18  that tells you, I'm going to kill myself --

19      A   Yes, sir.

20      Q   -- would you have monitored that person

21  closely?

22              MR. SMOLEN:  Object to the form.

23              THE WITNESS:  I would have went to

24  my supervisor and got better advice on the

25  situation.

1     Q    Have you ever heard of that name before,

2  Brian --

3     A    No, sir.

4     Q    -- Sparks?   Okay.   You came on at the

5  3:00 p.m. to 11:00 p.m. shift, correct?

6     A    Yes, sir.

7     Q    Okay.   You were told -- or were you told

8  by Anthony Cornwell that he thought Billy Woods

9  had mental health issues?

10    A    No, not directly, no.

11    Q    Okay.   Were you indirectly told that?

12    A    No, sir.

13    Q    Did you see that during shift change

14 when you came on and you start to complete your

15 daily note on the same page?

16    A    No, I didn't read it.   I just started on

17 mine.

18    Q    Okay.   What's the importance of having

19 the daily note from the 7:00 a.m. to 3:00 p.m.

20 shift on the same page as the 3:00 p.m. to 11:00

21 p.m. note?

22    A    Because there's three different shifts

23 in one day.

24    Q    Right.   But would you ever read the

25 previous note so that you could understand what

1  situation you were dealing with when you began

2  your shift?

3      A    I would get the information through

4  shift change.  I would hardly ever read it.

5      Q    Okay.  But you don't recall Mr. Cornwell

6  ever telling you that he thought Billy Woods had

7  mental health issues?

8      A    No, sir.

9      Q    And as far as whether or not you knew

10  that, it's your testimony that you just simply

11  didn't read the note above?

12      A    Yes, sir.

13      Q    It's fair to say that at the time you

14  did his intake paperwork, Mr. Cornwell had

15  already identified Billy as having mental health

16  issues, correct?

17              MR. LEBLANC:  Object to the form of

18  the question.  Object to the form of the

19  question.

20              THE WITNESS:  I can't speak for

21  Mr. Anthony Cornwell.

22      Q    (By Mr. Smolen)  Well, we know that -- I

23  mean, he signs this --

24      A    Yes, sir.

25      Q    -- before you make your entry, right?

1      A    Yes, sir.

2      Q    We know he identified Billy on the

3  morning shift to have mental health issues,

4  correct?

5                 MR. LEBLANC:  Object to the form.

6                 THE WITNESS:  That's what the paper

7  says.

8      Q    (By Mr. Smolen)  Okay.  Had you read

9  that note, would you have approached your intake

10 any differently?

11                MR. LEBLANC:  Object to the form.

12 Calls for speculation.

13                THE WITNESS:  I would have

14 questioned Mr. Anthony.

15     Q    (By Mr. Smolen)  And what would you have

16 asked him about?

17     A    What did he mean by that?  Why -- why

18 would you say that?

19     Q    And why would it have been important for

20 you to talk to Mr. Anthony about that?

21     A    Because he seemed to write it down, but

22 he didn't say it in shift change but he wrote it

23 down.

24     Q    Okay.  You don't recall him telling you

25 that during shift change?

 1     Q    Okay.

 2     A    -- at that point.

 3     Q    Let's look back at Exhibit 33 real

 4  quick.

 5     A    32?

 6     Q    33.  Are you there?

 7     A    Yes, sir.

 8     Q    Let's look at Lang 4, which was a

 9  question Mr. Wood -- or a page Mr. Wood talked

10  to you about under Forty Hours Observing.

11     A    I might have misplaced that one.  I have

12  3 and 5.

13          MR. LEBLANC:  We can sort it out

14  later.  Here's Page 4.

15          MR. SMOLEN:  Thomas, I have some --

16  I've got an extra copy here.

17          THE WITNESS:  I've got it -- I've

18  got it here.

19          MR. LEBLANC:  You got it?

20     Q    (By Mr. Smolen)  Earlier, when I had

21  asked you about night shift and how it worked,

22  you said you didn't know because you had never

23  worked night shift, right?

24     A    Yes, sir.

25     Q    Okay.  Your orientation packet states

1    that after you had completed your initial 40

2    hours of training, you will then be expected to

3    observe an experienced staff member for an

4    additional 40 hours, correct?

5        A    Yes, sir.

6        Q    So 80 hours of training is what this

7    policy indicates would happen, correct?

8        A    Yes, sir.

9        Q    Okay.  It says that:  During this time

10   you will be assigned to all shifts.  Your

11   schedule will vary a great deal so that you are

12   aware of the responsibilities of all three

13   shifts, correct?

14       A    Yes, sir.

15       Q    That never happened, did it?

16       A    No, sir.

17            MR. ARTUS:  Object to the form.

18       Q    (By Mr. Smolen)  Give me one minute to

19   see if I can find one more.  Look at Lang 003

20   under the Policy And Procedure Manual.

21            MR. ARTUS:  Are you talking about

22   Exhibit 33?

23            MR. SMOLEN:  Yeah, 33, Page 3.

24            MR. ARTUS:  Okay.  You said Policy

25   And Procedure Manual?

1   questions?

2       A   Yes, sir.

3       Q   Okay.  Let's look at Exhibit 35.  Are

4   you there?  No. 6?

5                   MR. LEBLANC:  Can you be more

6   specific?

7                   MR. SMOLEN:  Oh, I'm sorry, Thomas

8   MCCOYS 442, Paragraph 6.

9       Q   (By Mr. Smolen)  Are you there?

10      A   Yes, sir.

11      Q   Okay.  It says:  Joe can now pull up

12  video on his phone.  He observed five people

13  working and everyone watching TV and not

14  supervising the kids, right?

15      A   That's what it says.

16      Q   Okay.  Two people sitting at the table

17  with backs to the kids at free time, correct?

18      A   Yes, sir.

19      Q   Joe could observe whether or not

20  15-minute checks were happening from his phone,

21  couldn't he?

22      A   That's what it says.

23      Q   Okay.  And -- and he made people aware

24  of that, correct?

25      A   Yes, sir.

1  to 8 of 22 under your Interview Summary.  Are

2  you there?

3       A    Yes, sir.

4       Q    Okay.  And I'm going to start with the

5  section that says:  Lang said on 12/14/16, it's

6  about two-thirds of the way down through that

7  paragraph, okay?

8       A    The first one or the second one?

9       Q    It's in the second paragraph on that

10  page.  It's the continuation of your summary of

11  your interview?

12       A    Okay.

13       Q    And it says:  Lang said on 12/14/16.

14  Are you there?

15       A    Okay, yeah.

16       Q    It says:  Lang said on 12/14/16,

17  resident, Billy Woods, started the intake

18  process before Lang arrived at 3:00 p.m. but

19  Lang was responsible for finishing the process.

20  Lang said Woods was, quote, nonchalant,

21  belligerent, and disrespectful at that time.

22       So he placed -- so he was placed in his room

23  until approximately 7:00 p.m. and then Lang

24  brought him out of his room to finish intake,

25  correct?

358

```
1        A    That's what it says.

2        Q    Do you recall making those statements?

3        A    I remember talking to him, you know,

4   but...

5        Q    Is that -- is that an accurate

6   description as to what happened?

7        A    I don't believe so.

8        Q    Okay.  So --

9        A    I don't know.  I don't know.

10       Q    Well, if you said that to an

11  investigator, okay, without -- short of us

12  having to pull out the audio recordings --

13       A    Yes, sir.

14       Q    -- do you believe that -- you weren't

15  lying, were you?

16       A    No, I wasn't lying.

17       Q    Okay.

18       A    I'm guessing.

19       Q    Well, you would have known then years,

20  you know, previous to today's deposition, you

21  would have a better memory as to what happened,

22  right?

23       A    I was in -- I was in a jacked up state

24  of mind at that time.  I can't remember.

25              THE COURT REPORTER:  Say that one
```