

PLAINTIFF'S
EXHIBIT
9



## OKLAHOMA DEPARTMENT OF HUMAN SERVICES

### Report to District Attorney
Office of Client Advocacy (OCA)
Kathryn Boyle Brewer, Advocate General



05/22/2017

## Approved

| Facility/Agency Name | | | | Referral Date |
|---|---|---|---|---|
| MUSKOGEE COUNTY REGIONAL JUVENILE DETENTION | | | | 12/15/2016 |

| Investigation Type | Referral Number | KIDS Case Number | Primary Investigator | |
|---|---|---|---|---|
| Juvenile | 1806285 | 20450874 | SHANNON IWANSKI | |

| Facility Address | Facility Administrator |
|---|---|
| KK20450874 | Joe Washington |
| 601 W SHAWNEE Street | 601 W Shawnee Street |
| MUSKOGEE, Oklahoma 74401-3521 | Muskogee, Oklahoma 74401- |
| County: Muskogee | |

| Incident Location if not Facility |
|---|
| |

| Referral Synopsis |
|---|
| Resident Billy Woods committed suicide while placed at the Muskogee County Regional Juvenile Detention Center. Staff on duty at the time were Shift Supervisor Jerrod Lang, Detention Worker (DW) Marietta "Jackie" Winkle, DW Brandon Miller, and DW Angela Miller. |

# A. CLIENTS

### Alleged Victim(s):

| | Name | DOB | Gender | Custody |
|---|---|---|---|---|
| 1. | BILLY DUAIN WOODS | ▆▆▆▆ | Male | OJA Custody |

### PRFC(s) of Interest:

| | Name | DOB | Gender | Position/Title |
|---|---|---|---|---|
| 2. | ANGELA MILLER | ▆▆▆ | Female | Detention Worker |
| 3. | JERROD LANG | ▆▆▆ | Male | Shift Supervisor |
| 4. | MARIETTA E WINKLE | ▆▆▆ | Female | Shift Supervisor |
| 5. | BRANDON MILLER | ▆▆▆ | Male | Detention Worker |

# B. Investigative Findings

**Overall Finding**: Substantiated

| Child's Name | Abuse/Neglect Category | Abuse/Neglect Type | Perpetrator | Finding |
|---|---|---|---|---|
| BILLY D. WOODS | Neglect | Lack of Supervision | JERROD LANG | Substantiated |
| BILLY D. WOODS | Neglect | Lack of Supervision | BRANDON MILLER | Substantiated |
| BILLY D. WOODS | Neglect | Lack of Supervision | ANGELA MILLER | Substantiated |
| BILLY D. WOODS | Abuse | Mental Injury | JERROD LANG | Substantiated |
| BILLY D. WOODS | Neglect | Lack of Supervision | MARIETTA E. | Substantiated |

Plaintiff_000001

| | | | WINKLE | |
|---|---|---|---|---|

**Caretaker Misconduct:**

| PRFC(s) of Interest | Caretaker Misconduct |
|---|---|
| ANGELA MILLER | Confirmed |
| JERROD LANG | Confirmed |
| MARIETTA WINKLE | Confirmed |
| BRANDON MILLER | Confirmed |

# C. Legal

Law Enforcement Involvement? - **Yes**

## Legal Authority

The Oklahoma Children's Code 10A-1-1-105 defines **"Neglect"** as:
"Neglect" means:
    a.  the failure or omission to provide any of the following:
        (1) adequate nurturance and affection, food, clothing, shelter, sanitation, hygiene, or appropriate education,
        (2) medical, dental, or behavioral health care,
        (3) supervision or appropriate caretakers, or
        (4) special care made necessary by the physical or mental condition of the child,
    b.  the failure or omission to protect a child from exposure to any of the following:
        (1) the use, possession, sale, or manufacture of illegal drugs,
        (2       illegal activities, or
        (3) sexual acts or materials that are not age- appropriate, or
    c.  abandonment.

The Oklahoma Children's Code 10A-1-1-105 defines **"Abuse"** as:
"Abuse" means harm or threatened harm or failure to protect from harm or threatened harm to the health, safety, or welfare of a child by a person responsible for the child's health, safety, or welfare, including but not limited to nonaccidental physical or mental injury, sexual abuse, or sexual exploitation.  Provided, however, that nothing contained in this act shall prohibit any parent from using ordinary force as a means of discipline including, but not limited to, spanking, switching, or paddling.
    a.  "Harm or threatened harm to the health or safety of a child" means any real or threatened physical, mental, or emotional injury or damage to the body or mind that is not accidental including but not limited to sexual abuse, sexual exploitation, neglect, or dependency.
    b.  "Sexual abuse" includes but is not limited to rape, incest, and lewd or indecent acts or proposals made to a child, as defined by law, by a person responsible for the health, safety, or welfare of the child.
    c.  "Sexual exploitation" includes but is not limited to allowing, permitting, or encouraging a child to engage in prostitution, as defined by law, by a person responsible for the health, safety, or welfare of a child, or allowing, permitting, encouraging, or engaging in the lewd, obscene, or pornographic, as defined by law, photographing, filming, or depicting of a child in those acts by a person responsible for the health, safety, and welfare of the child;

# D. Investigation

## Summary

Plaintiff_000002

This case named one alleged victim, Billy Woods, a 16-year-old in the custody of the Arkansas Office of Juvenile Affairs, and four accused staff, Shift Supervisor Jerrod Lang, Detention Worker (DW) Marietta "Jackie" Winkle, DW Brandon Miller, and DW Angela Miller. Woods was found unconscious and unresponsive in his room at approximately 8:36 pm on 12-15-16 by Lang. Lang called for other residents to be locked down. Lang, Winkle, and B. Miller were in Woods's room at various times following his discovery. None of the staff attempted to remove the sheet from his neck or to perform CPR on him. Lang, Winkle, and B. Miller had been in the West Wing, where Woods was housed in Room One, at various times during the approximately two hours and two minutes that he went unchecked after entering his room at approximately 6:34 pm. None of the staff opened his door or the flap covering the window in his door in order to perform required 15-minute checks on Woods. A. Miller was stationed in the control center during the time in question and should have been monitoring Woods via the intercom. After placing residents on lockdown, staff checked only one resident approximately 26 minutes later. The remaining residents on West Wing were not checked for approximately one hour and 45 minutes. None of the staff followed policies and procedures for 15-minute checks of Woods or other residents. Woods's Daily Notes sheet had initials "JL" and "BM" documented for 15 minute checks being completed from 3:00pm to 10:45pm. There is a line drawn through the initials from 8:45pm to 10:45pm as Woods was found deceased during this time period. Winkle reported staff are required to document 15 minute checks of residents. She stated if a resident was in their room, staff could check through the window in the door. Winkle reported Lang told staff the residents needed to be placed on lock down and after the residents were placed in their cells, Lang informed staff that Woods was dead. Winkle reported she

went to "go see for myself." Winkle stated she did not check if Woods was breathing or if he had a pulse. When asked if 15-minute checks were conducted on residents after they were placed on lockdown following the discovery of Woods's body, Winkle said, "[I] don't think so." Lang reported during Woods's intake, Woods disclosed he had attempted suicide "a lot." Lang stated Woods told him the last attempt was about a month prior by hanging. Lang stated he was going to speak with Washington about what Woods disclosed, but he forgot to. Lang stated the Daily Notes were kept in the control room and stated that is where the 15 minute checks were documented. When asked about the line being drawn through the times after Woods was found deceased, Lang stated "[I] jumped the gun on my paperwork." Lang also admitted he added Miller's initials to the Daily Notes as completing 15 minute checks. Lang said when he went to take a snack to Woods, he opened the door to Woods's cell, and said, "He [Woods] was deceased." Lang said he called Woods's name, and then he shut the door when Woods did not respond or move. When asked how he knew Woods was "deceased," Lang said it was "obvious" because Woods was "purple" and "pale-ish." Lang said he went to tell the other staff to place kids on lockdown. Lang said he told staff he "just found Billly in room, dead." Lang said he told staff to call Washington and 911. During his interview B. Miller reported he only saw resident Woods at shower time, which was somewhere between 6:40 pm and 7:00 pm. B. Miller said after Woods finished showering, Woods put his clothes in a hamper and  requested to go back to his room. Miller said Lang gave approval for Woods to return to his room. Miller said that was the last time he saw Woods. B. Miller reported Lang told staff after the residents were locked down that Woods hanged himself. A. Miller told him and Lang to administer CPR. B. Miller said he and Lang went to Woods's cell and Lang advised him to not complete CPR since Woods was already deceased. When asked if he completed required 15-minute checks, B. Miller said he had not. When asked why his initials were on the notes sheet indicating he had completed the checks, B. Miller said Lang wrote his initials on the sheet. A. Miller reported in her interview she was assigned to the control room the night Woods committed suicide. A. Miller reported Lang placed the residents on lockdown and then told all staff, "that boy hung himself." A. Miller reported she asked if CPR was tried and when told no, she told Lang and B. Miller to go do CPR. A. Miller reported both supervisors, Lang and Winkle, did not know the protocol in this situation. A. Miller reported she told winkle to call Washington.  A. Miller reported they had to call Washington back and ask if 911 needed to be called. There was a 20 minute delay of 911 being called after Woods was found in his cell. OCA's investigation has determined, based on some credible evidence, the allegation of NEGLECT LACK OF SUPERVISION by LANG, WINKLE, B. MILLER, and A. MILLER is SUBSTANTIATED. It was further discovered during the course of the investigation that Lang made fun of Woods's name and the way he walked. Reportedly, that contributed to Woods not wanting to be out of his room.  Three residents confirmed Lang made fun of Woods. One resident also reported he told Lang he should probably check on Woods because "he could be in there killing himself." This resident stated staff did not go check Woods. The allegation of ABUSE-MENTAL INJURY by LANG is SUBSTANTIATED. CARETAKER MISCONDUCT is also CONFIRMED as Lang, Winkle, B. Miller and A. Miller did not follow their own procedures for Emergency Procedures. Nobody administered CPR and 911 was not called prior to notifying the Administrator since it was a life or death situation.

## Documents and Other Evidence Reviewed During Investigation

1) Plan for Immediate Safety 2) Photographs 3) Video 4) OSBI Documents 5) Daily Notes 6) Policies and Procedures for the Muskogee County Regional Juvenile Detention Center 7) Intake Packet for resident Billy Woods 8) Incident Reports 9) CPR Certificates 10) Medical Examiner's Report 11) Prehospital Care Report

## Areas of Concern (AOCs)

Plaintiff_000003

Please see the list of AOCs in the Collateral Interview section.

## List Other Documents/Records Attached

## Exit Conference

On **04/19/2017**, Administrator or Designee was informed **By eMail** that this investigation was concluded. The notice included any

AOCs identified at that time and advised that the investigative report would be prepared in accordance with OKDHS administrative rules.

# E. Addresses/Locations

**Children**

1.  **Child Name**  BILLY D. WOODS
    **Gender**  Male
    **Date of Birth**
    **SSN**  4
    **Race**  American Indian/Alaskan Native
    **Custody**  OJA Custody
    **Address**  305 E CINCINNATI Avenue
    MUSKOGEE, Oklahoma  74403-5432
    County: Muskogee

**PRFC of Interest**

2.  **Adult Name**  ANGELA MILLER
    **Position Title**  Detention Worker
    **Start Date**  12/01/2016
    **Date of Birth**  1          2
    **SSN**  4
    **Race**  Black/African American
    **Home**  2020  TENNYSON  Street
      **Address**  MUSKOGEE, Oklahoma  74401-7353
    County: Muskogee

    **Home Phone**  (000)360-7658
    **Cell Phone**

3.  **Adult Name**  JERROD LANG
    **Position Title**  Shift Supervisor
    **Start Date**  04/15/2016
    **Date of Birth**  0          9
    **SSN**  4
    **Race**  Black/African American
    **Home**  2907  KEETOOWAH  Trail
      **Address**  Apartment  1
    MUSKOGEE, Oklahoma  74403-1584
    County: Muskogee

    **Home Phone**  (918)310-4023
    **Cell Phone**

4.  **Adult Name**  MARIETTA E. WINKLE
    **Position Title**  Shift Supervisor
    **Start Date**  01/08/2016
    **Date of Birth**
    **SSN**
    **Race**  American Indian/Alaskan Native
    **Home**  Rural Route : 4  Box Number : 1214
      **Address**  CHECOTAH, Oklahoma  74426-9010
    County: McIntosh
    **Home Phone**  (918)687-3265
    **Cell Phone**

5.  **Adult Name**  BRANDON MILLER
    **Position Title**  Detention Worker
    **Start Date**  10/15/2016
    **Date of Birth**
    **SSN**
    **Race**  Black/African American
    **Home**  800  COLE  Street
      **Address**  TAFT, Oklahoma  74463-
    County: Muskogee
    **Home Phone**  (918)616-9246
    **Cell Phone**

Plaintiff_000004

## Collaterals/Witnesses

| | |
|---|---|
| **Name** RO████T G██████ | **Name** JA██ P██████ |
| **Relation to Family** Facility Resident | **Relation to Family** Facility Resident |
| **Date of Birth** | **Date of Birth** |
| **SSN** | **SSN** |
| **Race** | **Race** |
| **Address** 6262 S Sheridan Avenue<br>Tulsa, Oklahoma 74133-<br>County: Tulsa 72G | **Address** 423 Kingsway<br>Muskogee, Oklahoma 74403-<br>County: Muskogee |
| **Home Phone** (918)492-8200 | **Home Phone** (918)869-8711 |
| **Work Phone** | **Work Phone** |
| **Employer** | **Employer** |

| | |
|---|---|
| **Name** RA█████ W█████ | **Name** P█████N H██████ |
| **Relation to Family** Facility Resident | **Relation to Family** Facility Resident |
| **Date of Birth** ████████ | **Date of Birth** 1████ |
| **SSN** | **SSN** |
| **Race** Black/African American | **Race** |
| **Address** | **Address** |
| **Home Phone** | **Home Phone** |
| **Work Phone** | **Work Phone** |
| **Employer** | **Employer** |

| | |
|---|---|
| **Name** D████L SA██████ | **Name** JOE WASHINGTON |
| **Relation to Family** Facility Resident | **Relation to Family** Empl/Agnt-Hospital/Secure Facility |
| **Date of Birth** | **Date of Birth** |
| **SSN** | **SSN** |
| **Race** | **Race** |
| **Address** 4009 Eufala Avenue<br>Muskogee, Oklahoma 74403-<br>County: Muskogee | **Address** 305 E Cincinnati Avenue<br>Muskogee, Oklahoma 74403-<br>County: Muskogee |
| **Home Phone** (918)682-2841 | **Home Phone** |
| **Work Phone** | **Work Phone** (918)683-3696 |
| **Employer** | **Employer** |

| | |
|---|---|
| **Name** PREHOSPITAL CARE REPORT | **Name** MICHAEL TURIC |
| **Relation to Family** No Relation | **Relation to Family** Government Agency |
| **Date of Birth** | **Date of Birth** |
| **SSN** | **SSN** |
| **Race** | **Race** |
| **Address** | **Address** 700 Main Street<br>Little Rock, Arkansas 72203- |
| **Home Phone** | **Home Phone** |
| **Work Phone** | **Work Phone** (501)982-8654 |
| **Employer** | **Employer** |

| | |
|---|---|
| **Name** DON JOHNSON | **Name** MEDICAL EXAMINER |
| **Relation to Family** Law Enforcement | **Relation to Family** Medical Professional |
| **Date of Birth** | **Date of Birth** |
| **SSN** | **SSN** |
| **Race** | **Race** |

Plaintiff_000005

| **Address** | 112 S 3rd Street<br>Muskogee, Oklahoma 74401-<br>County: Muskogee | **Address** | 1115 W 17th<br>Tulsa, Oklahoma 74107-<br>County: Tulsa 72D |
|---|---|---|---|
| **Home Phone** | | **Home Phone** | |
| **Work Phone** | (918)680-3117 | **Work Phone** | (918)295-3400 |
| **Employer** | Muskogee Police Department | **Employer** | |

| **Name** | DR RYAN BROWN | **Name** | VIDEO NOTES |
|---|---|---|---|
| **Relation to Family** | Medical Professional | **Relation to Family** | No Relation |
| **Date of Birth** | | **Date of Birth** | |
| **SSN** | | **SSN** | |
| **Race** | | **Race** | |
| **Address** | 940 NE 13th<br>Oklahoma City, Oklahoma 73104-<br>County: Oklahoma 55D | **Address** | |
| **Home Phone** | | **Home Phone** | |
| **Work Phone** | (405)271-2429 | **Work Phone** | |
| **Employer** | | **Employer** | |

| **Name** | HISTORY SEARCH | **Name** | AREAS OF CONCERN |
|---|---|---|---|
| **Relation to Family** | No Relation | **Relation to Family** | No Relation |
| **Date of Birth** | | **Date of Birth** | |
| **SSN** | | **SSN** | |
| **Race** | | **Race** | |
| **Address** | | **Address** | |
| **Home Phone** | | **Home Phone** | |
| **Work Phone** | | **Work Phone** | |
| **Employer** | | **Employer** | |

# F. Victim Interviews

| **Victim Name**<br>BILLY D WOODS | | **Date of Birth**<br>█████ | |
|---|---|---|---|
| **Date Interviewed**<br>12/16/2016 | **Time Interviewed**<br>11:15 AM | **Type of Contact**<br>Face to Face (N/A) Child Death | |
| **Interview Location** | | | |
| **Others Present During Interview** | | | |
| **Interview Summary**<br>Resident Billy Woods is a 16-year-old who is in the custody of the Arkansas Office of Juvenile Affairs. He was placed into custody in Januray, 2016 for Delinquent/Runaway. He was placed at Muskogee County Regional Juvenile Detention Center on 12-14-16. According to intake paperwork, Woods had no formal diagnoses and was not prescribed medications. Woods was found unresponsive in his room at approximately 8:36 pm on 12-15-16, after he was not checked for two hours and two minutes after being placed in his room.<br><br>Woods's body had been removed by the nursing home prior to OCA's notification of the incident. | | | |
| **Interviewer Name**<br>SHANNON IWANSKI | | **Interviewer County**<br>State Office | |

Plaintiff_000006

# G. PRFC of Interest Interviews

| PRFC/Alleged Perpetrator<br>OCA-PRFC of Interest | Name<br>MARIETTA E WINKLE | Date of Birth<br>0 |
|---|---|---|
| **Date Interviewed**<br>01/05/2017 | **Time Interviewed**<br>10:17 AM | **Type of Contact**<br>Face to Face (Other) |

**Interview Location**
Muskogee County Regional Juvenile Detention Center; Muskogee, OK

**Others Present During Interview**
OSBI Special Agent Jeremy Yerton

**Interview Summary**
(Note: This interview was primarily conducted by OSBI Special Agent Jeremy Yerton.) Marietta E. "Jackie" Winkle said she typically worked from 11:00 pm to 7:00 am as a Shift Supervisor, but she also occasionally helped fill shifts as a Detention Worker (DW). Winkle said when she worked her usual shift, it was typically her and a maintenance man working together, and they alternated who did checks on the residents throughout the night. Winkle further clarified that she typically had Monday and Tuesday off, worked from 3:00 pm to 11:00 pm on Wednesday and Thursday, and then worked 11:00 pm to 7:00 am on Friday, Saturday, and Sunday. Winkle said when she worked Wednesday and Thursday, she reported to Shift Supervisor Jerrod Lang, and there were two other DWs in addition to Winkle. Winkle said she did not have any formal training in order to be a DW. Winkle said she had been trained in CPR and Medication Administration Technician (MAT) from another job. Winkle said she had no formal restraint training. Winkle said she was working the 3:00 pm to 11:00 pm shift on 12-15-16. Winkle said she was stationed in the kitchen area, and it was her responsibility to prepare dinner, clean the kitchen, prepare snacks, and assist residents with writing any letters they wanted to write. Winkle said between 6:00 pm and 7:00 pm she had to assist the one female resident with showering and hygiene. Winkle said hygiene was not documented, and medications were documented as they were administered. Winkle said staff were also responsible for completing Daily Notes for each resident on each shift. Winkle said if residents were in their rooms, staff were required to do checks every 15 minutes. Winkle said staff could check through the window in the

door, and then staff went to the control room to document that checks were completed. Winkle said if residents were in the common area, checks were not required to be documented. Winkle said there were no cameras placed in the residents' room, however, there were intercoms. Residents were able to press a red button on the intercom and speak to the person manning the control tower. Winkle said the person in the control tower could turn the lights on and off in each of the rooms. Winkle said she had no contact with resident Billy Woods, and the first time she saw him was when he was going to the shower between 6:00 and 7:00 pm on the night he died. Winkle said that she was not allowed to assist male residents with showering; only male staff could do that. Winkle said sometime after she had finished passing snacks to the residents, Shift Supervisor Jerrod Lang said the residents should be placed on lockdown. Winkle said she locked down the residents on East Wing, and DW Brandon Miller locked down the residents on West Wing, which was the wing where Woods's room was located. Winkle said once the residents were locked down, the staff gathered in the control tower, and Lang informed staff that Woods was dead. Winkle said Lang was "pretty visibly upset." Winkle said, "I went to see for myself." Winkle said DW Angela Miller called 911, and Lang called Superintendent Joe Washington. Winkle said calling 911 is an "automatic" thing that is done in emergency situations. Winkle said she went into Woods's cell and saw him in a "somewhat" prone position on the floor with a sheet wrapped around his neck. Winkle said Woods was a "slight grey color," and he had a drop of spit hanging from his lip. Winkle did not remember if the spit was

colored in any way. Winkle said she did not check if Woods was breathing, she did not check for a pulse, and she did not attempt to loosen the sheet. Winkle said she was not sure if the facility had a cut-down tool, and she said there was no Automated External Defibrillator (AED). Winkle said staff

do not have radios to communicate with each other, but they can use their cell phones if they need assistance. Winkle said she would assume staff would push the button for the in-room intercom if they needed medical assistance. Winkle said nothing similar had occurred before at the facility. Winkle said the facility did not have a first responder, and there was not a nurse on the staff. Winkle said a doctor came to the facility every two weeks, and workers could transport residents to see a doctor if they needed assistance in the meantime. Winkle said 911 would be called in the event of an emergency. Winkle said at shift changes the staff discussed any residents who were on suicide watch. Winkle said if she was responsible for supervision of suicide watch residents, she would put a checklist on the door of the resident's room. Winkle said once on an overnight shift, she had placed a chair outside the door of a resident on suicide watch and had the maintenance man sit there to provide 15-minute checks. Winkle said Woods was not on suicide watch as far as she knew, and no one had told her that he was. Winkle said after Woods died a different resident was placed on suicide watch, and he was naked in his room and checked routinely. Winkle said residents typically eat in the common room unless they are placed on room confinement. Winkle said she did not know how a person on suicide watch would take their meals. Winkle said residents ate from paper plates using plastic spoons and forks, no knifes. Winkle said she had been trained in CPR through the American Heart Association, and her training, which was valid for two years, had occurred on 03-02-

Plaintiff_000007

| 15. Winkle was asked to describe how she had been trained to handle an (continued) | |
|---|---|
| **Interviewer Name** SHANNON IWANSKI | **Interviewer County** State Office |

| **PRFC/Alleged Perpetrator** OCA-PRFC of Interest | | **Name** MARIETTA E WINKLE | **Date of Birth** ▇▇▇▇ |
|---|---|---|---|
| **Date Interviewed** 01/05/2017 | **Time Interviewed** 10:18 AM | **Type of Contact** Face to Face (Other) | |

**Interview Location**
Muskogee County Regional Juvenile Detention Center; Muskogee, OK

**Others Present During Interview**
OSBI Special Agent Jeremy Yerton

**Interview Summary**
(continued) unconscious victim. Winkle said the person should be moved onto their back and shaken while asking if they could breathe "or something." Winkle said she did not do anything to assist Woods. Winkle said she asked what should be done to help Woods, but she did not believe that Lang said anything. Winkle said she was not sure if she should do anything because she did not know if Woods's room was considered a crime scene. Winkle said she did consider death to be a medical emergency, and she thought the facility's policy was to provide CPR until paramedics arrived. Winkle said she had read the policy and procedure manual on her own and signed a paper saying she had read it. Winkle said she did not receive initial or follow-up training on the manual, however, it was accessible in the control tower if staff wanted to access it. Winkle said she was not aware of any checks being required other than 15-minute visual checks of residents if they were in their rooms. When asked if 15-minute checks were conducted on residents after they were placed on lockdown following the discovery of Woods's body, Winkle said, "[I] don't think so." Winkle said the residents wanted to know what was happening, but she did not know if any of the residents were safe during lockdown. Winkle was provided a time line of events from the time Woods was discovered to the time 911 was called. Winkle said she did not know why it took 20 minutes for staff to call 911. Winkle said if a similar situation occurred at home with a family member, she would attempt to revive the person and call 911. Winkle said she did not know anything about 15-minute check sheets being filled out before checks were actually conducted. Winkle said she had never done that

herself, and if she knew it was being done by a staff, she would contact Washington and report it.

| **Interviewer Name** SHANNON IWANSKI | **Interviewer County** State Office |
|---|---|

| **PRFC/Alleged Perpetrator** OCA-PRFC of Interest | | **Name** JERROD LANG | **Date of Birth** ▇▇▇▇ |
|---|---|---|---|
| **Date Interviewed** 01/05/2017 | **Time Interviewed** 11:28 AM | **Type of Contact** Face to Face (Other) | |

**Interview Location**
Muskogee County Regional Juvenile Detention Center; Muskogee, OK

**Others Present During Interview**
OSBI Special Agent Jeremy Yerton

**Interview Summary**
(Note: This interview was primarily conducted by OSBI Special Agent Jeremy Yerton.) Shift Supervisor Jerrod Lang said he had been employed by the Muskogee County Regional Juvenile Detention Center for approximately eight months, and he had been a supervisor for approximately four or five of those eight months. Lang said he typically worked from 3:00 pm to 11:00 pm Wednesday through Sunday, with his days off being Monday and Tuesday. Lang said he typically supervised three staff. Lang said on 12-15-16, he was working with Detention Worker (DW) Jackie Winkle, DW Angela Miller, and DW Brandon Miller. Lang said Winkle worked in the kitchen; A. Miller worked in the control room; and B. Miller and Lang worked the floor. Lang said there were nine or 10 kids present in the program that day. Lang said a typical shift consisted of free time and exercise time between 3:00 pm and 5:00 pm, dinner at 5:00 pm, and then showers, television, phone calls, and snacks until bedtimes started. Lang said bedtimes were at 9:00 pm/9:20 pm/9:40 pm/10:00 pm, depending on a child's level of 3/2/1/1+. Lang said on 12-14-16, resident Billy Woods started the intake process before Lang arrived at 3:00 pm, but Lang was responsible for finishing the process. Lang said Woods was "nonchalant, belligerent, and disrespectful" at that time, so he was placed in his room until approximately 7:00 pm, and then Lang brought him out of his room to finish intake. Lang said Woods was "responsive" and "cooperative" at that time and answered questions without issue. Lang said Woods answered medical questions and stated he was not taking any medications. Lang said when he asked Woods about suicide, Woods said he had tried to commit suicide "a lot." Woods reportedly said

the first time he had tried to commit suicide it was by hanging, and the last time he had attempted to commit suicide, by hanging, was a month prior to being placed at the facility. Lang said when he asked Woods how likely he was to commit suicide now,

Plaintiff_000008

Woods said, "not likely at all." When asked if he was required to report that information to anyone, Lang said he was "going to pass it by [Superintendent] Joe [Washington]," but he forgot to do so. Lang said on 12-15-16, Woods spent most of the day in his room because he did not want to return to his "chomo father." Woods ate dinner at a table in the common room and then returned to his bedroom. Lang said the last time he saw Woods was when B. Miller brought Woods out of the shower and put him back in his room after 7:00 pm. (Note: According to video footage, Woods entered his room after showering at 6:34 pm.) Lang said residents were not allowed to have shoes in their room. He did not know why; that was what he was told by an unknown person. Lang said the shoes were property of the facility, and no resident was allowed to wear a belt while in the facility. Lang said staff carried memo pads to write notes about things that occurred during the shift, and then they used those notes to compile Daily Notes. Lang said the Daily Notes were maintained in the control room, and there was no time frame on when those had to be completed during a shift. Lang said if residents were in the common room then they had to be checked every 15 minutes, and there was a line on the Daily Notes for documenting common room checks. When Lang was asked about a line being drawn through some initials on the Daily Notes sheet for Woods, Lang said "[I] jumped the gun on my paperwork." Lang said he only

pre-emptively filled out the sheet for Woods, and that was "not how I normally do things." Lang said he added B. Miller's initials to the Daily Notes sheet for times when checks were not conducted due to Woods's death, and B. Miller had no idea that his initials were on the sheet for those times.

Lang said it was "okay" for one staff to put another staff's initials on the Daily Notes, indicating checks had been conducted. Lang said Woods finished his shower and went to his room between 7:00 pm and 7:30 pm, but it may have been between 6:00pm and 6:30 pm. Lang could not be certain because the only clock was in the control room, and he usually gauged the time by where kids were in the progression of the program steps. Lang said staff did not have radios to communicate with each other, but there were intercoms in the common room and in all of the cells. Lang said he had not worked in any other facilities similar to Muskogee County Regional Juvenile Detention Center, and he had "no formal training" in order to work in the facility. Lang said there were "disagreements about people being trained wrong," and he had only had one class on restraints. When asked how he was trained to restrain residents, Lang said he was told to "swoop and grab [them] from behind." Lang said when he went to take a snack to Woods, he opened the door to Woods's cell, which was cell one on West Wing. Lang said, "He [Woods] was deceased." Lang said he called Woods's name, and then he shut the door when Woods did not respond or move. When asked how he knew Woods was "deceased," Lang said it was "obvious" because Woods was "purple" and "pale-ish." Lang said he nudged Woods with his foot, but then said that may have occurred the second time he entered Woods's cell, not the first. Lang said he "panicked and got out of there." When asked why he thought Woods was "purple" or "pale-ish," Lang said from "lack of oxygen, I guess." Lang said Woods had a sheet wrapped around his neck and "braced under the sink." When asked why he did not (continued)

| Interviewer Name | Interviewer  County |
|---|---|
| SHANNON IWANSKI | State Office |

| PRFC/Alleged Perpetrator | | Name | Date of Birth |
|---|---|---|---|
| OCA-PRFC of Interest | | JERROD LANG | ▉ |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 01/05/2017 | 11:29 AM | Face to Face (Other) | |

**Interview Location**
Muskogee County Regional Juvenile Detention Center; Muskogee, OK

**Others Present During Interview**
OSBI Special Agent Jeremy Yerton

**Interview Summary**
(continued) attempt to remove the sheet, Lang said, "I couldn't do it." Lang said he shut the door and went to tell the other staff to place kids on lockdown. Lang said he told staff he "just found Billy in room, dead." Lang said he told staff to call Washington and to call 911. Lang said he told staff "I can't do CPR," and added "I couldn't do nothing." Lang said B. Miller said he would try to do CPR, but B. Miller ultimately did not do CPR either. Lang said his CPR training certification was current but he had never "seen anything like it" and he was "in shock." Lang said he told A. Miller to call 911, but he said to call Washington first. Lang was not certain when A. Miller called because he was in Woods's room with B. Miller. Lang said when he and B. Miller left Woods's room, he (Lang) went outside and "smoked a bunch of cigarettes." Lang said he had not previously dealt with a resident dying, although he had a situation where a resident had a seizure and was bleeding from his mouth. Lang said he turned the resident on his side and ensured that 911 was called. Lang said there was no Automated External Defibrillator (AED) in the facility. When asked about the facility's policy manual, Lang said he had read "most of it" on his own, but he did not understand all of it. Lang said he talked to other staff and Washington about his questions, and Washington told him "we'll get to it." Washington reportedly answered "a few" of Lang's questions so that he "got the gist" of the policy manual. When asked if he had to sign a form stating he had read and understood the manual, Lang said he was required to sign that form before he had a chance to read the manual. Lang insisted that residents were checked after the lockdown was

implemented. Lang said he and A. Miller reminded staff to do the checks, and Winkle and B. Miller conducted them. Lang said he

Plaintiff_000009

saw "a few of them [checks] done." Lang said this was his first time being a supervisor, and he was promoted so quickly because the facility was "short staffed." Lang said he had initially turned down the promotion twice but ultimately accepted it. Lang said there were "a few shifts" where he received on-the-job training, but there was no formal training. Lang said while he was outside smoking "a bunch of cigarettes," B. Miller came out "once or twice" to check on him, but otherwise the DWs were all in the facility while he was outside. Lang said he had been certified in CPR by the American Red Cross, but he did not remember what he had been trained to do if he found an unconscious victim. Agent Yerton provided Lang with the actual timeline of events surrounding Woods's death. Lang said he told staff to call Washington and ask him what to do. Lang said he did not have any training that would allow him to call a time of death. Lang said if he was faced with a similar situation for a family member, he would call 911. Lang said it was the first time he had ever been confronted with a dead body. Lang said he did not know why he had called for a lockdown, other than "panic" and "shock."

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| PRFC/Alleged Perpetrator | Name | Date of Birth |
|---|---|---|
| OCA-PRFC of Interest | BRANDON MILLER | |

| Date Interviewed | Time Interviewed | Type of Contact | |
|---|---|---|---|
| 01/05/2017 | 12:17 PM | Face to Face (Other) | |

**Interview Location**
Muskogee County Regional Juvenile Detention Center; Muskogee, OK

**Others Present During Interview**
OSBI Special Agent Jeremy Yerton

**Interview Summary**
(Note: This interview was primarily conducted by OSBI Special Agent Jeremy Yerton.) Detention Worker (DW) Brandon Miller said he worked part-time evenings (3:00 pm to 11:00 pm) on Sunday, Monday, and Thursday. Miller said he worked from 3:00 pm to 10:00 pm on 12-15-16. Miller said when he reported for work on that day he was told there were two new residents. Miller said he only saw resident Billy Woods at shower time, which was somewhere between 6:40 pm and 7:00 pm. Miller said prior to that Woods had been in his cell one on the West Wing. Miller assumed Woods had eaten dinner in the common area because Miller had seen an empty plate on a table. Miller said it was procedure to lock the residents in the shower room, and that was what he had done. Miller said after Woods finished showering, Woods put his clothes in a hamper and then requested to go back to his room. Miller said DW Supervisor Jerrod Lang gave approval for Woods to return to his room. Miller said that was the last time he saw Woods. Miller said later Lang called all of the staff together and told them to put the residents on lockdown; Miller locked down the residents on the East Wing. Miller said he asked Lang three times why he had called for lockdown before Lang said, "That guy back there hung himself." Miller said the other staff, including DW Jackie Winkle and DW Angela Miller (B. Miller's aunt) were crying and "everybody [was] freaking out." Miller said A. Miller told him and Lang that someone needed to do CPR. B. Miller said he and Lang went to Woods's cell and went inside. B. Miller said Woods was "pale." Woods had tied a sheet under the sink in his room, and Woods was stretched out on the floor. B. Miller said Woods was not breathing. According

to B. Miller, Lang checked Woods for a pulse and said, "He's gone." B. Miller said he watched Lang check for a pulse in Woods's neck, but Lang did not remove the sheet that was wrapped around Woods's neck. B. Miller again referenced A. Miller insisting that CPR be performed. B. Miller said that was his intent when he went to the room with Lang, and Lang said, "I can't do it [CPR]." B. Miller said when Lang was informing the staff that Woods had hanged himself, Lang said, "He's gone." B. Miller said Lang knew Woods was "gone" because Lang had called Woods's name, and Woods had not responded. B. Miller said he was instructed by Lang not to perform CPR on Woods when they were both in the room. B. Miller said he was not sure if a "cut down tool" was present in the facility. B. Miller said Woods was not on suicide watch, but he also said that he did not know anything about Woods. B. Miller said that any resident on suicide watch was to be checked every 15 minutes, and staff would be informed of residents on suicide watch at the shift change. B. Miller said there was nothing placed on a resident's door or on his/her check sheet to inform staff of a resident's suicide watch status. (Note: Policies and Procedures for the Muskogee County Regional Juvenile Detention Center states on page 19 "When the juvenile is in his/her room they are monitored by intercom and visually observed every five (5) minutes." Standard, non-suicide watch checks are conducted every 15 minutes.) When asked if he completed required 15-minute checks, B. Miller said he had not. When asked why his initials were on the checklist sheet indicating he had completed the checks, B. Miller said, "I ain't really done it." B. Miller said the checklist was maintained

in the control room, or "tower," and Lang was the one who had written B. Miller's initials on the sheet. (Note: In his interview, Lang confirmed B. Miller's assertion that Lang had written B. Miller's initials on the sheet.) B. Miller said he was not certain why Lang had filled out the checklist,

indicating checks had been conducted on Woods through 10:45 pm that night. B. Miller said he was not aware of any other situations where checklists had been falsified by staff. B. Miller said staff did not carry radios to communicate with each other. B. Miller said the DW responsible for manning the control room could hear what was being said on the main floor, and there were

intercoms in the residents' room that staff could utilize. B. Miller said there were no special codes staff could use in order to maintain secrecy. B. Miller was asked if he received a copy of Policies and Procedures for the Muskogee County Regional Juvenile Detention Center. B. Miller indicated that he had received a copy of the manual, he had read it, and he had signed a form stating he had read the manual. B. Miller said a supervisor "skims through" the manual with employees, but employees do not actually receive training on the manual. B. Miller said he had been trained in CPR through the American Heart Association. When asked if he knew what to do when finding an unconscious victim, B. Miller said the respondent should begin with 30 chest compressions. B. Miller said that he did not do that. When asked if that was what he should have done, B. Miller said he would have done that if Lang had not told him not to perform CPR. Any time he was asked about CPR, B. Miller reiterated that Lang had told him not to perform CPR on Woods. B. Miller said when he returned to the control room from Woods's room he informed A. Miller that he had not performed CPR on Woods. According to B. Miller, A. Miller said, "You have to do it." B. Miller said that A. Miller did not perform CPR herself because she was on restrictions due to a shoulder injury (continued)

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| PRFC/Alleged Perpetrator | | Name | | Date of Birth |
|---|---|---|---|---|
| OCA-PRFC of Interest | | BRANDON MILLER | | ███████ |
| **Date Interviewed** | **Time Interviewed** | **Type of Contact** | | |
| 01/05/2017 | 12:18 PM | Face to Face (Other) | | |

**Interview Location**
Muskogee County Regional Juvenile Detention Center; Muskogee, OK

**Others Present During Interview**
OSBI Special Agent Jeremy Yerton

**Interview Summary**
(continued) that had been sustained at a different job. B. Miller said Winkle also did not perform CPR. When asked what Lang did subsequent to him and B. Miller leaving Woods's room, B. Miller said Lang went outside because Lang was "freaked out." When asked why 15-minute checks were not completed on the other residents who had been placed in their rooms for lockdown, B. Miller said the staff were "still stunned," but he thought he had checked residents on the East Wing. B. Miller was given the exact timeline of events: Woods was placed in his room at 6:34 pm; Lang discovered Woods at 8:36 pm; and 911 was called at 8:56 pm. B. Miller said he did not know why 911 was called so late because he thought A. Miller was calling 911 when he and Lang went to Woods's room. When asked what he would do if he arrived home and found a family member in similar circumstances to Woods's, B. Miller said he would call 911 and perform CPR.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| PRFC/Alleged Perpetrator | | Name | | Date of Birth |
|---|---|---|---|---|
| OCA-PRFC of Interest | | ANGELA MILLER | | ███████ |
| **Date Interviewed** | **Time Interviewed** | **Type of Contact** | | |
| 01/17/2017 | 11:29 AM | Other | | |

**Interview Location**



**Others Present During Interview**


**Interview Summary**
OSBI Special Agent Jeremy Yerton interviewed Detention Worker (DW) Angela Miller over the phone due to his belief that she was attempting to get out of a face-to-face interview. Yerton provided the following account of that interview in his written report: "On December 5, 2016, MILLER was employed part time at the Muskogee County Juvenile Detention Center. MILLER had been employed for six to eight months. MILLER was a detention worker and primarily worked in the control room. On December 15, 2016, MILLER was working 1500-2100 hours and was assigned the control room. The control room operator watched the monitors, answered the phones and listened to other parts of the facility via the speaker system. There was no master log book maintained by the control room operator for shift activities. MILLER had been relieved by BRANDON MILLER to begin giving phone calls to the inmates. ANGELA had just finished with a phone call when shift supervisor JARRED [sic] LANG came over and told ANGELA to relieve BRANDON and send BRANDON down to LANG. ANGELA relieved BRANDON and from the control room observed LANG locking down one side and BRANDON and JACKIE WINKLE began locking down the other side. LANG and the other employees came to the control room and LANG stated, that boy hung himself. ANGELA then began to panic. ANGELA came back around and asked LANG "Did you try CPR?", LANG stated no, that he was gone. ANGELA told LANG and BRANDON to go down and do CPR. ANGELA asked both supervisors LANG and WINKLE what was the protocol for the situation, and neither one knew. JACKIE asked ANGELA if Director JOE WASHINGTON should be called. ANGELA told WINKLE to call WASHINGTON. WINKLE was finally able to get a hold of WASHINGTON and ANGELA had JACKIE

Plaintiff_000011

ask WASHINGTON if 911 should be called because ANGELA did not know the protocol. ANGELA called 911. ANGELA could not explain the twenty minute delay in calling 911, ANGELA believed everyone was in shock and no one knew the protocol. ANGELA was unaware if there was a cut down tool in the facility. ANGELA did not know any of the protocols for a medical emergency at the facility. The supervisor was responsible for maintaining the daily notes for each inmate including initialing the fifteen minute cell checks. The supervisor placed their initials on the time of the check even if another worker conducted the check. The only method of indicating that an inmate was on suicide watch was during the shift change/briefing and on the daily notes."

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

# H. Collateral/Witness Interviews

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| MEDICAL EXAMINER | | Medical Professional | Referral |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 12/16/2016 | 08:30 AM | Other | |
| Interview Location | | | |
| | | | |
| Others Present During Interview | | | |
| | | | |

**Interview Summary**
An autopsy was completed on resident Billy Woods's body by Ross Miller, MD, of the Office of the Chief Medical Examiner. The report returned the following Pathological Diagnosis: "I. Hanging. A. White fitted bedsheet ligature is still in place (loosely tied/looped) around the neck at the time of examination. 1. Pressure furrow is present in an upward "V" configuration that partially encircles the neck and is at its highest point on the right lateral neck. i. Brown and yellow, dry based abrasion (1 x inch), left anterolateral neck. ii. Furrow pattern of the neck is consistent with the ligature. B. Rare (one) petechial, scleral conjunctiva, left eye globe. C. Protruding tongue. D. Head and neck cyanosis/congestion. E. Purple (cyanotic) appearing lips and fingertips. F. Brain (1480 grams) with mild cerebral edema. G. Lungs (right, 650 grams; left 680 grams) with marked congestion. II. Minor asynchronous abrasions and contusion, head, torso, and extremities. III. Toxicological analyses are negative (see toxicology report). Cause of Death: Hanging. Manner of Death: Suicide.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| JOE WASHINGTON | | Empl/Agnt-Hospital/Secure Facility | Referral |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 12/16/2016 | 11:30 AM | Face to Face (Other) | |
| Interview Location | | | |
| Muskogee County Regional Juvenile Detention Center; Muskogee, OK | | | |
| Others Present During Interview | | | |

**Interview Summary**
Superintendent Joe Washington said he received a phone call at approximately 8:40 pm on the night of 12-15-16. Washington said he was asked to come to the Muskogee County Regional Juvenile Detention Center because there was an emergency. Washington said the caller hung up, but then Washington received a phone call from Shift Supervisor Jerrod Lang, who said the resident in room one "hung himself." Washington said he asked if staff had administered CPR, and Lang said, "No, he's dead." Lang reportedly told Washington that he had gone into the room to rouse the resident, but there was no response. Lang then said, "He's gone." Washington said he went to the facility, and when he arrived, he went to the control area. Washington said emergency medical personnel and police were on the scene. Washington met with Lang, and Lang reportedly said "I'm responsible because I'm the supervisor." Washington said he told Lang all of the staff were responsible. Washington described Lang as "shaken up" and "scared." Washington said resident Billy Woods was to be released from the facility on 12-16-16. Woods had reportedly told staff he did not want to go back to his dad's house, and he would rather be in detention. Washington said staff told him Woods ate dinner and took a shower before asking to return to his room. When Lang went to the room to give Woods a snack, he realized Woods had hanged himself. Washington reviewed video for the evening. On video, Woods took a shower at approximately 6:30 pm, and then went to his room around 6:35 pm. Washington said Woods was not on any suicide precautions. Woods had been administered a suicide assessment, during which he disclosed that he had first attempted suicide at the age of eight or nine.

Woods also reported attempting to hang himself approximately one month prior to being admitted to the facility. Woods said was

Plaintiff_000012

"definitely not" thinking about committing suicide at the time of the assessment, but if he were to attempt suicide again he would use a gun because it was "quicker." Washington said checks were required to be conducted every 15 minutes if residents were in their rooms and were not on suicide precautions. Washington said any resident not on suicide precautions would be allowed to have a flat sheet, a fitted sheet, one or two blankets, and a pillow case. Washington said Woods used a flat sheet to wrap around his neck and hang himself. Washington said Woods was placed in room one, which had a handicap accessible bar across the front of the combination toilet and sink installed in the room. Washington said room ten had a similar bar installed, and there was a resident placed in that room. As part of the safety plan, Washington said that bar would be removed from room ten. Washington said the staff working the night of the alleged incident were Jackie Winkle, Brandon Miller, Angela Miller, and Lang. Washington said all of the staff had been employed for a year or less, and he considered them short-term staff. Washington said Lang had originally been hired as a part-time staff but had been hired full-time and promoted to a supervisor because he was a "conscientious" staff and was capable of doing the job. Washington said he had no concerns about Lang, and

he said Lang would call if he had questions. Washington said none of the staff had ever been subject to disciplinary action. Washington said all of the staff were "pretty shook up" following the incident. Washington said the Medical Examiner did not pick up Woods's body, but a local funeral home had done so around midnight. Washington said counselors were made available to the staff and residents, and Lang had spoken to a counselor before going home for the night. Washington said he did not know if any other residents expressed suicidal thoughts following Woods's death, but they were being urged to talk to counselors. Washington said Woods had entered the facility at 3:00 pm on 12-14-16. Woods had no medications, and Washington was "not sure" of any diagnoses. Washington said Woods had been scheduled to be transported to Arkansas, to his father's custody, on 12-16-16.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| DON JOHNSON | | Law Enforcement | Referral |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 12/16/2016 | 12:15 PM | Face to Face (Other) | |
| Interview Location | | | |
| Muskogee Police Department; Muskogee, OK | | | |
| Others Present During Interview | | | |
| | | | |

**Interview Summary**
Officer Don Johnson, Criminal Investigator for the Muskogee Police Department, said he had responded to the Muskogee County Regional Juvenile Detention Center due to a report that resident Billy Woods had hanged himself in his cell. Johnson said he had taken photographs of the scene. Johnson said staff reported finding Woods in his cell and calling 911. Johnson said Woods had hanged himself by wrapping a sheet around his neck and a metal bar attached to the sink/toilet in his cell. Johnson said as far as his investigation was concerned, it was wrapped up because Woods had committed suicide and no crime had been committed.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| MICHAEL TURIC | | Government Agency | Referral |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 12/22/2016 | 10:00 AM | Telephone | |
| Interview Location | | | |
| | | | |
| Others Present During Interview | | | |
| | | | |

**Interview Summary**
Michael Turic is the Director of the Arkansas Office of Juvenile Affairs. Turic was interviewed because resident Billy Woods's assigned worker was on medical leave. Turic said Woods had been arrested due to shoplifting and had been held on a warrant that the state of Arkansas had issued for safety concerns. Turic said Woods's parents had previously gone through a divorce that was less than amicable, and there were multiple issues with custody and criminal records that colored Woods's relationship with his father. Turic said Woods had run away from his father's home in January 2016, and that led to the warrant being issued. Turic said Woods was not going to face any charges upon his return; there were just concerns about his safety.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | Relationship | Type of Collateral |
|---|---|---|

Plaintiff_000013

| D██ S██ | | Facility Resident | Referral |
|---|---|---|---|
| **Date Interviewed** 01/30/2017 | **Time Interviewed** 09:22 AM | **Type of Contact** Face to Face (Placement Provider) | |

**Interview Location**
Allaxis Boys Home; Muskogee, OK

**Others Present During Interview**

**Interview Summary**
Resident D██ S██ said he was placed at the Muskogee County Regional Juvenile Detention Center when resident Billy Woods committed suicide. S██s said prior to committing suicide, Woods was "depressed" because Shift Supervisor Jerrod Lang was "making fun of the way he [Woods] walked." S██ said Woods went by his middle name Duane, and Lang also made fun of that name. S██ said because of the way Lang treated him, Woods did not want to come out of his room. S██ said Lang was the only staff who made fun of Woods. S██ said no one checked on Woods when he was in his room prior to committing suicide. Sallis said he told Lang he should probably check on Woods because "he could be in there killing himself" and staff would not know it. Sa██ said Woods was the only resident who staff did not check on.

| **Interviewer Name** SHANNON IWANSKI | **Interviewer  County** State Office |
|---|---|

| **Collateral Name** RYAN BROWN | **Relationship** Medical Professional | **Type of Collateral** Referral |
|---|---|---|
| **Date Interviewed** 02/08/2017 | **Time Interviewed** 11:34 PM | **Type of Contact** E-Mail |

**Interview Location**

**Others Present During Interview**

**Interview Summary**
Program Manager Bateman provided Dr. Ryan Brown with information regarding the death of Woods.  Dr. Brown is on the Child Protection Committee at Children's Hospital in Oklahoma City.  The following is Dr. Brown's response to reviewing the information gathered during the investigation.  "Amy, If you would like to call me tomorrow about this case you can. In short, after looking at the photos and the ME report, I believe that the deceased would have died within the 15 minutes in between the sweeps. I think that if after the person came by to check on him, the deceased could have hang himself, died, and could not have been resuscitated by the time another person were to come by in 15 minutes. Please let me know if you have any questions.   Ryan Ryan Brown, MD, FAAP  Associate Clinical Professor  University of Oklahoma College of Medicine  Dept. of Pediatrics, Section of Pediatric Emergency Medicine  405-760-4123 cell  405-271-2429 office  405-271-2421 fax  Ryan-brown@ouhsc.edu"

| **Interviewer Name** AMY BATEMAN | **Interviewer  County** State Office |
|---|---|

| **Collateral Name** R██████ G█████ | **Relationship** Facility Resident | **Type of Collateral** Referral |
|---|---|---|
| **Date Interviewed** 02/15/2017 | **Time Interviewed** 09:11 AM | **Type of Contact** Face to Face (Placement Provider) |

**Interview Location**

**Others Present During Interview**

**Interview Summary**
Resident R█████ G█████ said he had been placed at the Muskogee County Regional Juvenile Detention Center when resident Billy Woods arrived and subsequently killed himself. G██t said supervisor Jerrod Lang was "always mean to him [Woods]." When asked to clarify what he meant, G██ said Lang would make fun of Woods's name and of the way Woods walked because of a limp. G██ said Lang would use a "weird accent" to say Woods's name, not Billy or Woods, but either a first or middle name that G██ could not remember. G██ said if Woods asked Lang to stop, Lang would say, "[I will] call you what I want to call you." G██ said on the evening that Woods died, Lang did not check on Woods for over an hour, and the only reason Lang finally checked on Woods was because another resident told him that he should. G██t said when Lang finally made the check, he came back into the common area "yelling" for everyone to go to their rooms. G██ said he was also a target of Lang's, but he was used to it because it had happened when he was placed at the facility previously. G██ said Lang made fun of the way G██ shot a basketball, how he cleaned during cleaning time, and how G██ was unable to pronounce some words correctly. G██ said a staff named "Mr. Anthony" also made fun of G██t on a regular basis and called G██t "retard" or "retarded." "Mr. Anthony" also made

Plaintiff_000014

fun of Woods's name, according to G███t. Gr██t said when the residents were placed in their rooms on lockdown, none of the staff checked on them for "a pretty long time." G██t said he was not checked on until after the police left the facility.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | Relationship | Type of Collateral |
|---|---|---|
| J█████ P█████ | Facility Resident | Referral |

| Date Interviewed | Time Interviewed | Type of Contact | |
|---|---|---|---|
| 02/15/2017 | 03:23 PM | Face to Face (Home) | |

**Interview Location**
P█████ Home; Muskogee, OK

**Others Present During Interview**

**Interview Summary**
J███b P█████s said he had been placed at the Muskogee County Regional Juvenile Detention Center between December 20, 2016, and December 22, 2016. H████ said he was not present in the facility when resident Billy Woods committed suicide, but he had heard about the situation. P████ said he did not know the names of staff who had worked with him, but none of them made fun of him or other residents. Pa████ said he felt like staff ignored him. P████s said he requested a sweatshirt for two days before one was given to him. P████ said he was on suicide watch while at the facility, and not allowed to have clothing or sheets. P████s said he also was not allowed to have a mattress, and he resorted to sleeping on the toilet because he was so cold. P████s said staff checked on him "a lot" during that time. P████s said he did not know if the intercom in his room was on or if it worked because when he tried to use it to call staff, no one answered him. P████s said he knew the intercoms in other rooms worked.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | Relationship | Type of Collateral |
|---|---|---|
| R█████ W█████ | Facility Resident | Referral |

| Date Interviewed | Time Interviewed | Type of Contact | |
|---|---|---|---|
| 02/16/2017 | 01:04 PM | Face to Face (Placement Provider) | |

**Interview Location**
Juvenile Detention Center in Manitou, OK.

**Others Present During Interview**
None

**Interview Summary**
Wa██r advised staff member Jerrod [Lang] was one of the staff members on duty when resident Billy [Woods] choked himself at the Muskogee County Regional Detention Center (MCRDC). W███r said staff members and residents did not communicate much with Woods because Woods stayed in his bedroom most of the three days he resided at MCRDC. W███r said he never observed anyone mistreat or make fun of Woods. W███ said Woods had been in his bedroom the "whole day" on the day he choked himself to death. W███r explained Woods misbehaved and would then demand to go to his bedroom. W███ reported staff members checked on Woods every fifteen minutes; however, W███r reported he "guessed" when W███r choked himself that staff had not checked on him in about one hour. W███r said no one made fun of Woods's name, and that no one made fun of the way Woods walked. W███r reported no one said much of anything to Woods. Wa██ said no one ever mentioned anything about Woods trying to harm himself, and he was not aware of Woods making any self-harm statements to anyone.

Walker said the night Woods died, Woods had not been able to get a lid off the hygiene supplies, so he threw his clothes and walked into his bedroom. W███r said Woods stayed in his bedroom until he was found by Lang. W███r said he heard Woods wrapped his sheet around something in order to choke himself. W███r said he did not see Woods's body, and the coroner removed Woods's body. Wa██r advised Woods had anger issues so staff members put him in his bedroom "24 hours," but staff members checked on him every 15 minutes. Walker said the day Woods died, there were only three staff members on duty, instead of the required four staff members. Walker advised there were numerous times that the facility only had three people working, instead of the required four people.

| Interviewer Name | Interviewer County |
|---|---|
| LORA WILLIAMS | State Office |

| Collateral Name | Relationship | Type of Collateral |
|---|---|---|
| PE████N H█ | Facility Resident | Referral |

| Date Interviewed | Time Interviewed | Type of Contact | |
|---|---|---|---|
| 02/16/2017 | 02:35 PM | Face to Face (Placement Provider) | |

Plaintiff_000015

| Interview Location | | |
|---|---|---|
| Lawton Boys Home. | | |
| **Others Present During Interview** | | |
| None | | |
| **Interview Summary** | | |

Resident H████ n H██████y, 17, is a male resident currently staying at the Lawton Boys Home. H█████y had been staying at Muskogee County Regional Juvenile Detention Center. H████y did not have any injuries at the above date and time of his interview. H████ay reported he was never afraid of any staff member at MCRJDC, and he is not afraid of anyone at his current placement. H█████y advised staff members generally checked on residents every 15 minutes. H█████y explained some staff members conducted the checks a little later and some conducted the checks a little sooner than the 15 minutes. H██████y advised those staff members that waited later sometimes waited about 25 minutes in between checks. H█████y said he never heard any staff member make fun of any resident. H███████ said resident Billy [Woods] did not like to be called by his first name, but staff members told Woods that they were required to call the residents by their first name. H██████y said staff members treated all residents fair. H█████y said he did not remember any resident walking with a limp. H████y said he was at the facility the day Woods hung himself.

H█████y said when resident T███ (last name unknown to H██████y) mentioned to staff member Jerrod (Lang) that Woods may want a snack, Lang took a snack to Woods. H█████ said when Lang opened Woods's door Lang closed the door back and stated, "Oh, Fuck! Oh, Fuck!" H███████y reported due to Lang's reaction when he opened Woods's door, resident Ra████ [W████] "instantly knew" Woods had killed himself. H███████y said Lang then directed residents to go to their bedrooms. H████████y said when the ambulance arrived they tried to use a defibrillator on Woods, but they were unsuccessful. H█████y explained Woods was at the facility for three days, but Woods stayed inside his bedroom most of the entire time of his stay.

| Interviewer Name | | Interviewer County | |
|---|---|---|---|
| LORA WILLIAMS | | State Office | |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| RYAN BROWN | | Medical Professional | Referral |
| **Date Interviewed** | **Time Interviewed** | **Type of Contact** | |
| 02/22/2017 | 09:00 AM | Face to Face (Other) | |
| **Interview Location** | | | |
| Children's Hospital, OKC | | | |
| **Others Present During Interview** | | | |
| | | | |
| **Interview Summary** | | | |

Program Manager Bateman attended the Child Protection Committee meeting at Children's Hospital in Oklahoma City. Dr. Brown indicated based on the positioning of the sheet and position of Woods's neck, the death could have taken place within a 15 minute time period. Dr. Brown agreed there was a lack of supervision since the staff did not check on Woods for an extended period of time, but stated if the checks had been completed timely, it was still a possibility the death could have occurred.

| Interviewer Name | | Interviewer County | |
|---|---|---|---|
| AMY BATEMAN | | State Office | |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| PREHOSPITAL CARE REPORT | | No Relation | Referral |
| **Date Interviewed** | **Time Interviewed** | **Type of Contact** | |
| 03/06/2017 | 07:26 AM | Other | |
| **Interview Location** | | | |
| | | | |
| **Others Present During Interview** | | | |
| | | | |
| **Interview Summary** | | | |

Per the narrative of the Prehospital Care Report, Muskogee County Emergency Medical Services stated, "PT [patient] was in juvenile detention facility and gaurds [sic] stated that PT showered approx. 1830-1900 and then was locked up in cell. Guards went to check on PT and they found that he had hung himself and called 911. PT UAA was lying face down, unresponsive, GCS 3, lividity noted to upper and lower ext, PT had hung himself with a sheet from railing on sink approx. 2 ft from ground. PT was asystole on monitor, PT was not moved. PD came and took over PT, scene was marked off as possible crime scene and PT was released to care of Officer Hamlin, signature obtained." The reported noted resident Billy Woods's skin was cyanotic and cold. Per the report, dispatch for the ambulance was notified at 20:56 on 12-15-16. The unit was dispatched at 20:27; was en route at 20:58; arrived at the facility at 21:02; was in Woods's cell at 21:04; and they departed at 21:34.

Plaintiff_000016

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | Relationship | Type of Collateral |
|---|---|---|
| VIDEO NOTES | No Relation | Referral |

| Date Interviewed | Time Interviewed | Type of Contact | |
|---|---|---|---|
| 03/07/2017 | 10:54 AM | Other | |

| Interview Location |
|---|
| |

| Others Present During Interview |
|---|
| |

**Interview Summary**

6:29:46 Video begins. 6:33:08 Detention Officer Brandon Miller enters the West Wing (WW), which is where resident Billy Woods's cell #1 is located. Miller unlocks the door to the shower room, which is located directly across from Woods's room. 6:33:16 Woods exits the shower room. He rolls his dirty clothes in a towel and then leaves the WW with the bundle while Miller remains in the area. 6:34:40 Miller unlocks Woods's room door. Woods re-enters the WW. 6:43:48 Woods enters his room. Miller closes and locks the door. The flap covering the window in the door is closed. Miller moves to the doorway of the WW and appears to be talking to an unseen person in the common room. 6:35:14 Miller opens the shower room door. First unknown male resident (UMR) enters the WW, gathers hygiene supplies from a table located near the camera, and then enters the shower room. 6:36:06 Miller locks First UMR in the shower. Miller remains near the shower door and appears to be talking to someone in the common room. 6:36:35 Miller unlocks the shower room door. First UMR drops clothes outside the door, and Miller hands him a towel. Miller locks the door and leaves the WW. 6:38:16 Shift Supervisor Jarred Lang enters the WW. He appears to sneeze into his elbow and then stands in the doorway, facing the common room. 6:38:50 Lang leaves the WW. 6:50:23 Second UMR enters the WW. He stands in a corner near Woods's room before leaving approximately 20 seconds later. 6:53:10 Miller enters the WW. He unlocks the shower room door. First UMR exits the shower room, rolls up his clothes in a towel, and talks with Miller. 6:55:43 First UMR leaves WW. Miller stands in the doorway. At this point, Woods has been in his room for approximately 21 minutes without

being checked. 6:55:55 Third UMR enters the WW, gathers hygiene supplies, and enters the shower room after Miller unlocks the door. Miller then locks the door after Third UMR enters the shower room. Miller remains in the area. 6:57:22 Miller leaves the WW. 6:57:43 Miller re-enters the WW. Miller unlocks the shower room door. Third UMR tosses his clothes out and Miller hands him a towel. 6:57:51 Miller re-locks the door and leaves the WW. 7:08:15 Fourth UMR enters the WW. He sits at the table containing the hygiene supplies and then leaves the WW approximately 43 seconds later. 7:11:32 Lang enters the WW and unlocks the shower room door. Third UMR leaves the shower room, rolls up his clothes, and completes post-shower clean up. Afterward, both Lang and Third UMR leave the WW. 7:12:30 Detention Officer Jackie Winkle enters the WW with an unknown female resident (UFR). The UFR gathers her hygiene supplies and goes to the shower room; the shower room door is open. 7:13:05 Winkle leaves the WW for approximately 25 seconds, with the UFR remaining in the area. When Winkle returns, she talks briefly to the UFR. 7:13:46 Winkle locks the shower room with UFR inside. 7:14:02 Winkle leaves the WW and returns at 7:14:58. Winkle unlocks the shower room door. UFR drops her clothes outside the door, and Winkle hands her a towel. 7:15:21 Winkle locks the shower room door and leaves the WW. Woods has not been checked for approximately 41 minutes at that time. 7:30:05 Winkles enters the WW. She

unlocks the shower room door. The UFR exits the shower room and completes her post-shower clean up. 7:31:11 Winkle and the UFR leave the WW. Woods has not been checked for approximately 57 minutes at that time. 7:31:46 Fifth UMR enters the WW, followed by Miller. 7:31:52 Miller walks past Woods's door and slides his hand along the door. He does not open the door or open the flap covering the window in the door. 7:32:08 Miller leaves the WW while Fifth UMR gathers hygiene supplies, prepares for his shower, and moves about the area. It appears that Fifth UMR has access to a razor in plastic container of hygiene supplies. 7:34:08 Miller re-enters the WW with additional hygiene supplies. He provides additional supplies to the Fifth UMR. 7:34:43 The Fifth UMR enters the shower room, and Miller leaves the WW. 7:36:13 Miller enters the WW. Miller assists the Fifth UMR with hygiene supplies and then stands in the doorway leading to the common room. 7:37:15 Miller moves from the WW doorway and stands near Woods's door. Miller does not open Woods's door or open the flap covering the window. At this point, Woods has not been checked for approximately one hour and three minutes. 7:38:50 Lang

enters the WW. Miller still stands near Woods's door. Lang and Miller appear to be talking while the Fifth UMR is in the shower room with the door open. 7:39:41 Lang leaves the WW, and Miller takes an item from the Fifth UMR. The item appears to be a razor. Miller locks the shower room door. 7:40:01 Miller unlocks the shower room door. Fifth UMR tosses out clothes and receives a towel from Miller. Miller the locks the door and leaves the WW. 7:54:11 A Sixth UMR enters the WW with a mop and mop bucket. He places them in the corner near the shower room and then leaves the WW. 8:00:49 Miller enters the WW and unlocks the shower room door. The Fifth UMR completes post-shower clean up. Fifth UMR was in the shower for approximately

Plaintiff_000017

20 minutes without being checked. 8:01:59 Miller and Fifth UMR leave the WW. At this time, Woods has not been checked for approximately one hour and 27 minutes. 8:02:16 Miller and Sixth UMR enter the WW. After removing some items from the shower room, Miller leaves while Sixth UMR mops the floor in the shower room and outside the shower room door. 8:05:37 Sixth UMR leaves the WW. 8:14:23 Seventh UMR and Miller enter the WW. Seventh UMR goes into the shower room. 8:14:33 Miller locks the shower room door, with Seventh UMR inside, and leaves the WW. At this point, Woods has not been checked in approximately one hour and 40 minutes. 8:17:26 Lang enters the WW and unlocks the shower room door. Lang and Seventh UMR leave the WW. 8:36:11 Lang (continued)

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | Relationship | Type of Collateral |
|---|---|---|
| VIDEO NOTES | No Relation | Referral |

| Date Interviewed | Time Interviewed | Type of Contact |
|---|---|---|
| 03/07/2017 | 10:55 AM | Other |

| Interview Location | | |
|---|---|---|

| Others Present During Interview | | |
|---|---|---|

**Interview Summary**

(continued) enters the WW. At this point, Woods has not been checked for approximately two hours and two minutes. Lang unlocks the door to Woods's room and steps most of the way inside the room. Lang's left hip and leg are still visible to the camera. Lang backs out of the room and leaves the WW at 8:36:30. 8:37:13 Residents in the common room stand up and go to their respective rooms. Lang unlocks rooms on the WW and then locks them once residents are inside. 8:38:10 Lang leaves the WW after securing all residents on lockdown. 8:40:35 Miller and Lang enter the WW. They go into Woods's room. 8:41:16 Miller and Lang exit Woods's room. Miller does not close Woods's door completely before leaving the WW. 8:41:39 Miller returns and closes Woods's door. Miller leaves the WW again. 8:45:39 Winkle enters the WW and goes to Woods's room. She unlocks the door and enters the room. 8:46:22 Winkles leaves Woods's room and closes the door before leaving the WW. 9:01:36 Miller enters the WW followed by emergency medical technicians (EMT). Miller unlocks Woods's door, and the EMTs enter Woods's room. 9:03:14 Police arrive, followed by Winkle. Officers enter Woods's room, where EMTs are already present. 9:04:26 Miller opens the flap covering the window in the door to room #5. Miller does not check any other rooms. Residents have been on lockdown without room checks for approximately 26 minutes. Miller and Winkle remain in the area, watching police and EMTs in Woods's room. 9:05:50 Winkle and one of the EMTs leave the WW. Miller remains and appears to be talking to police and the other EMT. 9:07:52 More police officers arrive. Miller leaves the WW. 9:08:46 Superintendent Joe Washington arrives and enters Woods's room before being asked

to step out by an officer. 9:10:06 Miller returns to the WW and stands in the doorway. At this point, residents in rooms two, three, and four have not been checked for 32 minutes. 9:10:50 Miller and Washington leave the WW with some police officers. Other police officers place crime scene tape on the door to Woods's room. EMTs and police wait in the main area of the WW. 9:18:48 EMTs leave the WW. 9:28:21 Officer Don Johnson arrives and begins taking photographs. Checks of rooms #2, #3, and #4 have not been completed for approximately 50 minutes. Room #5 has not been checked in approximately 24 minutes. 9:35:44 Johnson leaves Woods's room. 10:21:18 Winkle enters the WW. She knocks on the door of room #4 and places a binder on the table. At this point, rooms #2, #3, and #4 have not been checked for approximately one hour and 43 minutes. Room #5 has not been checked for one hour and 17 minutes. 10:21:29 Miller enters the WW, carrying a cup. 10:21:39 Winkle unlocks room #4 and appears to be administering medications to the resident. 10:22:44 Winkle closes the door to room #4 and locks it. 10:23:01 Miller opens the window flap on the door of room #5 and checks the resident. The room has not been checked for approximately one hour and 19 minutes. 10:23:06 Winkle opens the window flap on room #3 and checks the resident through the window. The room has not been check for approximately one hour and 45 minutes. 10:23:26 Miller opens the window flap on room #2 before opening the door.

The room has not been checked for approximately one hour and 45 minutes. 10:24:27 Winkle and Miller leave the WW. 10:26:07 Miller enters the WW and goes to room #3. Miller unlocks the door and opens it. After appearing to speak to the resident, Miller closes the door and then moves to room #2. He opens the door, appears to speak to the resident, and then closes the door. Miller repeats the action with room #5. 10:27:24 Miller leaves the WW. 10:47:06 Miller enters the WW. He unlocks room #5, opens the door, and then closes the door. Miller then checks on rooms #4, #3, and #2 through the window flap. Room #5 had not been checked in approximately 20 minutes. Room #4 had not been checked in approximately 26 minutes. Room #2 and #3 had not been checked in approximately 24 minutes. 10:47:35 Miller leaves the WW. 10:57:06 A worker from the funeral home enters Woods's room with a gurney. 11:00:57 The funeral home worker leaves Woods's room with Woods's body, covered, on the gurney. 11:23:01 An unknown worker enters Woods's room to clean. 11:25:01 Checks of rooms #2 through #5 are completed through the window. It has been 36 minutes since the rooms were checked. 12:06:39 Checks of rooms #2

Plaintiff_000018

| through #5 are completed through the window. It has been approximately 41 minutes since the rooms were checked. 12:31:55 Checks of rooms #2 through #5 are completed. It has been approximately 25 minutes since the rooms were checked. 12:44:11 Checks of rooms #2 through #5 are completed. It has been approximately 14 minutes since the rooms were checked. | |
|---|---|
| **Interviewer Name** SHANNON IWANSKI | **Interviewer  County** State Office |

| **Collateral Name** HISTORY SEARCH | **Relationship** No Relation | **Type of Collateral** Referral |
|---|---|---|
| **Date Interviewed** 03/10/2017 | **Time Interviewed** 07:54 AM | **Type of Contact** Other |
| **Interview Location** | | |
| **Others Present During Interview** | | |

**Interview Summary**
This investigator conducted history searches in the OCA CCM database and KIDS database for the Alleged Victim(s) and Accused Caretaker(s), and in the Oklahoma State Courts Network (OSCN) and On Demand Court Records (ODCR) public databases for the Accused Caretaker(s).  Any relevant history, in light of the current investigation, is as follows: Billy Woods was an alleged victim in two prior Neglect-Lack of Supervision allegations. Both of the allegations occurred in a family setting.  The outcomes were one Services Recommended and one No Finding-Failure to Cooperate. Investigator found no criminal history.

| **Interviewer Name** SHANNON IWANSKI | **Interviewer  County** State Office |
|---|---|

| **Collateral Name** AREAS OF CONCERN | **Relationship** No Relation | **Type of Collateral** Referral |
|---|---|---|
| **Date Interviewed** 03/16/2017 | **Time Interviewed** 08:36 AM | **Type of Contact** Other |
| **Interview Location** Part One | | |
| **Others Present During Interview** | | |

**Interview Summary**
1. The Daily Notes sheet for resident Billy Woods was pre-emptively filled out for the entire 3:00 pm to 11:00 pm shift on 12-15-16. Woods's body was discovered in his cell at 8:34 pm, after Woods had not been checked for approximately two hours and two minutes. Checks were initialed through 10:45 pm as having been completed. Shift Supervisor Jarrod Lang admitted he had filled out the sheet ahead of time, but claimed he had never done that before for any resident. Lang also filled in the initials for Detention Worker (DW) Brandon Miller. According to Lang and DW Jackie Winkle, shift supervisors are permitted to write in the initials of other staff who complete checks, even if the shift supervisor does not complete that check. 2. The Daily Notes sheet for Woods had initials for Miller and Lang at 6:45 pm, 7:00 pm, 7:15 pm, 7:30 pm, 7:45 pm, 8:00 pm, 8:15 pm, and 8:30 pm. A review of video showed none of these checks were completed by any staff. Miller, Lang, and Winkle were all in the area directly outside of Woods's room at multiple and various times during the times in question, but checks were not completed. At approximately 7:32 pm, Miller placed his hand on the door to Woods's room, but he did not check on Woods. At approximately 7:37 pm, Miller was standing beside Woods's door, but did not check on Woods. 3. The Daily Notes sheets for the other nine residents in the facility did not have 15-minute checks documented from 8:00 pm to 10:45 pm. 4. Lang placed residents on lockdown at approximately 8:37 and had finished securing all residents in their rooms on the West Wing, where Woods resided, by approximately 8:38 pm. Video was not provided for the East Wing, so it cannot be determined at what time the residents on

that wing were secured in their rooms. Fifteen minute checks were not completed for residents on the West Wing until Miller opened the flap covering the in-door window for room #5 at approximately 9:04 pm. At that point, 26 minutes had passed without any checks. Miller did not check the residents in rooms #2, #3, or #4 at that time. 5. At approximately 10:21 pm, Winkle appeared to be administering medication to the resident in room #4. At that point, the resident had not been checked for approximately one hour and 43 minutes. Miller and Winkle then conducted checks of rooms #2, #3, and #5. Rooms #2 and #3 had not been checked for approximately one hour and 45 minutes, and room #5 had not been checked for one hour and 19 minutes. None of these checks were documented on the Daily Notes. These four rooms were not checked again until approximately 10:47 pm, which was approximately 26 minutes since the last check. These four rooms were then checked again at approximately 11:25 pm, which was approximately 36 minutes since the last check. These four rooms were not checked again until approximately 12:06 am, which was approximately 41 minutes since the last check.  6. An unknown male resident was left unsupervised, by Miller, with access to a shaving razor for approximately four minutes. The razor was in his hygiene box, which was sitting on the table in the West Wing.

Plaintiff_000019

Video showed the resident picking up the razor and rubbing his thumb over the blades. 7. An unknown male

resident was locked in the shower room for approximately 20 minutes without being checked. 8. Lang said when he reported to work at 3:00 pm on 12-14-16, he had to complete Woods's intake. Lang said Woods was not cooperating with the process, so Lang placed Woods in a room until approximately 7:00 pm. Lang said Woods then cooperated with the process and finished the intake process, which included a suicide assessment. Woods was in a room for approximately four hours without having a suicide assessment completed. It is unknown how often Woods was checked during that time. 9. In Woods's suicide assessment, he reportedly said he had attempted multiple times to commit suicide and had a family member who had successfully committed suicide. Woods also reportedly said he had attempted to hang himself approximately one month prior to being placed at the facility. When asked if he relayed any of that information to a supervisor, Lang said he was going to tell Superintendent Joe Washington about it, but he forgot. Woods was not placed on suicide precautions because he reportedly said he did not intend to kill himself at that time. 10. Woods did not sign his suicide assessment, although he

signed all other documents in his intake paperwork. 11. Lang said he does not have a background in psychology or psychiatry. It is unclear if other shift supervisors have a background in psychology or psychiatry. Shift supervisors are tasked with conducting suicide assessments, apparently with no formal training on recognizing signs and symptoms of suicidal ideations or behaviors. The facility does not have a qualified mental health professional administer suicide assessments. 12. Detention Workers only know that a resident is on suicide precautions if it is discussed during a shift change. Reportedly, there is no indication on a resident's Daily Notes or near his/her room if he/she should be monitored for suicidal behavior. Extra steps are not taken to ensure that heightened monitoring is completed. 13. Miller said he did not know anything about Woods until he saw Woods during shower time at approximately 6:30 pm on 12-15-16. Miller's shift did not begin until after 3:00 pm that day, so he had no way of knowing that Woods had a history of suicidal behavior or attempts. It is unclear how information is relayed if at all to workers who are not able to attend a shift change meeting. 14. The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Suicide Prevention and Control section (page 19) states (in part): "When the juvenile is in his/her room they are monitored by intercom and visually observed every five (5) minutes." Lang, Miller, and Winkle

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| AREAS OF CONCERN | | No Relation | Referral |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 03/16/2017 | 08:47 AM | Other | |

**Interview Location**
Part Two

**Others Present During Interview**

**Interview Summary**
all indicated checks for residents on suicide precautions were to be conducted every 15 minutes. None of them indicated any knowledge of 5-minute check requirements for suicide precautions. None of them appeared to know residents were to be monitored with the intercom, too. 15. Resident J___ H___ was placed at the facility from 12-20-16 to 12-22-16, after Woods's death. H___ said he was placed on suicide precautions during his placement, and he had his bedding and clothes removed. H___s said staff checked on him "a lot" during that time. H___s said his room was cold, and without any way to stay warm, he resorted to sleeping while sitting on the metal toilet. H___s said he had requested a sweatshirt prior to his clothes being removed, but staff did not get him a sweatshirt. H___ reported other residents were given sweatshirts. H___ns said staff ignored him when he made requests. The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Suicide Prevention and Control section (page 19) states (in part): "The juveniles [sic] bed linens are removed from their room and clothing can be removed if they attempt to use them to cause bodily harm. When the juvenile demonstrates to staff that the threat of suicide is no longer real, his/her caseworker and/or medical authority considers the threat of suicide no longer real, his bed linens and clothing will be returned to him/her." It is unknown how a determination was made to remove H___ from suicide precautions. 16. The Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Medical section (page 16) states (in part): "If a juvenile is seriously injured or has a medical emergency, the following procedures

should be followed: 1) One staff member is to administer first aid if necessary. One staff member is to secure the remaining population. 2) The Administrator is to be called immediately. If it is a life or death situation the shift supervisor is to call 911 before notifying the Administrator." Washington said staff called him prior to calling 911, and he had to tell them to call 911. 17. Woods was discovered at approximately 8:36 pm. 911 was not called until 8:56 pm. Lang, Miller, Winkle, and Detention Worker Angela Miller could not account for the 20-minute delay in seeking emergency medical attention for Woods. 18. B. Miller said after Woods was discovered, B. Miller and Lang went to Woods's room because B. Miller was going to do CPR. However, B. Miller said when they got to Woods's room, Lang told him not to do CPR. When asked any questions about performing CPR on

Plaintiff_000020

Woods, B. Miller resorted to saying he had been instructed not to do CPR. B. Miller said if a similar situation had occurred at his home with a family member, he would have performed CPR and called 911. 19. B. Miller said he did not receive training on the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center. B. Miller said a supervisor "skims through" the manual with employees. B. Miller signed a form indicating he had read the manual and understood it. 20. Lang said he had worked at the facility for approximately eight months, and he had been a shift supervisor for four or five of

those eight months. Lang indicated he did not have any prior experience in a similar field or facility. According to the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center Shift Supervisor Job Description, an employee must have "one year experience working with juveniles" in order to qualify for the position. 21. Lang said he had not received any formal training to work at the facility. Lang also said there "disagreements about staff being trained wrong" once they began their on-the-job training. Lang said he had one class on restraint, and he was taught to "swoop and grab from behind." Lang did not know the restraint technique he had training for. 22. Winkle said she had not received any training on how to restrain a resident. 23. Lang said he was required to sign a form stating he had received and read the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center before he had a chance to actually read the manual. 24. Lang said he had read "most" of the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center, but he did not understand all of what he read. Lang said when he asked questions about

the manual, "a few" of them were answered. 25. Lang said he did not receive any formal training to be a Shift Supervisor. Lang said there were "a few shifts" where he received on-the-job training, but he was mostly left on his own to figure things out. 26. When asked how he knew Woods was deceased upon entering Woods's room, Lang said it was "obvious" because Woods was "purple" and "pale." Lang said he also called Woods's name, and when Woods did not respond, Lang knew he was dead. Lang admitted he did not attempt to remove the sheet from Woods's neck, and he did not attempt to perform CPR. Lang said he "panicked and got out of there." 27. Lang admitted that he told A. Miller to call Washington before she called 911. 28. Winkle said a copy of the Policies and Procedures for the Muskogee County Regional Juvenile Detention Center was maintained in the control room so that everyone could access it. However, A. Miller said when they were dealing with the emergency situation no one knew what to do. No staff mentioned accessing the manual to determine what to do. 29. Lang said he and B. Miller went to Woods's room together, and Lang nudged Woods's body with his foot. Lang said Woods did not respond. Neither Lang nor B. Miller attempted to loosen the sheet or to perform CPR at that time. Lang said after they left the room, he went outside and "smoked a bunch of cigarettes." Lang said staff came outside a few times to check on him, but he could not deal with the situation.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

| Collateral Name | | Relationship | Type of Collateral |
|---|---|---|---|
| AREAS OF CONCERN | | No Relation | Referral |
| Date Interviewed | Time Interviewed | Type of Contact | |
| 03/16/2017 | 08:55 AM | Other | |
| Interview Location | | | |
| Part Three | | | |
| Others Present During Interview | | | |

**Interview Summary**

30. Lang said he had been trained in CPR by the American Red Cross. Lang could not remember what he had been trained to do if he discovered an unconscious victim. 31. Winkle said calling 911 was an "automatic" thing to do in a medical emergency. However, she could not account for why it had taken staff 20 minutes to call 911 after Woods's body was discovered. 32. Winkle went into Woods's room after his body was discovered. Winkle admitted she did not attempt to loosen the sheet around his neck, check for a pulse, check for respiration, or perform CPR. Winkle said she did not perform CPR because she did not know if the room was a crime scene. Winkle said she thought policy stated facility staff should perform CPR on a victim until paramedics arrived. 33. A. Miller admittedly did not know any of the protocols for a medical emergency at the facility. 34. The facility was not equipped with an Automated External Defibrillator (AED). 35. It was reported by some residents who were placed at the facility during the time Woods was there that Lang made fun of the way Woods talked. Woods also reportedly wanted to be addressed by his middle name, Duane, and Lang reportedly made fun of that name and would say it in a way that was perceived as being belittling or ridiculing. Reportedly, Lang's actions contributed to Woods not wanting to be out of his room and with the rest of the residents. 36. A staff known only as "Mr. Anthony" reportedly made fun of resident R████t G██t and called G██t "retard" or "retarded." This behavior reportedly occurred over multiple times that G██t was placed at the facility, not just during the dates in question during December, 2016.

| Interviewer Name | Interviewer County |
|---|---|
| SHANNON IWANSKI | State Office |

Plaintiff_000021

**Report to DA Approval Request**
SHANNON IWANSKI    03/21/2017

_____

Social Service Inspector                                    . Date

**Report to DA Approval**
AMY BATEMAN    04/18/2017

_____

Supervisor                                              Date