## **VERIFICATION**

    I, Peter Ash, M.D., declare under penalty of perjury under the laws of the United States, that I drafted the attached expert report, dated February 5, 2019, and that the statements and opinions therein are true and correct, to the best of my knowledge and belief.

Executed on: _April 4, 2019_
               (date)

_____
Peter Ash, M.D.

PLAINTIFF'S EXHIBIT 25

**Peter Ash, M.D.**

P.O. Box 15315
Atlanta, Georgia 30333-5315

tel (404) 727-3244

Practice limited to Psychiatry:
   Adults
   Children and adolescents
   Forensic

American Board of Psychiatry and
   Neurology:
   Diplomate in Psychiatry
   Diplomate in Child Psychiatry
   Diplomate in Forensic Psychiatry
Diplomate, American Board of Forensic
   Psychiatry

February 5, 2019

Robert M. Blakemore, Esq.
Smolen, Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119

                    re:    Estate of Billy Woods v Muskogee County
                           Council of Youth Services et al

Dear Mr. Blakemore:

At your request, I reviewed records in the above-cited case that involves the suicide of Billy Woods (hereafter Billy) at the age of 16 (d.o.b. ▓▓▓▓▓0) which occurred on December 15, 2016, while he was in custody in the Muskogee County Regional Juvenile Detention Center (MCRJDC) in Muskogee, Oklahoma. I understand you represent Mr. Woods' estate in litigation regarding his suicide. I was asked to review the assessment and treatment Mr. Woods received and the extent to which that assessment and treatment contributed to his death.

## Qualifications

I am a Professor of Psychiatry and Behavioral Sciences at Emory University and am Board-certified in general psychiatry, child and adolescent psychiatry, and forensic psychiatry. I have served as a mental health consultant to the Georgia Department of Juvenile Justice and as the mental health expert for the U.S. Department of Justice in investigations of care provided in juvenile detention centers in Arkansas, Indiana, and South Dakota. I have authored chapters on adolescent suicide in journals and in standard textbooks in general psychiatry and forensic psychiatry. As a member of the American Psychiatric Association (APA) Council on Psychiatry and Law, last year I chaired the workgroup that developed the APA position statement on juveniles in solitary confinement. A copy of my current curriculum vitae is attached to this report which provides more detail regarding my publications and qualifications.

## Records reviewed

    Amended complaint filed May 15, 2018
    Office of Client Advocacy (OCA) report dated April 20, 2017
    Medical examiner's report dated January 13, 2017
    Oklahoma Office of Juvenile Affairs Requirements of Secure Juvenile Detention Centers

re: Billy Woods' suicide

    Muskogee County Regional Juvenile Detention Center documents:
        Records pertaining to Billy Woods
        Policies and procedures
        Staff meeting notes July 2015- December 2016
        Job descriptions
        Selected emails (MCCOYS numbered 806-809)
    Documents from Muskogee County EMS
    Jerrod Lang's training folder (Ex 33)
    Photographs of suicide scene
    Deposition of Heath Woods, Billy's father, taken Nov. 30, 2018

**Course of events**

The following facts were derived from the sources cited above. There may be other pertinent facts in the history that I am not aware of, or other sources that are at variance with the details below. Such new facts could potentially significantly alter the opinions based on the facts cited below.

*Assessment*

Billy Woods, a 16 year-old boy, was admitted to the Muskogee County Regional Juvenile Detention Center for being a runaway on December 14, 2016, the day before his suicide. He was initially placed in a room for 4 hours with no suicide assessment. The assessment was conducted by the shift supervisor, Jerrod Lang, who, when interviewed by the OCA, said he had "no formal training" for working in the facility. The assessment indicated that Billy had made multiple prior suicide attempts and had tried to hang himself about a month previously. He was not put on suicide watch, presumably because he said he was not suicidal at that time. The findings of the assessment did not trigger any assessment by a mental health professional at any time. Staff reported that there were no mental health staff available to conduct suicide assessments, and it was unclear from the material reviewed whether there were any mental health services available in the detention center. The staff were also unaware that facility policies required that a youth placed on suicide watch needed to be observed every 5 minutes. Therefore, even had the staff placed Billy on suicide watch, he would only have been observed every 15 minutes.

*Treatment of Billy*

Despite the history of suicidal behavior, Billy was not referred for mental health assessment or treatment, and he received no mental health assessment or treatment during his incarceration.

According to the OCA report, another inmate, Da▮▮l Sa▮▮, reported that Mr. Lang "made fun of the way he [Woods] walked" and ridiculed him about his name. When Billy spent a great deal of time in his room, Mr. Sa▮ said Lang should probably check on Woods because "he could be in there killing himself" and that Woods was the one inmate who was not checked on. Ro▮▮ Gr▮▮ reported that Mr. Lang was "always mean to him" and made fun of his name. The OCA report made a finding of abuse (mental injury) because of Mr. Lang's behavior.

The Policies and Procedures for the Muskogee County Regional Detention Center under "L. Staffing

Standards" (p. 15) state:
> "The staff must always remember that the most effective tool for the security and control of the juveniles in residence is a positive relationship between the staff and juveniles. A staffing pattern has been established that will allow maximum interaction with the juveniles."

*Monitoring*

By policy, all inmates in the facility were to be observed every 15 minutes. It was clear that Billy was not observed with that frequency on the 3 PM to 11 PM shift on December 15, the day of his suicide. The OCA report of the video of the area indicates that Billy was last observed around 6:34 pm, a little over 2 hours prior to the hanging being discovered. While the daily notes have initials that record that a detention officer, Brandon Miller, observed him every 15 minutes, video records do not support that he was observed. The OCA report documents that Mr. Lang, in fact, admitted he had initialed the times, not Mr. Brandon, and the initials included times after Billy's was discovered at 8:36 pm with a sheet tied around his neck. Mr. Lang admitted that he "jumped the gun" on the paperwork. There are documented instances of officers standing outside Billy's room around 7:30 pm but not checking on him. From the materials, it appears that there was also an intercom system that allowed staff to talk to youth in their rooms, but there is no evidence anyone communicated with Billy in the two hours before his suicide was discovered.

*Actions on discovering Billy hanging*

At about 8:36 pm, Mr. Lang discovered Billy in his room with a sheet tied around his neck and hanging from a low bar. Photographs of the scene show Billy's head hanging in a very loose noose, considerably larger than the diameter of his neck, close enough to the floor such that by straightening his arms, Billy could have relieved the pressure on his neck. It's not completely clear to me whether the noose was loosened after he was discovered but before the photograph was taken by Officer Don Johnson of the Muskogee Police Dept. Between 9:28 and 9:35. According to the OCA report, Mr. Lang did not remove the sheet and instructed another officer, Miller, not to conduct CPR, because he thought Billy was already dead. Instead of immediately calling 911, Mr. Lang went out to smoke cigarettes. Approximately 20 minutes after discovering Billy, 911 was called, and Billy was pronounced dead at 9:05. According to the EMS report "PT WAS NOT MOVED," "PD CAME AND TOOK OVER PT, SCENE WAS MARKED OFF AS POSSIBLE CRIME SCENE" (EMS 000010-caps in original).

According to Superintendent Joe Washington, Billy was to have been discharged from the facility the following day.

*Subsequent investigation*

The Oklahoma Office of Client Advocacy conducted an investigation of Billy Wood's death and issued a report dated April 20, 2017. They interviewed workers and other residents at the detention facility and issued a number of findings, including a finding of "Abuse substantiated" by Jerrod Lang, "neglect substantiated" by Jerrod Lang, Brandon Miller, and Angela Miller, and "caretaker misconduct confirmed" by Jerrod Lang, Brandon Miller, Angela Miller, and Marietta Winkle.

re: Billy Woods' suicide

**Opinions**

The opinions below are based on the information I have reviewed up until this time. In the event further information becomes available, I reserve the option of revising or extending these opinions. I hold the following opinions to a reasonable degree of medical certainty:

1. Assessing adolescents for suicidality and other mental health problems should occur very shortly after a youth is admitted to a detention center. If the assessment is delayed, the youth should be continuously observed pending the assessment. That did not occur in this case. It is well known that suicide risk in juvenile detention is highest in the first 72 hours after admission.[1]

2. The standard of care in juvenile detention facilities is that suicide assessments should be done by personnel trained in the assessment technique. Mr. Lang conducted Billy's assessment. The OCA report documents that Mr. Lang had "no formal training" to work at the facility, and there is no indication that he received special training in suicide assessment. There should be clear criteria for referring youth with serious risk factors to a trained mental health clinician for more detailed assessment and follow-up. That standard was not met in this case. In addition, the findings of Billy's suicide risk were supposed to be passed on at the shift change, but were not.

3. There is considerable evidence that Mr. Lang ridiculed Billy, and the OCA made a finding of abuse (mental injury) by Mr. Lang. Such ridicule would likely have at least two main effects. First, in a vulnerable youth, it would likely decrease self-esteem and so increase depression. Second, such abuse would make it less likely that a youth would confide any depressive or suicidal thinking in the person who was ridiculing them, and be less likely to confide in other staff as well. Thus the likelihood of suicidal behavior would increase, and the likelihood that staff would learn about a youth's increasing suicidality would decrease. Both factors likely contributed to Billy's mental deterioration and ultimate suicide.

4. Youth in the Muskogee County Regional Juvenile Detention Center should be monitored at least every 15 minutes. The policy was not followed in this case. Billy was not monitored for the two hours during which he stripped his bed of his sheet, tied the sheet around a low towel bar, made a noose around his neck, and hanged himself.

   The means of suicide are important in this case. Death by hanging can occur in a number of different ways, depending on the positioning and force applied to the neck. It takes considerably more force to constrict the airway than it does to occlude the veins or arteries in the neck. Billy hanged himself from a low towel rack, so unless he pulled the noose very tight, the force applied by his head hanging would have been relatively low and thus death likely occurred from venous occlusion reducing the return of blood from the brain. Depending on how completely the veins were occluded, death would have come considerably more slowly than it would have had he suspended his entire body from a ceiling.

---

[1] Hayes LM: Juvenile suicide in confinement-findings from the first national survey. Suicide Life Threat Behav 39:353-63, 2009

- 4 -

re: Billy Woods' suicide

While we don't know how long it actually took from the time Billy started taking the sheet off his bed until he was dead, there is a good chance that had he been observed every 15 minutes, the sequence could have been interrupted. The clear failure to monitor him, in my opinion, contributed to his death.

Photographs of the scene show Billy's head in a very loose noose. From the photographs it appears that simply by straightening his arms or bending his knees he could have relieved the pressure on his neck without having to loosen the noose at all. It's not altogether clear to me whether the noose was loosened after he was discovered but before the photographs were taken, but the available evidence I reviewed suggests it was not. If the finder of fact concludes the noose was that loose when he committed suicide, his ability to easily relieve the pressure raises the very real possibility that he may have interrupted the suicidal sequence one or more times before passing out, which would have further extended the time that, had he been observed, the fatal sequence could have been interrupted.

5. When Billy was discovered hanging, it is striking that there was no intervention for at least 20 minutes: the noose was not loosened, there was no attempt to take a pulse, 911 was not called, and CPR was not attempted. Had Billy still been alive at the time of discovery, potentially his life could have been saved. The OCA report found the failures to intervene to constitute neglect. The failure of the staff to attempt resuscitation is also consistent with and provides evidence for a strong pattern of the staff not caring about or focusing on the well-being of the youth under their care, a pattern which would increase suicidality in vulnerable youth.

6. Given the totality of the above multiple issues, it is my opinion to a reasonable degree of medical certainty that had the proper policies been followed and had Billy not been emotionally abused by detention center staff, it is more likely than not that he either would not have made a suicide attempt or his suicide attempt would have been discovered and interrupted prior to his death.

If you have questions about this report, I would be happy to try to answer them. I am attaching a copy of my curriculum vitae which lists my qualifications for conducting this case evaluation.

Sincerely,

*Peter Ash, MD*

Peter Ash, M.D.

enc: CV
.